## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

IN RE: Quintus Corporation, et al.

| | |
|---|---|
| Avaya, Inc. | ) |
| | ) |
| Appellant, | ) C.A. No. 06-769 (SLR) |
| | ) |
| v. | ) |
| | ) |
| KURT F. GWYNNE, Chapter 11 | ) Bankruptcy Case No. 00-01-00501 through |
| Trustee, | ) 01-00503 (MFW) |
| | ) Adv.  04-53074 |
| Appellee. | ) AP    06-06-73 |

## OPENING BRIEF OF DEFENDANT AVAYA
## IN SUPPORT OF ITS APPEAL FROM AN ORDER
## OF THE BANKRUPTCY COURT

ROSENTHAL, MONHAIT & GODDESS, P.A.
Jeffrey S. Goddess (Del. Bar. No. 630)
919 N. Market Street, Suite 1401
Wilmington, DE 19801
jgoddess@rmgglaw.com
(302) 656-4433

- and -

SIDLEY AUSTIN LLP
James D. Arden
787 Seventh Avenue
New York, NY 10019
(212) 839-5300

April 9, 2007                              *Attorneys for Appellant*

**TABLE OF CONTENTS**

**PAGE**:

TABLE OF CITATIONS ii

NATURE AND STAGE OF THE PROCEEDINGS 1

SUMMARY OF ARGUMENT 2

STATEMENT OF FACTS 5

   A.   The Asset Purchase Agreement 6

   B.   "Accrued or Recorded" 8

   C.   The April 5, 2001 Initial Schedule 9

   D.   The April 20, 2001 Final Schedule 10

   E.   Payment of Assumed Liabilities From 11
       April - June 2001

   F.   Debtors' Books and Records 13

   G.   Procedural History 14

ARGUMENT 15

   I.   AVAYA WAS ENTITLED TO SUMMARY JUDGMENT 17
       THAT IT ONLY ASSUMED THOSE LIABILITIES LISTED
       ON THE FINAL SCHEDULE

       A.   "Books and Records" 17

       B.   Avaya Did Not Assume Post-Closing Liabilities 18

       C.   Vendor Invoices Are Not Books And Records 20

       D.   Debtors' Bankruptcy Schedules Are Not Books 21
          And Records

       E.   The Final Schedule Reflects All Assumed Liabilities 22

II.     THE BANKRUPTCY COURT'S FINDING THAT AVAYA                    25
        INTENTIONALLY DESTROYED EVIDENCE IS WHOLLY
        UNSUPPORTED

        A.    There Is No Evidence That Avaya Destroyed Documents   27
              At A Time When It Could Have Reasonably Anticipated
              Litigation Over The Payment Of Assumed Liabilities

        B.    There Is No Evidence That Avaya Intentionally Or       30
              Fraudulently Destroyed Evidence

        C.    There Was No Evidence Of Prejudice By The Alleged      31
              Destruction Of Evidence

        D.    The Bankruptcy Court's Award Of $1,888,410.52 Is       33
              Inconsistent With The APA

CONCLUSION

\*   \*   \*

A.    Opinion of Bankruptcy Court;
      Adv. No. 04-53074; Oct. 30, 2006 (D.I. 120)

B.    Order of Bankruptcy Court;
      Adv. No. 04-53074; Oct. 30, 2006 (D.I. 121)

## TABLE OF CITATIONS

**CASE**:                                                                                      **PAGE**:

*Anderson v. Liberty Lobby, Inc.*,                                                               15
    477 U.S. 242 (1986)

*Brewer v. Quaker State Oil Refining Corp.*,                                               16, 26, 30
    72 F.3d 326 (3d Cir. 1995)

*Caines v. Hendricks*,                                                                           15
    2007 WL 496876 (D.N.J. Feb. 9, 2007)

*Celotex Corp. v. Catrett*,                                                                      15
    477 U.S. 317 (1986)

*In re General DataComm Indus.*,                                                               16
    407 F.3d 616 (3d Cir. 2005)

*Hartford Ins. Co. of Midwest v. Am. Automatic Sprinkler Systems, Inc.*,                       33
    201 F.3d 538 (4th Cir. 2000)

*Hickman v. Carnival Corp.*                                                                      28
    2005 WL 3675961 (S.D.Fla. July 11, 2005)

*Kronisch v. U.S.*,                                                                           27, 30
    150 F.3d 112 (2d Cir. 1998)

*Menz v. New Holland North America, Inc.*,                                                      26
    2006 WL 645908 (8th Cir. March 16, 2006)

*Newport Assocs. Dev. Co. v. Travelers Indemnity Co. of Ill.*,                                 16
    162 F.3d 789 (3d Cir. 1998)

*Paramount Pictures Corp. v. Davis*,                                                            33
    2005 WL 3303861 (E.D.Pa. Dec. 2, 2005)

*Pfizer, Inc. v. Int'l Rectifier Corp.*,                                                        27
    538 F.2d 180 (8th Cir. 1976)

*Schmid v. Milwaukee Elec. Tool Corp.*,                                                      16, 31, 33
    13 F.3d 76 (3d Cir. 1994)

*SEC v. Hughes Capital Corp.*,                                                15
    124 F.3d 449 (3d Cir. 1997)

*Shamis v. Ambassador Factors Corp.*,                                    27, 28
    34 F.Supp.2d 879 (S.D.N.Y. 1999)

*Shepherd v. Am.Broad. Cos.*,                                                27
    62 F.3d 1469 (D.C. Cir. 1995)

*Tamarind Resorts Assoc. v. Government of the Virgin Islands*,               16
    138 F.3d 107 (3d Cir. 1998)

*In re Trans World Airlines, Inc.*,                                          16
    145 F.3d 124 (3d Cir. 1998)

**OTHER AUTHORITIES**:

29 Am.Jur.2d Evidence §177                                                   26

**RULES**:

Fed. R. Civ. P. 56                                                           15

Pursuant to Federal Rule of Bankruptcy Procedure 8001, Defendant-Appellant Avaya, Inc. ("Avaya") respectfully submits this Opening Brief in Support of its Appeal of the Order and Opinion (the "Opinion") of the Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") granting and denying in part the parties' motions for summary judgment and granting the Chapter 11 Trustee's Motion for Sanctions for the Spoliation of Evidence and awarding judgment to the Trustee in the amount of $1,888,410.52.[1]

## **NATURE AND STAGE OF THE PROCEEDINGS**

This case arose over the Trustee's belated effort to expand the scope of Avaya's assumption of certain liabilities in connection with its 2001 acquisition of Debtors' assets pursuant to an Asset Purchase Agreement (the "APA"). Under the APA and by its terms, Avaya assumed "all liabilities accrued or recorded after the Balance Sheet Date in the ordinary course of business consistent with past practice." After evaluating the parties' cross-motions for summary judgment, the Bankruptcy Court properly concluded that this clause obligated Avaya to assume only those liabilities that were reflected ("accrued or recorded") in the Debtors' books and records ("Assumed Liabilities"). However, the Bankruptcy Court failed to abide by its own contractual interpretation when it further concluded, among other things, that Avaya assumed liabilities which were not accrued or recorded on the Debtors' books, but which were listed on Debtors' bankruptcy schedules and creditor invoices, and also had assumed other liabilities never entered on the books and records of the Debtors. Even if the APA were rewritten to enlarge the defined scope of Assumed Liabilities to include these items, the maximum amount of unpaid Assumed Liabilities would be $752,696.76, which is far less than the $1,888,410.52 awarded to the Trustee.

---

[1]     A copy of the Opinion and of the Order of the Bankruptcy Court are attached hereto for the Court's ready reference.

The Bankruptcy Court awarded $1,888,410.52 to the Trustee based on the

Bankruptcy Court's legally and factually unsupported conclusion that Avaya intentionally

destroyed relevant evidence. But there was no evidence of intent to destroy evidence; rather,

Avaya had merely reformatted a computer server containing certain payment records back at a

time when its business records showed that only a few Assumed Liabilities remained to be paid,

when there was no dispute as to Avaya's intent to pay these, and no litigation as to those

liabilities or any other liabilities had been filed, threatened, or even contemplated. Moreover, the

$1,888,410.52 awarded, which is largely based on claims asserted well after the Closing, is an

amount well in excess of any amount that conceivably could have been recorded in the Debtor's

books and records, and thus has no basis in the parties' contract.

In short, the Bankruptcy Court's ruling is completely at odds with well-

established precedent and the uncontradicted testimony below. It should be reversed.

## SUMMARY OF ARGUMENT

1.      The Bankruptcy Court properly dismissed the Trustee's unjust enrichment claim

on the ground that this claim is "exclusively governed by the APA." (Opinion at 12-13.) The

Trustee has not appealed this determination.

2.      In addressing the parties' core dispute over the meaning of the phrase "accrued or

recorded" in Schedule 1.03, the Bankruptcy Court correctly held that "Avaya assumed only

obligations that were reflected in the Debtors' books and records." (Opinion at 20.) This ruling

too has not been appealed.

3.      The Bankruptcy Court ignored the force and effect of its own interpretation of the

APA when it awarded the Trustee judgment in the amount of $1,888,410.52. (See Quintus

Corp., Mustang.com, Inc. & Acuity Corporation v. Avaya, Inc., Adv. Proceeding No. 04-53074-

MFW, Docket Index Number ("D.I.") 120, 121.) According to the uncontroverted evidence, the Bankruptcy Court's ruling on the language of the APA should have resulted in a damages award of approximately $138,000 in taxes and some additional amount representing trade payables for which checks had been issued by Avaya but not cashed by the trade creditors.[2]

4.      The Bankruptcy Court improperly held that Avaya was obligated to assume liabilities that were not, and in many cases could not have been, reflected in Debtors' books and records, including all liabilities listed on Debtors' bankruptcy schedules (even though these schedules do not constitute corporate books and records and do not satisfy the "ordinary course of business" requirement under Schedule 1.03) (Opinion at 24-25), amounts set forth on invoices submitted to Debtors on which notations were made (even when Debtors did not accrue or record such amounts in their books) (id. at 31-32), and liabilities entered after the transaction contemplated by the APA closed in books and records that belonged to Avaya (id. at 32).

5.      The Bankruptcy Court's rulings were unsupported by any evidence and disregarded the uncontroverted testimony of Mark Thompson that the schedule of Assumed Liabilities he prepared on April 20, 2001 reflected the contents of Debtors' books and records as of the date the transaction contemplated by the APA closed.

6.      Even assuming the Bankruptcy Court's erroneous conclusions concerning the meaning of the phrase "Debtors' books and records" had some basis in fact, the maximum amount of damages that could be awarded as a result of these conclusions was $752,696.76.

7.      There was no basis for an award of sanctions in this case because the Trustee did not and could not establish that any evidence was intentionally destroyed by Avaya to obstruct a

---

[2]      Thus, while Avaya had reason to believe as of June 2001 that all trade payables had been paid, the subsequent failure of certain creditors to cash issued checks ultimately left certain additional amounts due.

3

pending or threatened litigation. The Bankruptcy Court imposed the severest sanction against Avaya for reformatting a computer server for business reasons, years before the commencement of this suit and in the absence of *any* evidence that *anyone* at Avaya – let alone the unknown persons responsible for the reformatting – at that time conceived of the prospect of future litigation.

8.      The Bankruptcy Court's finding that Avaya "should have anticipated litigation" at the time of the reformatting because certain Assumed Liabilities remained unpaid is inconsistent with the evidence. (Id. at 10.) At the time the reformatting occurred, only a miniscule amount of Assumed Liabilities remained unpaid – consisting primarily of taxes for which no bill had been received, but which had been accrued in the books – and there was no evidence that Avaya ever intended to disregard its contractual obligations with respect to such taxes upon receipt of tax bills. Thus, no dispute was either pending or anticipated, much less the broad dispute which arose after the appointment of the Trustee.[3]

9.      In addition, the Bankruptcy Court's award of $1,888,410.52 bears no relation to any amount that was due under the APA. That sum reflects numerous claims filed by creditors long after the petition date, including claims for rejection of contracts – claims that were not and could not have been accrued or recorded on the Debtor's books and records as of the Closing. Thus, not only was the sanction improperly imposed in the first place, but its scope went beyond the limited obligations which, on the Bankruptcy Court's own interpretation, the APA imposed.

10.     The Bankruptcy Court's imposition of sanctions was, in part, based on its mistaken notion that Section 5.05 of the APA obligated Avaya to preserve the post-Closing

---

[3]      Indeed, there was certainly no reason for Avaya to anticipate the lawsuit filed by Trustee, which was based on the erroneous theory that "accrued" liabilities were "incurred" liabilities, a theory barred (as the Bankruptcy Court found) by the express language of the APA that Avaya had negotiated.

4

payment records that were housed on the server. (Id. at 9.) Section 5.05 imposes no such

obligation, because it only addresses preservation of the Debtors' records, and not records

generated by Avaya.

11.    The Bankruptcy Court erroneously included in its judgment $228,564 for

rejection damages – a claim advanced by the Trustee for the first time in a *surreply* brief that has

nothing whatsoever to do with Avaya's obligations under Schedule 1.03 and is unrelated to any

spoliation claim – finding that Avaya had conceded its liability for such a claim, when it had

done nothing of the sort.

## STATEMENT OF FACTS

On February, 22, 2001, Quintus Corporation ("Quintus"), Mustang.com, Inc. and

Acuity Corporation (collectively, "Debtors") filed voluntary petitions under Chapter 11 of the

Bankruptcy Code. That same day, Avaya and Debtors executed the APA, whereby the parties

agreed that Avaya would purchase substantially all of Debtors' assets in exchange for a $30

million payment when the transaction closed and an agreement to assume certain of Debtors'

liabilities. (Opinion at 2.) By Order entered on April 6, 2001, the Bankruptcy Court authorized

the sale of substantially all of Debtors' assets to Avaya, free and clear of interests, pursuant to

the terms of the APA. (See 01-00501-MFW, D.I. 157; see also App. 1-63.)[4] The transactions

contemplated by the APA were consummated on April 11, 2001 (the "Closing Date").

---

[4]    References herein to App. 1, *et seq.* refer to portions of the record that are included in the
accompanying appendix.

A.    **The Asset Purchase Agreement**

The APA obligates Avaya to assume only certain of the Debtors' liabilities (the

"Assumed Liabilities"). Section 1.03 of the APA provides:

> *Assumed Liabilities.*   On the terms and subject to the conditions set forth in this
> Agreement, at the Closing, [Avaya] shall assume from [Debtors] and thereafter
> pay, perform or discharge in accordance with their terms all of the liabilities and
> obligations in Schedule 1.03, but excluding any Excluded Liabilities (the
> "**Assumed Liabilities**").

(App. 10-11 (emphasis in original).)

Section 1.03 obligated Debtors to provide to Avaya "no more than 3 business

days prior to the Closing Date" a reasonably detailed schedule "showing [Debtors'] estimate of

the Assumed Liabilities as of the Closing Date." Id.

After extensive negotiations between Avaya and Debtors, the parties agreed on

the language of Schedule 1.03, which defines Assumed Liabilities in two parts. First, Schedule

1.03 addresses the general scope of Assumed Liabilities:

> All liabilities listed on the Company Balance Sheet (exclusive of the liability
> listed thereon that is an Excluded Liability pursuant to Section 1.04(v) *and all*
> *liabilities accrued or recorded after the Balance Sheet Date* in the ordinary course
> of business consistent with past practice to the extent not satisfied prior to the
> Closing Date, provided that the aggregate amount of liabilities assumed pursuant
> to this paragraph shall not exceed $30,000,000, and provided further that in no
> event shall [Avaya] assume liabilities for any advisers to any [Debtor] in
> connection with the Chapter 11 Case or any Existing Claims in excess of an
> aggregate of $1,000,000.

(Schedule 1.03(1) (App. 62) (emphasis supplied).)[5]  The core of this litigation relates to the

meaning and application of the clause highlighted above.

---

[5]      The APA is governed by Delaware Law.  (See APA § 10.06 (App. 50-51).)  The
preamble of the APA defines "Company" to mean Quintus Corporation, one of the Debtors.  (Id.
at 1 (App. 7).)  Section 11.01 of the APA defines "Balance Sheet" to mean "Company's
unaudited balance sheet at December 31, 2000" and "Balance Sheet Date" as "December 31,
2000."  (Id. § 11.01 (App. 52).)  Section 2.01 defines "Closing Date" as the date upon which the
transactions contemplated by the APA are consummated.  (Id. § 2.01 (App. 13).)  As detailed

By contrast, the second part of Schedule 1.03 states that Assumed Liabilities also

include:

> In addition, [Avaya] shall assume each of the liabilities and obligations set forth
> in clauses a-c below, and such liabilities shall count against the $30,000,000
> limitation . . . to the extent such liabilities *are or should be accrued or recorded*
> on the Company balance sheet based on GAAP applied on a consistent basis and
> have not been satisfied at the Closing.

(Id. Schedule 1.03(1) (App. 62) (emphasis supplied).)[6] Thus, under Schedule 1.03, the liabilities

described in clauses a-c are assumed if they "are or *should be* accrued or recorded," but other

liabilities are assumed only if they in fact were "accrued or recorded." (Id. (emphasis supplied).)

This case concerns the latter category of Assumed Liabilities.

The contours of the Assumed Liabilities at issue here were the product of

extensive negotiations between counsel for the two parties. (See Deposition Transcript of Irving

L. Rotter, dated November 4, 2005 ("Rotter Tr.") at 20:11-14 (App. 155).) The undisputed

documentary evidence shows that Debtors' counsel, Davis Polk & Wardwell ("Davis Polk"),

twice proposed language that would have required Avaya to assume liabilities that were not

reflected in Debtors' books or records, which language Avaya rejected. Two days before the

parties executed the APA, on February 20, 2001, Martin A. Wellington, a partner at Davis Polk,

proposed a broad definition of Assumed Liabilities:

> All liabilities accrued on the Company Balance Sheet and *all liabilities arising*
> *after the Balance Sheet Date in the ordinary course of business* and consistent
> with past practice to the extent not satisfied prior to the Closing Date.

---

herein, the language at issue was drafted to capture liabilities booked between the Balance Sheet
Date and the Closing Date, provided that they were "accrued or recorded ... in the ordinary
course ... and consistent with past practice ...."

[6] Paragraphs a-c of Schedule 1.03(1) list various types of specific liabilities, including
obligations arising under leases and executory contracts, warranty obligations, and obligations
relating to employee benefits and compensation arrangements, that Avaya agreed to assume.
(See App. 62.)

7

(App. 64 (emphasis supplied).) After Avaya rejected this first proposal, Mr. Wellington next proposed another broad definition of Assumed Liabilities that would have included all liabilities "set forth on the Balance Sheet and all liabilities incurred thereafter." (See App. 67, 68.) Avaya rejected this proposal as well. As the Bankruptcy Court correctly found, Avaya's "express rejection of a version of Schedule 1.03 which would have obligated Avaya to assume all 'incurred' obligations of the Debtors is persuasive evidence that the parties intended 'accrued' to mean something other than 'incurred.'" (Opinion at 19.) Thus, as the Bankruptcy Court correctly found, any interpretation that obligated Avaya to pay incurred liabilities that were not in fact recorded or accrued on the Debtor's books and records would be inconsistent with the parties' intent.

Pursuant to Section 1.01 of the APA, Debtors transferred to Avaya at the Closing a copy of "all books, records, files and papers, whether in hard copy or computer format" of Debtors as of Closing, April 11, 2001. Section 5.05 of the APA obligated Avaya to copy and maintain these "business records and files." (App. 36.) Section 5.05 imposed no obligation for Avaya to maintain any records that it generated after the Closing in connection with the payment of Assumed Liabilities.

**B.    "Accrued or Recorded"**

As those in charge of Debtors' books testified, and as the Bankruptcy Court agreed, for a liability to be "accrued or recorded" it had to be reflected in Debtors' books and records. (See Deposition Transcript of Rosie Nguyen, dated January 27, 2006 ("Nguyen Tr.") at 24:19-23 (App. 218).)[7] Even according to the Trustee, the concept of a "recorded" liability

---

[7]    Ms. Nguyen was Quintus' account manager who later became an Avaya transitional employee. (Nguyen Tr. at 10:23-11:10 (App. 215-216).)

8

means one that is written down in financial books and records. (See Deposition of Kurt F. Gwynne, dated November 22, 2005 at 58:23-59:2 (App. 159-160).)

The concept of an "accrued liability" had a clear meaning in the context of Debtors' ordinary business operations. (See, generally, Nguyen Tr. at 24:2-23 (App. 218); Opinion at 19.) Debtors "accrued" liabilities by manually entering those liabilities into their financial books and records. (See Nguyen Tr. at 24:19-23 (App. 218).) Unlike liabilities "recorded" upon receipt of an invoice or bill, "accrued" liabilities were entered in the books before a supporting invoice or bill was received. (See Deposition Transcript of Mark Thompson, dated January 26, 2006 ("Thompson Tr.") at 22:26-25, 23:14-24:7, 122:11-14 (App. 182, 183, 209);[8] Nguyen Tr. at 24:2-3 (App. 218); see also Deposition Transcript of Eric Sherbet, dated November 22, 2005 ("Sherbet Tr.") at 51-1-19 (App. 166).)[9] Trade liabilities that were "accrued or recorded" on Debtors books and records were entered in Debtors' Aged Payables Journal. (See Nguyen Tr. at 33:3-13 (App. 220); Thompson Tr. 35:21-36:7 (App. 191-192); see also Opinion at 20.)

### C.    The April 5, 2001 Initial Schedule

On April 5, 2001, five days before the Closing Date, Debtors provided Avaya with an estimate of the total amount of Assumed Liabilities as of April 10, 2001 that is titled "Schedule of Assumed Liabilities – ESTIMATE" (the "Initial Schedule"). (See App. 69-71.) This schedule was prepared by Mr. Thompson pursuant to Section 1.03. (See Thompson Tr. at 10:20-23 (App. 180).) Because the Initial Schedule was prepared prior to the Closing Date, Debtors necessarily had to estimate what their books would look like at a future point in time.

---

[8]    Mr. Thompson, the Vice President, Finance of Quintus, was the person principally responsible for the maintenance of Debtors' books and records. (See Thompson Tr. at 10:20-23, 11:8-14 (App. 180, 181).)

[9]    Mr. Sherbet, a certified public accountant, was in-house counsel at Avaya during the negotiation and drafting of Schedule 1.03. (See Sherbet Tr. at 8:9-12; 39:1-23 (App. 164, 165).)

9

(See Thompson Tr. at 25:21-26:1 (App. 185-186).) The Initial Schedule predicted that the total

amount of Assumed Liabilities that would exist at Closing was $20,766,000, of which

$6,020,000 consisted of "Pre Petition Trade AP" and $230,000 consisted of "Post Petition Trade

AP." (See App. 70.) The line item concerning "Post Petition Trade AP" in the Initial Schedule –

which was a prediction of what would exist at Closing – is followed by a footnote which reads,

"Estimate of Post Petition Trade Accounts Payable." (See id.) The "Pre Petition Trade AP"

figure was not a prediction or estimate and bore no footnote.

### D.     The April 20, 2001 Final Schedule

Ten days after the Closing Date, on April 20, 2001, Debtors provided Avaya with

a second schedule that set forth all of the unpaid liabilities that were accrued or recorded in

Debtors' books as of April 20, 2001 that is titled "Schedule of Assumed Liabilities – FINAL"

(the "Final Schedule"). (See Thompson Tr. at 29:22-30:2 (App. 188); see also App. 72-74.) The

cover memorandum enclosing the Final Schedule notes that the Final Schedule was submitted to

Avaya "in lieu of" the estimate of Assumed Liabilities required by Section 1.03 of the APA.

(See App. 72.) [10] The undisputed evidence is that Mr. Thompson prepared the Final Schedule

using Debtors' books and records, and that the Final Schedule listed the total amount of all

unpaid trade payables and tax liabilities reflected on the Debtors' books and records that Avaya

had assumed. (See Thompson Tr. at 29:16-30:2 (App. 188-189).) Mr. Thompson testified that

all liabilities that were present on the Debtor's books and records were added up and included in

the Final Schedule. (See id.) There was no contrary evidence, and thus no basis for the

Bankruptcy Court to conclude that any liabilities that were not reflected on the Final Schedule

---

[10]     As discussed above, Section 1.03 required Debtors' to provide a forward-looking
schedule of Assumed Liabilities in advance of the Closing Date that estimated the total amount
of Assumed Liabilities as of the Closing Date. The Final Schedule, which was submitted *after*
the Closing Date is not the forward-looking estimate described in this provision.

10

could be accrued or recorded on the Debtor's books and records under the APA. Unlike the Initial Schedule, the Final Schedule does not break out trade accounts payables into Pre Petition Trade AP and Post Petition Trade AP; rather, Trade AP in a single line sets forth the number reflected in the books and records.

The total amount of Assumed Liabilities, as documented by the Final Schedule, was $22,549,000. (See App. 73.)[11] Of that amount, $7,080,000 constituted trade payables. (See id.) Detailed information concerning the amount and payee for each trade payable that Avaya assumed is listed in an Aged Payables Report dated April 20, 2001 (the "Payables Report") produced to the Trustee during discovery, which reflects all trade account payables entered into Debtors' books and records. (See App. 75-133; Thompson Tr. at 44:6-23 (App. 197).) The Final Schedule also set forth a total of $5,513,000 in "Accrued Liabilities." (See App. 73-74.) This amount is reflected as a line item on the first page of the Final Schedule and set forth in detail on page two. (See id.) These categories of Accrued Liabilities accounted for in the Final Schedule include Legal & Accounting, Payroll Related, Sales Related, Taxes and Escheat Liability. (See App. 74.) The only "Accrued Liability" at issue here is Taxes. The Final Schedule reflects a total outstanding tax liability of $163,000. (See id.)

Liabilities that were not reflected in the Final Schedule were not assumed by Avaya and remained Debtors' obligation to pay. (App. 72-74; Thompson Tr. at 34:20-35:2.)

**E.    Payment Of Assumed Liabilities From April – June 2001**

Following the Closing, certain of Debtors' employees, including Mr. Thompson and Ms. Nguyen, became transitional employees of Avaya. (See Thomson Tr. at 37:14-18; Nguyen Tr. at 11:21-22 (App. 216).) As such, Mr. Thompson and Ms. Nguyen were responsible

---

[11]    As required by law, in connection with their bankruptcy proceedings, Debtors filed schedules of their outstanding trade payables. Those schedules included certain liabilities that were not part of the $7,080,000 figure reflected in the Final Schedule and the Payables Report.

11

for the payment of the Assumed Liabilities reflected in the Final Schedule. (Thompson Tr. at 36:8-12 (App. 192); Nguyen Tr. at 13:20-23 (App. 217); see also Deposition Transcript of Shobhna Asthana, dated January 25, 2006 ("Asthana Tr. ") at 19:14-22 (App. 173).)[12] Between April and June 2001, Avaya paid substantially all of those liabilities. During their tenure at Avaya, Mr. Thompson and Ms. Nguyen generated electronic information concerning the post-Closing payment of Assumed Liabilities that was housed on one of Avaya's computer servers. This server was reformatted after their departure (in October 2001) because Avaya "needed the server" to house different information. (Nguyen Tr. at 29:6-12 (App. 219).)

To track the payments of Assumed Liabilities that had been made, Mr. Thompson generated interim financial schedules. (See Thompson Tr. at 37:14-38:21 (App. 193-194); see, e.g., App. 138 (showing that as of April 30, 2001, over \$4.5 million in Assumed Liabilities had been paid).) The information contained in these schedules was drawn directly from the financial records that previously belonged to Debtors and reflected the contents of those records as of the date of each interim financial schedule. On July 25, 2001, Mr. Thompson provided other Avaya employees a schedule that reflected the payment of Assumed Liabilities from April 2001 through June 30, 2001. (See Thompson Tr. at 40:4-15 (App. 195).) This schedule shows that as of June 30, 2001, only \$1,199 in trade liabilities and \$138,826.90 in tax liabilities that Avaya assumed under the APA remained outstanding.[13] (See A-257; Thompson Tr. at 41:8-14 (App. 196).) That is, as of June 30, 2001, virtually all of the trade payables and a portion of the tax liabilities reflected on the Final Schedule had been paid.

---

[12]    During their tenures at Avaya, both Mr. Thompson and Ms. Nguyen reported to Ms. Asthana, who was then responsible for the Financial Planning and Analysis for Avaya's Finance Department. (See Thompson Tr. at 69:14-22 (App. 206); Nguyen Tr. at 13:5-8 (App. 217); Asthana Tr. at 11:24-12-18 (App. 171-172).)

[13]    This schedule lists all of the unpaid tax liabilities that were accrued on Debtors' books, setting forth separately the amount accrued in each state. (See App. 152.)

12

To ensure the accuracy of the trade payables payment information contained in the interim financial schedules (which were drawn directly from the Aged Payables journal), Mr. Thompson performed monthly reconciliations of the Aged Payables journal to the General Ledger. (See Thompson Tr. at 61:21-25 (App. 202); see also Asthana Tr. at 58:18-59:12 (App. 174-175).) The purpose of this exercise was to ensure that the beginning and ending balances in each were consistent. (See Asthana Tr. at 58:18-59:2 (App. 174-175).) A reconciliation that Mr. Thompson's group performed in late June 2001 showed that there were no material differences between the Aged Payables journal and the General Ledger. (See App. 139-146; Thompson Tr. at 60:21-61:11.) A copy of this reconciliation, which confirms the accuracy of the June 30, 2001 interim financial schedule was produced to the Trustee in discovery.

### F.    Debtors' Books And Records

As transitional employees at Avaya, Mr. Thompson and Ms. Nguyen worked side-by-side with employees of Data Systems International ("DSI"), Debtors' consultant. DSI maintained an office in the same building where Mr. Thompson and Ms. Nguyen worked. (See Thompson Tr. at 57:3-24 (App. 198); see id. at 100:15-16 ("they frankly were right there in our office") (App. 207).) According to Mr. Thompson, DSI's responsibilities during the transitional period included the review of financial records that formerly belonged to Debtors. (See id. 58:20-59:6 (App. 199-200).) To fulfill this responsibility, DSI employees were given unfettered access to the financial records and "had ownership of all the Quintus records prior to the acquisition." (Id. at 58:24-25; 64:21-23 (App. 199, 203).) In connection with his departure from Avaya in October 2001, Mr. Thompson transferred all of his files to Scott Michel, a DSI employee. (Id. at 65:13-66:1 (App. 204-205); see also id. at 108:10-17 (App. 208).) According to Mr. Thompson, "before we left, myself being the last person, we boxed everything up that we

13

had in our files and gave them to DSI." (Id. at 65:22-25 (App. 204); see also id. 59:1-2 ("we

ended up flooding their office with boxes and boxes of records") (App. 200).)

### G.    Procedural History

On January 30, 2002, more than nine months after the Closing, the Bankruptcy

Court appointed Kurt F. Gwynne (the "Trustee") as Chapter 11 trustee for Debtors. (See

Opinion at 2.) Over two years later, on March 18, 2004, the Trustee commenced an adversary

proceeding against Avaya, asserting claims for breach of contract and unjust enrichment. (D.I.

1.) On April 19, 2005, Avaya filed its Answer and Affirmative Defenses to the Trustee's breach

of contract claim and a motion to dismiss the Trustee's unjust enrichment claim. (Quintus Corp.,

Mustang.com, Inc. & Acuity Corporation v. Avaya, Inc., Adv. Proceeding No. 04-53074-MFW,

D.I. 5.)

The parties engaged in extensive document and deposition discovery. In terms of

documents, Avaya produced, among other things, the Final Schedule, which sets forth all of the

liabilities Avaya assumed under the APA (App. 72-74); a copy of Debtors' Payables Report,

which lists, by vendor, each of the trade liabilities that Avaya assumed (App. 75-133); interim

schedules that reflect the payment of Assumed Liabilities after April 20, 2001 (see, e.g. App.

138); and the schedule created by Mr. Thompson showing the payment of Assumed Liabilities

through June 30, 2001, which includes a state-by-state breakdown of each of the assumed tax

liabilities that remained outstanding as of June 30, 2001 (App. 151-152). In addition, Avaya also

produced copies of documents establishing that there was no material difference between the

trade payable liabilities reflected in the Aged Payables journal and the General Ledger, which

also showed that virtually all trade payables had been paid. (App. 139-146.)

On March 18, 2006, the parties cross moved for partial summary judgment. (D.I.

87-90, 93-94.) On the same date, the Trustee filed a Motion for Sanctions for Spoliation of

14

Evidence (the "Sanctions Motion") based on the reformatting of the computer server on which

information was stored concerning the post-Closing payment of Assumed Liabilities. (D.I. 92.)

Avaya requested oral argument on the summary judgment motions and the Sanctions Motion on

May 3, 2006. (D.I. 108.) Without hearing oral argument, on October 27, 2006, the Bankruptcy

Court entered the Opinion granting in part and denying in part the parties' motions for summary

judgment. (D.I. 120, 121.) In the Opinion, the Bankruptcy Court also granted the Sanctions

Motion. The Bankruptcy Court entered judgment in favor of the Trustee in the amount of

$1,888,410.52 (See id.)

      Avaya timely filed its Notice of Appeal on November 8, 2006. (D.I. 123.) On

December 14, 2006, the Bankruptcy Court entered an order staying the execution of the

judgment provided that Avaya file a supersedeas bond. (D.I. 131.) On December 15, 2006,

Avaya filed a supersedeas bond. (D.I. 132.) The Trustee did not appeal any portion of the

Bankruptcy Court's Opinion.

## ARGUMENT

      **Summary judgment standard.** Pursuant to Rule 56(c) of the Federal Rules of

Civil Procedure, a court may grant summary judgment when discovery reveals the absence of a

genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); SEC v.

Hughes Capital Corp., 124 F.3d 449, 452 (3d Cir. 1997). The court's task "is to determine

whether disputed issues of material fact exist, but the court cannot resolve factual disputes in a

motion for summary judgment." Caines v. Hendricks, No. 05-1701 (JAP), 2007 WL 496876, at

* 5 (D. N.J. Feb. 9, 2007) citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

Where a summary judgment motion involves a contractual determination, if contractual language

is unambiguous and favors the interpretation advanced by the movant, summary judgment is warranted.  See, e.g., Newport Assocs. Dev. Co. v. Travelers Indemnity Co. of Ill., 162 F.3d 789, 791 (3d Cir. 1998) (summary judgment proper where contract is unambiguous); Tamarind Resorts Assoc. v. Government of the Virgin Islands, 138 F.3d 107, 111 (3d Cir. 1998) (same). The legal conclusions underlying the Bankruptcy Court's erroneous application of these standards are subject to *de novo* review, and the Bankruptcy Court's factual findings should be reviewed "for clear error and its exercise of discretion for abuse thereof." In re General DataComm Indus., 407 F.3d 616, 619 (3d Cir. 2005) (quoting In re Trans World Airlines, Inc., 145 F.3d 124, 130-31 (3d Cir. 1998).

**Standard on sanctions**.  In considering whether sanctions for the alleged spoliation of evidence is appropriate, a court should evaluate:

> (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.

Schmid v. Milwaukee Elec. Tool Corp., 13 F. 3d 76, 79 (3d Cir. 1994) (citations omitted); see also Opinion at 9.  The Third Circuit has held that sanctions are appropriate only where "the party that has prevented production did so out of the well-founded fear that the contents would harm him."  Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 334 (3d Cir. 1995).

The Bankruptcy Court erroneously determined that Avaya destroyed documents at a time when it should have anticipated litigation and that Trustee was prejudiced by such destruction; these findings were clear error.  Indeed, even if these findings were sustained, they would fall far short of the Third Circuit standard announced in Brewer, but overlooked by the Bankruptcy Court, that the destruction must be "intentional" in the sense of an intention to interfere with pending or threatened litigation.

16

## I.    AVAYA WAS ENTITLED TO SUMMARY JUDGMENT THAT IT ONLY ASSUMED THOSE LIABILITIES LISTED ON THE FINAL SCHEDULE

Schedule 1.03 of the APA unambiguously provides that Avaya is not responsible for any and all liabilities that Debtors' incurred before the Closing Date. Rather, pursuant to the APA's express terms, Avaya assumed only those liabilities that were reflected in Debtors' books and records, except for three items that are not at issue here. Mr. Thompson's unrefuted testimony demonstrates that the Final Schedule reflects all such liabilities.

### A.    "Books and Records"

In the Bankruptcy Court, the parties did not dispute that only liabilities that are actually written in a company's books and records may properly be considered "recorded liabilities" (see Gwynne Tr. at 58:23-59:2 (App. 159-160)), however, they disagreed as to the meaning of the term "accrued" as it is used in Schedule 1.03. Under the interpretation advanced by the Trustee, the word accrued was synonymous with the word "incurred," and under the interpretation advance by Avaya, the word "accrued" indicated a booked liability. Agreeing with Avaya, the Bankruptcy Court properly concluded that "Avaya assumed only obligations that were reflected in the Debtors' books and records." (Opinion at 20.)

Under basic accounting principles, the notion of an "accrued liability" signifies a liability that is not recorded, yet is listed under current liabilities on a company's books and records. See Barron's Dictionary of Accounting Terms 12 (3d ed. 2000); see also Opinion at 20. The unrefuted testimony of Quintus' former Vice President of Finance (Mr. Thompson) and former Accounting Manager (Ms. Nguyen) demonstrate that Debtors "accrued" liabilities consistent with this accounting definition. (See Thompson Tr. at 23:14-24:7 (liabilities are accrued by "journal entries [being] made into the accounting system") (App. 183-184); Nguyen Tr. at 24:1-23 (for a liability to be accrued, it had to be reflected in Debtors' books and records)

17

(App. 218); see also Sherbet Tr. at 51:7-8 ("you record an accrual in your accounting records") (App. 166); Asthana Tr. at 69:9-11 ("[i]f you're accruing something, you're recording it on the books") (App. 176).)

The meaning of the phrase "accrued or recorded" as it was used in the APA is therefore clear: liabilities that are "accrued or recorded" are liabilities that are entered in Debtors' books. The Bankruptcy Court's finding that "Avaya assumed only obligations that were reflected in Debtors' books and records" was consistent with the evidence and correct.

The principal flaw in the Bankruptcy Court's Opinion is that it ignored its own key conclusion as to the scope of the obligations which Avaya assumed under the APA by imposing liability on Avaya for amounts that were not in Debtors' books and records as of the Closing Date. It did so, moreover, without the benefit of any evidence to support its conclusion, and in the face of the undisputed evidence from Mr. Thompson that the amounts in the Final Schedule matched precisely those amounts that were reflected in Debtors' books and records as of Closing.

## B.    Avaya Did Not Assume Post-Closing Liabilities

Although the Bankruptcy Court correctly interpreted the APA to obligate Avaya to assume only those liabilities reflected in Debtors' books and records, it incorrectly found that: (1) Assumed Liabilities could have been accrued or recorded on Debtors' books and records after the Closing Date (Opinion at 26); (2) invoices received from vendors constitute Debtors' books and records[14] (id. at 31-32); and (3) Avaya assumed all of the liabilities listed on Debtors' bankruptcy schedules (id. at 24-25). These findings are not only against the evidence and without a shred of evidentiary support, but wholly inconsistent with the Bankruptcy Court's

---

[14]    The Bankruptcy Court erred further in overlooking the requirement that, even if marked-up invoices were "books and records," amounts noted in those invoices became Assumed Liabilities only if they were "accrued or recorded."

18

determination that Avaya assumed only those liabilities that were reflected in the Debtors' books and records.

The parties' negotiation of Schedule 1.03 makes clear that Avaya did not agree to assume liabilities that were entered in books and records after the Closing Date, because that would have made the APA obligation coterminous with an obligation to pay all liabilities "incurred," which Avaya explicitly did not agree to assume.[15] Indeed, Avaya twice rejected proposals for just such an obligation. Debtors' counsel alternately proposed language that would have made Avaya responsible for all liabilities "arising after" December 31, 2000 and all liabilities "incurred" after December 31, 2000. (App. 64, 67, 68.) While such language would be consistent with an obligation to assume liabilities that were incurred but not booked at the time of the Closing, Avaya refused to accept such an obligation and the APA instead limited Assumed Liabilities to liabilities that had been booked "up to the Closing." (Thompson Tr. 22:1-7 (App. 182).) Thus, any interpretation which would require Avaya to pay obligations that were not on the Final Schedule (which per Mr. Thompson were coterminous with the books and records as of Closing) would *ipso facto* require it to pay obligations that the parties had agreed Avaya would not be required to pay.

In addition, any liabilities that were entered in the books and records that belonged to Avaya after the Closing Date could not have been entered "in the ordinary course of business consistent with past practice" as required by Schedule 1.03. (See Opinion at 26.) For this reason, the inclusion of the phrase "prior to the Closing" immediately after the phrase "accrued or recorded after the Balance Sheet Date" would be redundant. Clearly, accounting entries that *Avaya* may have made in books *formerly* belonging to Debtors were not accrued or

---

[15]     Indeed, the Trustee recognized "recorded liabilities" refers to something actually entered on the Company's books and records. (See Gwynne Tr. at 58:23-24 (App. 159).)

19

recorded "in the ordinary course of" *Debtors'* business or consistent with *Debtors'* "past practice." Accordingly, consistent with the plain language of Schedule 1.03 and Section 1.03, Avaya agreed to assume only those liabilities reflected in the Debtors' books as of the Closing Date.

Moreover, under the express terms of the APA, Avaya acquired the books and records on the Closing Date. (See App. 8-9.) After the Closing Date, the books at issue ceased to be the property of Debtors and became *Avaya's* property. (See id.) The Trustee made this very point in his initial briefing of his summary judgment motion, arguing that Debtors could not have accrued or recorded liabilities in their books after the Closing because Avaya took possession of those books on the Closing Date.[16]  Accordingly, the Bankruptcy Court's determination that entries could be made on *Debtors'* books and records *after* the Closing Date defies logic, and is inconsistent with the uncontroverted record.

## C.    Vendor Invoices Are Not Books And Records

Likewise, the Bankruptcy Court's finding that vendor invoices constituted Debtors' books and records was clear error. Former Quintus employees responsible for Debtors' books and records explained that for a liability to be accrued or recorded, it must be reflected on the books and records of the obligor. (See Thompson Tr. at 23:14-24:7 (liabilities are accrued by "journal entries [being] made into the accounting system") (App. 183-184); Nguyen Tr. at 24:1-23 (there could be liabilities that were accrued that did not appear in Debtors' books and records) (App. 218); see also Sherbet Tr. at 51:7-8 ("you record an accrual in your accounting records") (App. 166); Asthana Tr. at 69:9-11 ("[i]f you're accruing something, you're recording it on the

---

[16]    The only former Quintus officer to testify – Mr. Thompson, Quintus's Vice President, Finance at the time the APA was executed – shared the understanding that Assumed Liabilities were limited to those liabilities listed on Debtors' books "up to the [C]losing [D]ate." (See Thompson Tr. at Thompson Tr. 22:1-7 (only liabilities entered in Debtors' books "up to the closing date" were Assumed Liabilities) (App. 182).)

20

books") (App. 176).)  Even if notations were made on the face of vendors' invoices (see Opinion

at 31-32), such notations were not part of the books and records that Avaya agreed to purchase

when it executed the APA, and in any event were not accounting entries that "accrued or

recorded" liabilities.  The Bankruptcy Court's decision to consider the amounts reflected on such

invoices as Assumed Liabilities under the APA, without any evidence – either from the

accounting literature or the parties' negotiations – that notations on invoices are "books and

records" within the meaning of that technical accounting term, is inconsistent with its own

finding that "Avaya assumed only obligations that were reflected in the Debtors' books and

records." (Id. at 20.)

### D.      Debtors' Bankruptcy Schedules Are Not Books And Records

The Bankruptcy Court's finding that Avaya assumed all of the liabilities listed on

Debtors' bankruptcy schedules is clear error. (See id. at 24-25.)  Again, the Bankruptcy Court's

determination that Avaya is responsible for every liability listed on Debtors' bankruptcy

schedules – regardless of whether those liabilities were listed in Debtor's books and records at all

or in lesser amounts – is inconsistent with its own interpretation of Assumed Liabilities.  Under

Schedule 1.03, Avaya assumed "all liabilities accrued or recorded after the Balance Sheet Date in

the ordinary course of business *consistent with past practice*...."  (App. 62 (emphasis supplied).)

Debtors accrued or recorded liabilities by entering those liabilities into their financial books and

records.  See Ngyuen Tr. at 24:19-23 (App. 218).  The act of preparing bankruptcy schedules is

in no way "consistent with [Debtors'] past practice" for accruing or recording liabilities.  Nor are

bankruptcy schedules, filed with a court, part of a company's books and records by any stretch of

the imagination – and not surprisingly, there was no evidence, from the accounting literature or

otherwise, that supported the Bankruptcy Court's conclusions on that point.  Thus, the amounts

listed on Debtors' bankruptcy schedules should not have been considered Assumed Liabilities.

21

In addition, there was no evidence before the Bankruptcy Court concerning how the Debtors' bankruptcy schedules were prepared and therefore no basis to conclude – particularly on summary judgment – that such schedules were reliable evidence of the contents of Debtors' books. Mr. Thompson clearly testified that although he signed the schedules, he did not know how the bankruptcy schedules were created:

Q:    [D]o you remember who actually prepared these schedules physically?

A:    I do not remember who prepared these. I don't think we – I can't remember if our – I don't think our group would have done something like this[.]

(Thompson Tr. at 146:12-17 (App. 210).) There was no testimony from a witness with knowledge concerning the process used to compile Debtors' bankruptcy schedules, and the Trustee's argument that amounts listed on the bankruptcy schedules should be considered Assumed Liabilities was not supported by reference to any document showing how those schedules were prepared, let alone providing the requisite link between the schedules and Debtors' books and records as of the Closing. Accordingly, the Bankruptcy Court's conclusion that Debtors' "bankruptcy schedules reflect liabilities that were on Debtors' books and records as of the date of the filing of the schedules" is without any evidentiary support. (Opinion at 25.)

### E.    The Final Schedule Reflects All Assumed Liabilities

The Bankruptcy Court's conclusion that "the Final Schedule was not a conclusive list of liabilities assumed by Avaya" wholly and improperly ignored Mr. Thompson's uncontroverted testimony that the Final Schedule represents a comprehensive compilation of Debtors' booked liabilities. (Opinion at 23; see Thompson Tr. at 26:23-25 (App. 186).) At his deposition, Mr. Thompson unequivocally testified under oath that the Final Schedule he prepared reflected "the liabilities we had put on our books" that Avaya agreed to assume under the APA. (Thompson Tr. at 29:18-30:07 (App. 188-189).) In his words, the Final Schedule represents a

22

"snapshot" of the liabilities in Debtors' "financial system" as of the Closing Date. (Id. at 26:23-25 (App. 186).) Despite Mr. Thompson's unrefuted testimony, the Bankruptcy Court adopted the Trustee's argument that because the Final Schedule "provides only a broad categorical description of the types of liabilities to be assumed and an estimate of the amount owed in each of those categories" and includes the word "estimate," it "bears no hallmarks of finality." (Opinion at 23.) This is clear error.

First, the fact that the Final Schedule listed categories rather than individual items is irrelevant. The numbers in the Final Schedule represented the total amount of those individual items, and as Mr. Thompson testified, there was a precise correspondence between the totals in the Final Schedule and the sums of the individual items in the books and records.

Second, there is nothing irregular or noteworthy about entering an estimate of liability as an accrual. To the contrary, because liabilities must be "accrued" by book entry prior to the receipt of a final bill or invoice, accruals by necessity are based on estimates. (See Asthana Tr. at 69:16-17 (App. 176)) ("that's the point of accruals ... estimating what your liabilities are"); accord Thompson Tr. at 28:7-10) (App. 187).) Accepted accounting principles are consistent with this understanding of an "accrual." For example, the FASB Statement of Financial Accounting Concepts No. 6 provides that "[a]ccrual is concerned with expected future cash receipts and payments; it is the accounting process of *recognizing* assets or liabilities and the related liabilities, assets, revenues, expenses, gains, or losses for amounts *expected* to be received or paid, usually in cash, in the future." (emphasis supplied); see also AICPA, Accounting Research Bulletin No. 43 (providing that the "concept of current liabilities would include estimated or accrued accounts which are expected to be required to cover expenditures within the year for known obligations" that must be estimated or whose precise payee is not yet

23

known). Accordingly, the Bankruptcy Court's reliance on the word "estimate" which appears "six times" in the Final Schedule as justification for its findings is misplaced. The mentions of "estimate" in the Final Schedule appear either as the basis for accruals or as a vestige of the prior, Initial Schedule.[17] As to accruals, the word "estimate" in the Final Schedule makes perfect sense and is consistent with Debtors' accounting practices. (See Thompson Tr. at 26:23-25 (App. 186).) It does not, as the Bankruptcy Court found, transform the entirety of the schedule itself into a tentative, preliminary estimate.

Third, the Final Schedule was sent and accepted "*in lieu of* the [Debtors'] estimate" of Assumed Liabilities "provided for by Section 1.03 of the Asset Purchase Agreement." (App. 72 (emphasis supplied).) Under Section 1.03, Debtors were to provide a forward-looking estimate of Assumed Liabilities as of the Closing three business days *before* the Closing Date. (See App. 10-11.) The parties agreed to modify this requirement. After submitting the Initial Schedule on April 5, 2001 (six days before the Closing Date), Debtors tendered the Final Schedule nine days *after* the transaction closed, on April 20, 2001 "in lieu" of the schedule contemplated by Section 1.03. Because it was delivered *after* the Closing Date, the Final Schedule does not constitute a forward-looking estimate created before the Closing Date of what Debtors' books and records would look like on the Closing Date. (Compare App. 69-71 with App. 72-74.) Rather, it reflected what was actually on the books and records as of Closing – and Mr. Thompson so testified, without contradiction.

---

[17]    The Initial Schedule separated "Pre Petition Trade AP" from "Post Petition Trade AP" and footnoted the latter category as including an estimate. (App. 70.) In the Final Schedule, which was not a projected estimate of future liabilities, Trade AP is a single line bearing no footnote, but there remains in the footnote section vestigial language, untied to any account, which references "Estimate of Post Petition Trade Account payable." (See App. 69.)

24

Fourth, the Bankruptcy Court's ruling ignores the significant differences between the April 5, 2001 Interim Schedule and the Final Schedule. First and foremost among them are the titles of the documents themselves. The Interim Schedule, which was intended to be a pre-Closing estimate of what Debtors' books and records would look like at a future point in time is entitled "Schedule of Assumed Liabilities – ESTIMATE" (App. 70), but the Final Schedule, which required no prediction of future events is entitled "Schedule of Assumed Liabilities – FINAL" (see App. 73). Likewise, the Bankruptcy Court simply ignored the fact that the Initial Schedule distinguished between Pre Petition Trade AP and Post Petition Trade AP, indicating the latter category was an "Estimate" but the Final Schedule makes no such distinction.

As the unrefuted testimony of the author of the Final Schedule makes clear, that schedule was intended to and did reflect all liabilities on Debtors' books as of the Closing – that is, all Assumed Liabilities. The Bankruptcy Court committed plain error in disregarding such unrefuted testimony by the author of the Final Schedule in favor of an argument unsupported by evidence. On a motion for summary judgment, a court is not to resolve issues where evidence conflicts, much less resolve issues against the uncontroverted evidence.[18]

## II.   THE BANKRUPTCY COURT'S FINDING THAT AVAYA INTENTIONALLY DESTROYED EVIDENCE IS WHOLLY UNSUPPORTED

The Bankruptcy Court's award of $1,888,410.52 to the Trustee is premised on its erroneous finding that Avaya's deletion of certain electronic records supports a sanction for the intentional destruction of evidence. (See Opinion at 9.) This was erroneous for two principal reasons. First, the requisite premise for any sanction at all is lacking. The evidence is abundantly clear that any documents lost as a result of Avaya's decision to put a computer server

---

[18]   Indeed, even if there were some reason for the Bankruptcy Court to have questioned Mr. Thompson's testimony or credibility, the appropriate response would have been to deny summary judgment and require the parties to proceed to trial. See Fed. R. Civ. P. 56(c).

25

to a different use were lost in the context of routine business activities and well before any

litigation by the Trustee was pending or threatened. *Any* sanction – let alone the extreme

sanction awarded by the Bankruptcy Court – would be inappropriate in these circumstances.

Second, the particular sanction awarded by the Bankruptcy Court – the award of every dollar

sought by the Trustee, even if the amounts involved could not conceivably have been included in

the books and records as of Closing – was inconsistent with the limited obligations which Avaya

assumed under the APA.

A decision to award sanctions should be made by "a case by case approach keyed

to the degree of fault on the part of the party accused of spoliation and the degree of prejudice to

the opponent." Schmid, 13 F.2d at 81. When considering whether sanctions for the spoliation of

evidence is appropriate, the court must consider

> (1) the degree of fault of the party who altered or destroyed the evidence; (2) the
> degree of prejudice suffered by the opposing party; and (3) whether there is a
> lesser sanction that will avoid substantial unfairness to the opposing party and,
> where the offending party is seriously at fault, will serve to deter such conduct by
> others in the future.

Id. at 79; see also Opinion at 9. When "the circumstances indicate that the document or article in

question has been lost or accidentally destroyed, or where the failure to produce it is otherwise

properly accounted for," sanctions are not appropriate. Brewer v. Quaker State Oil Refining

Corp., 72 F.3d 326, 334 (3d Cir. 1995). Absent some finding that "the party that has prevented

production did so out of the well-founded fear that the contents would harm him," sanctions

should not issue. Id.; see also Menz v. New Holland North America, Inc., No. 05-1739, 2006

WL 645908, at *3 (8th Cir. March 16, 2006) ("there must be a finding of intentional destruction

indicating a desire to suppress the truth" before sanctions may issue) (internal quotation

omitted); 29 Am.Jur.2d Evidence §177 (noting that sanctions are only appropriate when the

destruction "was intentional, and indicates fraud and a desire to suppress the truth, and [sanctions

are not appropriate] where the destruction was a matter of routine with no fraudulent intent"),

quoted in Brewer, 72 F.3d at 334.

    Several circuits have found that before a court may award sanctions – particularly

the "penal-dismissals and default judgments" like the award at issue here – a "court must find

clear and convincing evidence of the predicate misconduct." Shepherd v. Am. Broad. Cos., 62

F.3d 1469, 1478 (D.C. Cir. 1995); see also Pfizer, Inc. v. Int'l Rectifier Corp., 538 F.2d 180, 195

(8th Cir. 1976) (reversing summary judgment as a sanction where district court's findings were

not supported by "clear, unequivocal and convincing evidence"). Because there is no evidence

of sanctionable conduct in this case – let alone clear and convincing evidence of such conduct –

the Bankruptcy Court's decision on the Trustee's Sanction Motion must be reversed. See Pfizer,

538 F.2d at 195.

## A. There Is No Evidence That Avaya Destroyed Documents At A Time When It Could Have Reasonably Anticipated Litigation Over The Payment Of Assumed Liabilities

    "A condition precedent to the imposition of sanctions is whether [the party

charged with destruction] knew of or should have known that the destroyed evidence was

relevant to pending, imminent or reasonably foreseeable litigation." Shamis v. Ambassador

Factors Corp., 34 F. Supp. 2d 879, 888-89 (S.D.N.Y. 1999); see also Kronisch v. U.S., 150 F.3d

112, 126 (2d Cir. 1998) ("obligation to preserve evidence arises when the party has notice that

the evidence is relevant to the litigation").

    The Bankruptcy Court's finding that Avaya "should have anticipated litigation" at

the time it reformatted the server because "Avaya had not paid all the liabilities it had assumed"

(Opinion at 10) is simply wrong. On July 25, 2001, Mr. Thompson, the individual responsible

for making sure accounts payable that Avaya assumed were paid (See Thompson Tr. at 36:8-12

(App. 192)), provided other Avaya employees a schedule showing that as of June 30, 2001, only

27

$1,199 in trade liabilities (approximately *0.02%* of the initial $7,080,000 total) and a portion of

the tax liabilities it had assumed remained unpaid. Avaya never disputed its obligation to make

these payments, and indeed, that obligation was plainly reflected in the numerous documents,

including particularly the Final Schedule, which were in fact preserved. Moreover, because

these obligations were so reflected, there was no basis on which Avaya might have assumed that

information on the server would in any way be relevant to these already-acknowledged

obligations.[19] Thus, the core requirement of destruction of documents relevant to anticipated

litigation is not met because there was then no dispute as to which litigation was anticipated, and

in any case, the documents destroyed would have been irrelevant to that hypothetical litigation.

Nor did Avaya have any reason to believe that it might be called upon to pay any

liabilities beyond those on the Final Schedule.[20] As noted above, the parties negotiated that

Avaya would not be responsible for "incurred" liabilities, but only those actually included in the

books and records as of Closing, which corresponded to the amounts on the Final Schedule.

Thus, Avaya simply had no inkling that it would become the object of litigation brought at some

distant future time by a yet-to-be appointed Trustee, seeking a recovery of "incurred" obligations

that the parties had already agreed that Avaya did not have to pay. See Shamis, 34 F. Supp. 2d at

888-89; Hickman v. Carnival Corp., No. 04-20044 CIV UUB, 2005 WL 3675961, at *2 (S.D.

Fla. July 11, 2005) ("the duty to preserve evidence must be based on more than the mere

---

[19]     In addition, there was no evidence as to who destroyed the server at issue. Logically, one would assume that that person was a technician in Avaya's computer department, which makes it extremely unlikely that the person effecting the destruction was even aware of the APA, let alone the possibility of any dispute as to Avaya's obligations thereunder.

[20]     Notably, the Bankruptcy Court did not find that Avaya should have anticipated litigation on these issues and rested its conclusion on the existence of unpaid liabilities as to which there was no dispute and which would not have given rise to litigation. This is an extraordinary bootstrap to a $1,888,410.52 judgment.

28

possibility that something may occur at some time in the future"). Thus, the central threshold requirement for a sanctions award is plainly absent here.

The Bankruptcy Court's statement that "Avaya's conduct is exacerbated by the fact that the at the time the records were destroyed, Avaya had a contractual duty to maintain them" is a further misapprehension of Avaya's contractual duties. (Opinion at 10.) Section 5.05 of the APA did not require Avaya to retain payment records that it generated after the Closing Date. Rather, that provision required Avaya to retain only those records that Debtors transferred to it on the Closing Date and therefore did not include records created by Avaya after the Closing. (See App. 8-9.) The records on the server that were lost following the reformatting were records were created by Mr. Thompson and Ms. Nguyen in connection with their responsibilities as *Avaya* employees and do not fall within the scope of Section 5.05.

Moreover, even if a breach of contract occurred, the remedy imposed by the Bankruptcy Court – the payment of $1,888,410.52 – bore no relationship to damages which otherwise can be awarded for breach of contract. A plaintiff in a breach of contract action must prove breach, causation and damages. The Bankruptcy Court conducted no analysis of whether such damages were established, but simply entered an *ipse dixit* judgment for every dollar sought by the Trustee, based on the unsupported and illogical speculation that the destroyed server would have had information critical to the Trustee's case. Given that the bulk of the $1,888,410.52 represented claims of creditors that were asserted for the first time well after Closing, and not reflected on the Debtor's schedules, the supposition that the destroyed server would have shown that such liabilities were on the Debtor's books and records simply defies logic.

## B.   There Is No Evidence That Avaya Intentionally Or Fraudulently Destroyed Evidence

The Bankruptcy Court erred in finding that the Trustee is entitled to judgment for

the sanctions of the spoliation of evidence because "the destruction of documents was not

unintentional; rather Avaya deliberately deleted the Debtors' electronic records in order to give

itself more computer space." (Opinion at 9.) This is a misapprehension of the intent requirement

for a spoliation inference. The issue is not whether there was an intent to destroy the documents

– as inevitably always exists when a document is thrown away – but whether there was an intent

to effect that destruction for a specific improper purpose. See, e.g., Brewer, 72 F.3d at 334.

Sanctions for the spoliation of evidence are appropriate only where the party charged with the

destruction did so intentional or fraudulently "out of the well-founded fear that the contents

would harm him." Id. at 334. When documents are lost in the context of routine business

activities, extreme sanctions should not issue. See id.; see also Kronisch, 150 U.S. F.3d at 126.

The Bankruptcy Court made no finding that Avaya's decision to reformat its

server was done in order to conceal documents that would be relevant to future litigation.[21] Nor

could it, because the evidence before the Bankruptcy Court falls far short of showing that Avaya

deleted the electronic records as part of any supposed campaign to suppress the truth. Indeed,

that evidence affirmatively demonstrated that Avaya was not trying to hide anything. Mr.

Thompson's uncontroverted testimony established that he transferred all of his files to *Debtors'*

agent, DSI, in connection with his departure from Avaya and permitted DSI unfettered access to

Debtors' books and records during the transition period. (See Thompson Tr. at 65:13-66:1,

108:10-17 (App. 204-205, 208).) There is simply no way to reconcile Mr. Thompson's actions –

---

[21]      The record does not support such a finding. As explained above, by the time the server
was reformatted, Avaya had paid substantially all of the Assumed Liabilities and neither
anticipated nor reasonably could have anticipated litigation as to either these liabilities or others.

taken while he was an employee of Avaya – as consistent with a campaign to conceal evidence. Nor is there any evidence that the person who actually re-formatted the server did so with any awareness of any possible litigation. Rather than hold the Trustee to his burden, the Bankruptcy Court applied the incorrect legal standard and simply concluded that the loss of records, even if done for legitimate business purposes, is sufficient to award judgment for the spoliation of evidence. This is not the law, and this error alone requires reversal. See Menz, 2006 WL 645908 at * 3-4.

## C.    There Was No Evidence Of Prejudice By The Alleged Destruction Of Evidence

The judgment on the Sanctions Motion also should be reversed because there was no evidence that the Trustee was prejudiced by the loss of payment records. See Schmid, 13 F.3d at 81 (reversing sanctions award where there was no showing of prejudice to the movant). During discovery, Avaya produced the Final Schedule, which sets forth all of the liabilities Avaya assumed under the APA (App. 72-74); a copy of the Payables Report, which lists, by vendor, each of the trade liabilities that existed on Debtor's books at Closing and were unpaid as of April 20, 2001(App. 75-133); interim schedules that reflect the payment of Assumed Liabilities after April 20, 2001 (see, e.g., App. 138); and the schedule created by Mr. Thompson showing the payment of Assumed Liabilities through June 30, 2001, which includes a state-by-state breakdown of each of the assumed tax liabilities that remained outstanding as of June 30, 2001 (App. 151-152). Avaya also produced copies of documents establishing that there was no material difference between the outstanding trade payable liabilities reflected in the Aged Payables journal and the General Ledger after almost all of those liabilities had been paid. (See App. 139-146.) The testimony of Mr. Thompson and Ms. Nguyen further confirm that the interim schedules that Mr. Thompson prepared accurately reflected the books and records. (See

31

Thompson Tr. at 36:8-12; 60:17-25 (App. 192, 201); see also Nguyen Tr. at 13:20-23 (App. 217).) Mr. Thompson testified that the Final Schedule was a "snapshot" of Debtors' books and records as of April 20, 2001. (See Thompson Tr. at 26:22-25 (App. 186).)

As indicated by recent filings of the Trustee in Debtors' main bankruptcy case, the information made available to the Trustee in discovery in this case is more than sufficient to enable him to do his job. In those filings, the Trustee argues, on the basis of documents produced in this action and statements by Mr. Thompson, that $519,784349 in tax liabilities sought by the State of Ohio are improper because those liabilities were not reflected in Debtors' "books and records." (In re Quintus Corporation, Bankruptcy Petition Number 001-00501-MFW, D.I. 1549.)

Contrary to the Bankruptcy Court's findings, Avaya did not "selectively preserve 'relevant' documents and only present those that it finds favorable to its case, at a time when it finds convenient." (Opinion at 29.) To the contrary, Avaya has engaged in an exhaustive search for relevant information and, to the extent it found such information, that information was produced to the Trustee. The Bankruptcy Court did not consider the documents Avaya produced during discovery, which the Trustee recently relied upon to support an opposition to a proof of claim. The Bankruptcy Court thus erred in not considering the breadth of documents Avaya produced, which set forth all the information needed by the Trustee to prosecute its breach of contract claim with respect to Avaya's obligation for Assumed Liabilities. There was simply no reason to believe that any of the data on the reformatted server would add anything to or contradict either the documents that were already produced or the undisputed testimony as to the contents of the Debtor's books and records as of Closing. Indeed, the Trustee had not presented any evidence that there even *might* be an inconsistency between the server data and the other

evidence produced. Cf. Schmid, 13 F.3d at 79-81; Hartford Ins. Co. of Midwest v. Am.

Automatic Sprinkler Systems, Inc., 201 F.3d 538, 543 (4th Cir. 2000) (affirming District Court's

denial of sanctions for the spoliation of evidence where the destroyed evidence was irrelevant to

plaintiff's claims); Paramount Pictures Corp. v. Davis, No. Civ. A. 05-0316, 2005 WL 3303861,

at *9 (E.D. Pa. Dec. 2, 2005) ("the evidence destroyed or withheld [must be] relevant to claims

or defenses").

        In fact, the Sanctions Motion seems only an attempt by the Trustee to identify

some documents that were destroyed, speculate that they might have helped his case, and then

ask for an inference that contradicts every other piece of evidence and undisputed testimony.

The fact that the Trustee made this attempt is understandable, but the fact that the Bankruptcy

Court adopted it escapes all understanding.

## D.    The Bankruptcy Court's Award Of $1,888,410.52 Is Inconsistent With The APA

        Even assuming there were any basis for a sanction here – which is plainly not the

case – the Bankruptcy Court had no basis for awarding $1,888,410.52 to the Trustee.

Essentially, the Bankruptcy Court simply gave the Trustee every dollar that he sought, even

though there is no conceivable way that the bulk of these amounts were reflected on Debtors'

books and records as of Closing. Indeed, the $1,888,410.52 is $1,135,713.76 *in excess of* the

$752,696.76 shown on Debtors' own Schedules. The judgment award includes (a) claims that

were asserted by creditors well into the bankruptcy case and long after the Closing; (b) claims for

rejection of contracts; and (c) claims, such as the $519,784.49 tax claim of the State of Ohio, to

which the Equity Committee and Trustee have filed a formal objection. The notion that any of

these subsequently-discovered amounts were included in Debtors' books and records as of

Closing simply defies logic.

33

Thus, by awarding $1,888,410.52 as a sanction, the Bankruptcy Court required precisely what it itself recognized the APA did not require – the assumption by Avaya of all liabilities incurred by Debtors, even if they were recorded after the Closing, or even never recorded.[22] There was no evidence to support such an award, and indeed it was inconsistent with the undisputed evidence that all the accrued or recorded liabilities as of Closing were reflected in the Final Schedule. Mere speculation as to what a server *might* have contained, without a glimmer of proof that it contained anything that contradicted the ample undisputed evidence, does not provide a basis for the Bankruptcy Court's sanctions award. Such an award is arbitrary and capricious at best, and it therefore cannot be sustained even if all the other premises of a sanctions award were assumed.

For all these reasons, the Bankruptcy Court's ruling on the Trustee's motion for sanctions misapplies and overlooks governing legal standards and ignores relevant unrefuted facts as well as the APA. It should be reversed.

## CONCLUSION

For the foregoing reasons, Avaya respectfully requests that the Court reverse the Bankruptcy Court's Opinion and Order granting in part the Chapter 11 Trustee's Motions for Partial Summary Judgment and for Sanctions for the Spoliation of Evidence and only granting in

---

[22]    Moreover, even the Trustee's Supplement that set forth the $1,888,410.52 figure, filed *after* briefing on the motions for summary judgment had closed, establishes that the total amount the Trustee sought in damages was in flux. (See D.I. 116 at 3 (noting that certain claims had been disallowed, marked as fully or partially paid or withdrawn).) The Supplement also made clear that such amounts were sought not on the ground of having been entered in Debtors' books, but on the ground that they "constitute Assumed Liabilities under the Trustee's interpretation of the APA," which argued "accrued" liabilities to be "incurred" liabilities and which was emphatically rejected by the Bankruptcy Court. Accordingly, even if there had been a basis for not accepting the Payables Report as a definitive listing of all trade payable liabilities that Avaya had assumed – and there was not – the Bankruptcy Court should have ruled on the meaning of the contractual language at issue and reserved for trial issues of whether certain liabilities had been accrued or recorded on Debtors' books.

part Avaya's Motion for Partial Summary Judgment, except to the extent that the Opinion and

Order properly held that "Avaya assumed only obligations that were reflected in the Debtors'

books and records." (Opinion at 20.)

Dated: April 9, 2007

ROSENTHAL, MONHAIT, & GODDESS, P.A.

By:_____

Jeffrey S. Goddess  (Del. Bar No. 630)
919 N. Market Street
Wilmington DE 19801
(302) 656-4433
jgoddess@rmgglaw.com

- and -

SIDLEY AUSTIN LLP
James D. Arden
787 Seventh Avenue
New York, New York 10019
(212) 839-5300

Attorneys for Defendant Avaya Inc.

35

# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: | ) Chapter 11 |
| | ) |
| QUINTUS CORPORATION, et al., | ) Case No. 01-00501 through |
| | ) Case No. 01-00503(MFW) |
| Debtors. | ) |
| _____ | ) Jointly Administered |
| | ) |
| QUINTUS CORPORATION, | ) |
| MUSTANG.COM, INC., and | ) |
| ACUITY CORPORATION, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Adversary No. 04-53074 |
| | ) |
| AVAYA, INC., | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

## OPINION[1]

Before the Court are cross motions for summary judgment in
the above adversary proceeding filed by the chapter 11 Trustee of
the Debtors' estate and by Avaya, Inc., the purchaser of
substantially all the assets of the Debtors.  The Trustee has
also filed a Motion for Sanctions seeking judgment in his favor
as a result of Avaya's destruction of books and records essential
to the Trustee's case.  For the reasons set forth below, the
Court will grant, in part, both motions of the Trustee and will
grant, in part, Avaya's motion for partial summary judgment.

_____

    1  This Opinion constitutes the findings of fact and
conclusions of law of the Court pursuant to Rule 7052 of the
Federal Rules of Bankruptcy Procedure.

D.I. 120
10-30-2006

I.    BACKGROUND

On February 22, 2001, Quintus Corporation ("Quintus") and
its subsidiaries (collectively the "Debtors") filed voluntary
petitions under chapter 11 of the Bankruptcy Code.  On that same
day, the Debtors executed an Asset Purchase Agreement ("APA")
with Avaya, Inc. ("Avaya") for the sale of substantially all the
Debtors' assets.  In exchange for the Debtors' assets, Avaya
agreed to assume certain of the Debtors' liabilities not to
exceed $30 million and to pay $30 million in cash at closing.  On
April 6, 2001, the Court entered an Order authorizing the sale of
the Debtors' assets free and clear of all claims and interests
pursuant to the terms of the APA.  The sale closed on April 11,
2001 (the "Closing Date").

Subsequently, on January 30, 2002, Kurt F. Gwynne (the
"Trustee") was appointed as the chapter 11 trustee in the jointly
administered cases.  On March 18, 2004, the Trustee filed an
adversary complaint against Avaya asserting breach of contract
and unjust enrichment for failure to pay certain liabilities
assumed under the APA.  Avaya filed an answer and affirmative
defenses on April 19, 2004.  After discovery, both parties moved
for summary judgment.

2

Avaya seeks dismissal of the adversary complaint.[2]  The
Trustee seeks an order finding that Avaya materially breached the
APA and awarding damages accordingly.  The Trustee seeks that
relief based on the evidence garnered in discovery and on the
fact that Avaya has failed to produce relevant documents
essential to the Trustee's case which were in Avaya's sole
control and which Avaya was obligated to maintain pursuant to the
APA.

The motions have been fully briefed and are ripe for
decision.

II.  <u>JURISDICTION</u>

The Court has jurisdiction over this adversary proceeding
pursuant to 28 U.S.C. §§ 1334(b) & 157(b)(2)(A), (E), (N) & (O).

III. <u>DISCUSSION</u>

A.   <u>Standard for Summary Judgment</u>

Summary judgment is appropriate where "there is no genuine
issue as to any material fact and . . . the moving party is
entitled to a judgment as a matter of law."  Fed. R. Civ. P.
56(c).  "In deciding a motion for summary judgment, the judge's

---

2  Avaya previously filed a motion to dismiss one count of
the complaint.  The Court deferred ruling on that motion pending
the completion of discovery.  Because Avaya's motion for summary
judgment raises the same issue, this decision moots the dismissal
motion.

function is . . . to determine if there is a genuine issue for trial." Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 637 (3d Cir. 1993).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Huang v. BP Amoco Corp., 271 F.3d 560, 564 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). Once the moving party establishes the absence of a genuine issue of material fact, however, the burden shifts to the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). A party may not defeat a motion for summary judgment unless it sets forth specific facts, in a form that "would be admissible in evidence," establishing the existence of a genuine issue of material fact for trial. Fed. R. Civ. P. 56(e).[3] See also Fireman's Ins. Co. of Newark, N.J. v.

---

3   To rebut a moving party's record, Rule 56(e) requires:

(e) . . . When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e).

4

DuFresne, 676 F.2d 965, 969 (3d Cir. 1982); Olympic Junior, Inc.
v. David Crystal, Inc., 463 F.2d 1141, 1146 (3d Cir. 1972).

    In determining whether a factual dispute warranting trial
exists, the court must view the record evidence and the summary
judgment submissions in the light most favorable to the non-
movant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49
(1986).  Issues of material fact are those "that might affect the
outcome of the suit under governing law."  Id. at 248.  An issue
is genuine when it is "triable," that is, when reasonable minds
could differ on the result.  Matsushita, 475 U.S. at 587.

    In this case, the parties have supported their cross motions
for summary judgment with references to depositions and documents
garnered through discovery, as well as sworn affidavits.  Though
at first blush there appears to be a dispute of fact (whether
Avaya paid all assumed liabilities), in reality there is not.
The identity of the liabilities actually paid by Avaya is not
disputed; the Trustee has obtained copies of all the checks
issued by Avaya.  The crucial issue in dispute is one of contract
interpretation: which liabilities did Avaya assume?

          1.   Summary Judgment in Breach of Contract Suit

    Summary judgment is proper where contract language is
unambiguous and favors the interpretation advanced by the movant.
Newport Assocs. Dev. Co. v. Travelers Indemnity Co. of Ill., 162
F.3d 789, 791 (3d Cir. 1998); Tamarind Resorts Assocs. v. Gov't

5

of the Virgin Islands, 138 F.2d 107, 111 (3d Cir. 1998).
"Contract language is not ambiguous simply because the parties
disagree on its meaning." E.I. Dupont de Nemours & Co. v.
Allstate Ins. Co., 693 A.2d 1059, 1061 (Del. 1997). See also
Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc., 247 F.3d 79, 93
(3d Cir. 2001). "Rather, a contract is ambiguous only when the
provisions in controversy are reasonably or fairly susceptible of
different interpretations." Rhone-Poulenc Basic Chems. Co. v.
Am. Motorists, Inc., 616 A.2d 1192, 1196 (Del. 1992).

     Under Delaware law, the starting point for any contractual
interpretation is the plain language of the parties' agreement.[4]
Citadel Holding Corp. v. Roven, 603 A.2d 818, 822 (Del. 1992).
"If a writing is plain and clear on its face . . . the writing
itself is the sole source for gaining an understanding of
intent." City Investing Co. Liquidating Trust v. Cont'l Cas.
Co., 624 A.2d 1191, 1198 (Del. 1993); Klair v. Reese, 531 A.2d
219, 223 (Del. 1987).

     Where the meaning and application of the terms of the
contract are uncertain, the trial court may consider testimony
pertaining to antecedent agreements, communications and other
factors which bear upon the proper interpretation of the

---

     4 Pursuant to section 10.06, the APA is governed by
Delaware law. (Appendix to Opening Brief of Defendant Avaya,
Inc., in Support of its Motion for Partial Summary Judgment at A
50 (hereinafter referred to as "Appendix").)

6

contract.  <u>Klair</u>, 531 A.2d at 223.  <u>See also</u> <u>James River-</u>
<u>Pennington, Inc. v. CRSS Capital, Inc.</u>, No. 13870, 1995 WL
106554, at *5 (Del. Ch. 1995) (concluding that where contract is
ambiguous, the court is permitted to consider objective,
extrinsic evidence of the intent of the parties in drafting the
operative language).

     2.   <u>Sanction for Failure to Produce Documents</u>

The Trustee also seeks summary judgment as a sanction for
Avaya's failure to produce documents in discovery.  Specifically,
the Trustee argues that Avaya failed to produce the Debtors'
general ledger, sub-ledgers, and vendor files from which the
Trustee could establish what remains unpaid of the liabilities
Avaya assumed.  The Trustee argues that Avaya had a contractual
obligation under section 5.05(a) of the APA to maintain those
records for seven years after the Closing Date, yet destroyed
them within months of Closing.  (Appendix at A 36.)  The Trustee
contends that the destroyed documents are highly relevant to this
litigation because they go to the heart of the dispute: what
liabilities were assumed and what assumed liabilities remain
unpaid.  The Trustee asserts that he is highly prejudiced by the
destruction of the documents, to the extent that the Court does
not agree that he is otherwise entitled to summary judgment on
the legal bases asserted in his motion for partial summary
judgment.  <u>See, e.g.</u>, <u>Shamis v. Ambassador Factors Corp.</u>, 34 F.

7

Supp. 2d 879, 889 (S.D.N.Y. 1999) (stating that in determining
the prejudice suffered as a result of destruction of documents,
the court should "examine the materiality and value of the
suppressed evidence upon the ability of [the movant] to fully and
fairly prepare for trial."). As a result, the Trustee argues
that he is entitled to sanctions, including the entry of judgment
in his favor on the complaint. See, e.g., Shepherd v. Am. Broad.
Cos., 62 F.3d 1469, 1479 (D.C. Cir. 1995) (concluding that
judgment is appropriate sanction where destruction of documents
deprives adversary of critical evidence).

        Avaya responds that there is no evidence that it
intentionally destroyed these documents to suppress the truth.
The destruction occurred in 2001 or 2002, long before the Trustee
commenced this adversary proceeding (and before the Trustee was
even appointed). Therefore, Avaya asserts that the Court cannot
find  that the destruction of documents was done in anticipation
of litigation - a necessary element to sanction a party for
document destruction. See, e.g., Shamis, 34 F. Supp. 2d at 888-
89 ("A condition precedent to the imposition of sanctions is
whether [the party charged with destruction] knew or should have
known that the destroyed evidence was relevant to pending,
imminent or reasonably foreseeable litigation."). Further, Avaya
argues that it substantially fulfilled its obligation to retain
the records, because it gave copies to the Debtors' financial

8

adviser. Finally, it asserts that the Trustee is not prejudiced by the document destruction because all the documents relevant to the issue before the Court have been produced, namely the Final Schedule, which Avaya asserts is the definitive list of all liabilities which it assumed.

To sanction a party who has destroyed evidence, the court must consider: (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) what degree of sanction is necessary to avoid substantial unfairness to the opposing party and to deter such conduct by others in the future. <u>Schmid v. Milwaukee Elec. Tool Corp.</u>, 13 F.3d 76, 79 (3d Cir. 1994).

The Court finds that in this case, contrary to Avaya's assertion, the destruction of documents was not unintentional; rather Avaya deliberately deleted the Debtors' electronic records in order to give itself more computer space.[5]  The records were

---

5  Avaya's assertion that it gave hard copies of the documents to the Debtors' financial adviser is not supported by the record.  Although the Debtors' former CFO, Mark Thompson, testified that he boxed his records and left them behind for the Debtors' advisers, there is no evidence that those records were all the Debtors' financial records.  (Opening Brief in Support of Chapter 11 Trustee's Motion for Sanctions for Spoliation of Evidence, Exhibit D.)  Another former employee of the Debtors and Avaya, Rosie Nguyen, testified that she sent the Debtors' financial records to Avaya's archives.  (<u>Id.</u>, Exhibit A.)  Further, the Debtors' financial advisers testified that the records they received were extremely limited.  (Reply Brief in Support of Chapter 11 Trustee's Motion for Sanctions for Spoliation of Evidence, Exhibits G & H.)  Even if Avaya had given some of the records to the Debtors' financial advisers, they would have had no reason to keep them given Avaya's undertaking

9

not simply lost or accidentally destroyed. Cf. Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 334 (3d Cir. 1995) (concluding that the district court did not err in refusing to draw spoliation inference where there was no evidence that missing files were intentionally destroyed as opposed to misplaced or lost). Avaya's conduct is exacerbated by the fact that at the time the records were destroyed, Avaya had a contractual duty to maintain them. (Appendix at A 36.)

Further, when it destroyed the Debtors' books and records, Avaya had not paid all the liabilities it had assumed.[6] Therefore, it should have anticipated litigation over its failure to comply with the APA. See, e.g., Silvestri v. General Motors Corp., 271 F.3d 583, 591 (4th Cir. 2001) (noting that "[t]he duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation"); Shamis, 34 F. Supp. 2d at 888-89 (inquiry is whether the party destroying documents "knew or should have known that the destroyed evidence was relevant to pending, imminent or reasonably foreseeable litigation."); Howell

---

to preserve all the records for a period of seven years.

6   The Trustee asserts that Avaya admitted it owed $500,000 of the assumed liabilities at the time the documents were destroyed; Avaya disputes this. It is unnecessary to decide this dispute, however, because Avaya admits that it still owes in excess of $300,000 as of today.

10

v. Maytag, 168 F.R.D. 502, 505 (M.D. Pa. 1996) (holding that a party who has reason to anticipate litigation has an affirmative duty to preserve evidence which might be relevant to the issues in the lawsuit).

Finally, to the extent that the records are necessary for the Court to determine the merits of this suit, the destruction was prejudicial to the Trustee.  In that event, there would be a basis for sanctioning Avaya for its failure to maintain the Debtors' financial records.  See, e.g., Computer Assocs. Int'l, Inc. v. Am. Fundware, Inc., 133 F.R.D. 166, 170 (D. Co. 1990) (granting default judgment against party which had destroyed evidence essential to plaintiff's case); Wm. T. Thompson Co. v. General Nutrition Corp., 593 F. Supp. 1443, 1456 (C.D. Cal. 1984) (holding that defendant's destruction of relevant records warranted both monetary sanctions and ultimate sanction of default judgment against it); In re Wechsler, 121 F. Supp. 2d 404, 429 (D. Del. 2000) (concluding that owner's intentional destruction of ship, thereby precluding an inspection to determine the cause of a fire aboard, warranted judgment against it).  See generally 7 Moore's Federal Practice - Civil § 37.120 (2006).

The determination of the proper sanction, however, depends on the extent of any prejudice suffered by the Trustee.  If the Trustee is successful on the legal issues presented in his motion

11

for partial summary judgment, for example, no prejudice is shown
and no sanction is mandated.  The Court will therefore consider
the appropriate sanction in the context of its decision on the
merits of the cross motions for summary judgment.

    B.   Unjust Enrichment

    Initially, Avaya argues that where there is no dispute that
a valid contract governing the parties' relationship exists,
"recovery under an unjust enrichment claim is precluded as a
matter of law."  Liafail, Inc. v. Learning 2000, Inc., Nos. C.A.
01-599 GMS, C.A. 01-678 GMS, 2002 WL 31667861, at *13-14 (D. Del.
Nov. 25, 2002).  In his Complaint, the Trustee alleges that the
APA constitutes a valid, binding agreement between the parties.
(See Complaint at ¶¶ 11, 17-18.)  As it does not dispute this
assertion, Avaya contends that summary judgment in its favor
dismissing the Trustee's unjust enrichment claim is warranted.
Liafail, 2002 WL 31667861, at *13-14.

    The Trustee responds that Delaware law permits a claim for
unjust enrichment where an express contract exists, so long as
the obligations or rights that are the subject of that claim are
not exclusively governed by the contract at issue.  Fitzgerald v.
Cantor, No. C.A. 16297, 1998 WL 326686, at *6 (Del. Ch., June 16,
1998).

    In this case, however, the Trustee has made no effort to
demonstrate that his claims are not exclusively governed by the

12

APA; nor is any of the destroyed evidence relevant to this issue. Therefore, because a binding contract exists between the parties that adequately addresses each party's rights and duties, the Court concludes that a claim for unjust enrichment is not available.  Liafail, 2002 WL 31667861, at *13-14.  See also, In re Crown-Simplimatic, Inc., 299 B.R. 319, 327 (Bankr. D. Del. 2003) (concluding that "[b]ecause a binding contract exists that adequately addresses each party's rights and duties, [the plaintiff] cannot recover under the quasi-contractual theory of unjust enrichment.").  Therefore, the Court will grant Avaya's motion for summary judgment, in part, and will dismiss the Trustee's unjust enrichment claim.

C.    Breach of Contract

In this case, the Trustee seeks a judgment against Avaya in the amount of $1,888,410.52 for unpaid claims allegedly assumed by Avaya under the APA.  (See Exhibit A to Trustee's Motion for Partial Summary Judgment; Supplement in Support of Trustee's Motion for Partial Summary Judgment.)  The Trustee asserts that Schedule 1.03 of the APA requires that Avaya pay all claims which arose after the December 31, 2000, Balance Sheet, including the claims listed on the Debtors' bankruptcy schedules or on proofs of claim filed by creditors.

Avaya disagrees.  Avaya asserts that Schedule 1.03 cannot be read so broadly.  Rather, it argues that the only liabilities

13

assumed are those which were reflected in the Debtors' books and
records as of the Closing Date, except for three subcategories of
claims that are not at issue here.

The parties' dispute requires an interpretation of Schedule
1.03 of the APA, which provides:

Schedule 1.03: Assumed Liabilities

1.  All liabilities listed on the Company Balance
Sheet (exclusive of the liability listed thereon
that is an Excluded Liability pursuant to Section
1.04(v)) and <u>all liabilities accrued or recorded
after the Balance Sheet Date in the ordinary
course of business consistent with past practice
to the extent not satisfied prior to the Closing
Date</u>, provided that the aggregate amount of
liabilities assumed pursuant to this paragraph
shall not exceed $30,000,000, and provided further
that in no event shall Buyer assume liabilities
for any advisers to any Seller in connection with
the Chapter 11 Case or any Existing Claims in
excess of an aggregate of $1,000,000. In addition,
Buyer shall assume each of the liabilities and
obligations set forth in clauses a - c below, and
such liabilities shall count against the
$30,000,000 limitation in the foregoing sentence
to the extent such liabilities are or should be
accrued or recorded on the Company balance sheet
based on GAAP applied on a consistent basis and
have not been satisfied at the Closing.

(Appendix at A 10-11 (emphasis added).)

1.    Meaning of "Accrued"

a.    Plain Meaning

The Trustee argues that under the plain language of Schedule
1.03, Avaya is liable for any and all liabilities incurred by the
Debtors after the Balance Sheet Date (December 31, 2000) that
were not paid prior to the Closing Date (April 11, 2001).

14

Specifically, he argues that "accrued" and "incurred" are
interchangeable.

Avaya argues, in contrast, that "accrued" means a liability
that has been recorded on the Debtors' books and records. Avaya
contends, therefore, that the only liabilities it assumed are
those listed on the Debtors' books and records, which are
reflected on the Final Schedule submitted to Avaya at the
Closing. Avaya's argument is premised on the meaning of
"accrual" in financial parlance, which describes liabilities that
are reflected by an actual entry in financial books of account.
Under accounting literature, liabilities should be recorded once
an invoice is received. Even before an invoice is received,
however, some liabilities should be reflected on a company's
books (i.e., accrued) based on reliable estimates.[7] Therefore,
Avaya asserts that "accrued or recorded" in Schedule 1.03
referred to liabilities that were somewhere reflected in the

---

    7   The Financial Accounting Standards Board ("FASB")
Statement of Financial Accounting Concepts No. 6 provides that
"[a]ccrual is concerned with expected future cash receipts and
payments: it is the accounting process of recognizing assets or
liabilities and the related liabilities, assets, revenues,
expenses, gains, or losses for amounts expected to be received or
paid, usually in cash, in the future."  FASB's Statement of
Financial Accounting Standards No. 5 notes that an "estimated
loss from a contingency . . . shall be accrued by a charge to
income" if it is probable the loss will be incurred and it "can
be reasonably estimated."  AICPA Accounting Research Bulletin No.
43 states that the "concept of current liabilities would include
estimated or accrued amounts which are expected to be required to
cover expenditures within the year for known obligations" whose
precise amount or payee is yet unknown.

15

Debtors' books and records by an accounting entry.

The Trustee argues in response that "accrued" is interchangeable with "incurred." As support, the Trustee cites to an earlier edition of Black's Law Dictionary, which defined the word "accrue" as meaning, among other things, "was incurred." Black's Law Dictionary 20-21 (6th ed. 1990).

The Court finds this argument of the Trustee unpersuasive. Neither the 7th edition (published in 1999 and therefore the version in existence at the time the APA was drafted), nor the current 8th edition (published in 2004) provide that "accrue" is interchangeable with "incur." See Black's Law Dictionary 21 (7th ed. 1999); Black's Law Dictionary 22 (8th ed. 2004).

The Trustee further argues that if Avaya's interpretation that "accrued" means "recorded on the Debtors' books and records" was correct, the term "or recorded" found after it in Schedule 1.03 would be wholly unnecessary. Avaya's argument in essence is that "accrued or recorded" means "accrued and recorded" in the Debtors' books and records prior to the Closing Date. The Trustee asserts that Avaya's interpretation is incorrect because it would make part of the language of Schedule 1.03 meaningless surplusage.

Avaya similarly argues that if the Trustee's interpretation were correct, then much of the sentence would be surplusage. If the parties had intended Avaya to assume all liabilities of the

16

Debtors arising after the Balance Sheet Date (as the Trustee
contends), the provision would have said so more directly by
stating simply that "Avaya assumes all liabilities of the Debtors
to a maximum of $30,000,000."

In interpreting a contract, the Court should strive to avoid
an interpretation where any provision is rendered meaningless or
mere surplusage.  See, e.g., Rag Am. Coal Co. v. AEI Res., Inc.,
No. CIV. A. 16728, 1999 WL 1261376, at *5 (Del. Ch. Dec. 7, 1999)
(citing Sonitrol Holding Co. v. Marceau Invetissements, 607 A.2d
1177, 1183 (Del. 1992)).  In this case, however, both parties'
interpretation would render some of the language of Schedule 1.03
mere surplusage.  The Court is unable to determine, from a plain
reading of the provision, which interpretation is correct.
Therefore, the Court must refer to other evidence to determine
the parties' intent.  See, e.g., Eagle Indus., Inc. v. DeVilbiss
Health Care, Inc., 702 A.2d 1228, 1232-33 (Del. 1997) (concluding
that if there is any ambiguity in the meaning of a contract, the
court may consider parol evidence of the parties' intended
meaning).

b.    Prior Negotiations

Avaya argues that the evidence shows that during the
negotiations of Schedule 1.03, the Debtors' counsel twice
proposed language that would have required Avaya to assume
liabilities that were not reflected in the Debtors' books as of

17

the Closing Date, but Avaya steadfastly refused to accept that
language.  First, the Debtors proposed language for Section 1.03
that would have made Avaya responsible for "all liabilities [of
Debtors] arising after" December 31, 2000, subject only to the
$30 million limitation.  (See Appendix at A 64.)  Avaya rejected
this proposal.  Avaya contends that the Debtors made a second
proposal, which would have made Avaya accountable for all
liabilities "incurred after" December 31, 2000, which Avaya
rejected as well.

The Trustee argues in response that during negotiations
Avaya tried to get a more particularized definition of assumed
liabilities that would specifically identify by name and amount
each and every liability to be assumed by Avaya under the APA.
(Opening Brief in Support of Chapter 11 Trustee's Motion for
Partial Summary Judgment, Exhibit B at ¶ 4.)  This was rejected
by the Debtors who agreed only to limit liabilities to $30
million.  (Id.)  Avaya also tried to have attached to the Sale
Order, a list of all assumed liabilities by payee and amount.
(Id. at ¶ 5 & Exhibit C.)  The Debtors again rejected this
suggestion.  (Id., Exhibits D & E at 115.)  As a result,
Schedule 1.03 only provides categories of assumed liabilities and
does not contain or refer to a fixed list of specific assumed
liabilities.

18

The Trustee further cites an email exchange between the parties as support for his conclusion that the parties intended that all "incurred" debts were assumed. Counsel for the Debtors, in arguing against having a specific listing of claims, stated: "If, as one of your earlier e-mails suggests, the schedule was more specific it would necessarily exclude liabilities that I understood would be assumed, e.g., incurred but not invoiced debts." (Id., Exhibit D.) In response, counsel for Avaya states in part: "[w]e certainly are free to list the incurred but not invoiced debts . . . . " (Id., Exhibit F.) Also, in negotiating the Sale Order, the Trustee asserts that Avaya's counsel agreed that Schedule 1.03 encompasses liabilities which were "incurred" pre-closing. (Id.)

The Court is more persuaded by the evidence presented by Avaya. The Trustee's references are often to statements made after the APA was executed and, therefore, were not incorporated into the APA. In contrast, the Court finds that the parties' express rejection of a version of Schedule 1.03 which would have obligated Avaya to assume all "incurred" obligations of the Debtors is persuasive evidence that the parties intended "accrued" to mean something other than "incurred." Therefore, the Court is persuaded that the parties intended the term "accrued" to have its financial meaning, that is, an obligation which must be estimated on the Debtors' books and records for

19

purposes of accounting.  This is bolstered by the testimony of
the Debtors' former accounting personnel who stated that in the
ordinary course of the Debtors' business, they made a journal or
other book entry for accrued expenses.  This is further confirmed
by the schedule that was presented by the Debtors to Avaya on
April 20, 2001 (the "Final Schedule").  (Appendix at A 186-88.)
The Final Schedule had several categories of obligations which
Avaya assumed, including "Trade AP", "Other Accounts Payable",
and "Accrued Liabilities."  Mark Thompson, the former Vice
President of Finance of the Debtors, testified that the detail
supporting those categories of assumed liabilities all came from
the Debtors' books and records.  Therefore, the Court concludes
that Avaya assumed only obligations that were reflected in the
Debtors' books and records.

     The parties still disagree, however, about what liabilities
were reflected on the Debtors' books and records and, therefore,
were assumed by Avaya.  It is here where the destroyed documents
become crucial.

          2.   Final Schedule

     Avaya asserts that the liabilities it assumed are those
definitively listed on the Final Schedule.  (Appendix at A 186-
88, 292-95.)  The Final Schedule was prepared by Thompson.  (Id.
at A 285, 292-95.)  The cover memo enclosing the Final Schedule
notes that pursuant to the parties' agreement the Final Schedule

                              20

was submitted "in lieu of" the estimate of assumed liabilities required by Schedule 1.03. (Id. at A 186.)  Thompson testified that the Final Schedule represents the total amount of liabilities ($22,549,000) which were reflected on the Debtors' books and records as of April 20, 2001.  (Id. at A 283-96, 187.) As the Final Schedule reflects the total amounts "accrued or recorded" as of April 20, 2001, Avaya contends that it represents all the liabilities assumed by it under the APA.

The Trustee argues, however, that the Final Schedule is not conclusive evidence of the identity or amount of assumed liabilities.  Under the APA, the Debtors were supposed to provide Avaya, within three business days of the Closing Date, an estimate of what the assumed liabilities would be as of that date.[8]  (Id. at A 10-11.)  This schedule was to be the basis for

---

8  Section 1.03 provides in this regard:

No more than 3 business days prior to the Closing Date, Company shall deliver to Buyer a schedule in reasonable detail showing Company's estimate of the Assumed Liabilities as of the Closing Date.  Buyer shall have the right, to review this schedule of Assumed Liabilities, and the parties agree to discuss in good faith any comments or questions that Buyer may have with respect to such schedule.  From and after the Closing, Buyer shall have the right to confirm the accuracy of the schedule for a period of 5 business days after the Closing.  If, based on such review, Buyer believes that the Assumed Liabilities as of the Closing Date exceeds $30,000,000, the parties agree to discuss in good faith Buyer's comments, and any disputes that the parties cannot resolve within 2 business days will be resolved expeditiously before the Bankruptcy Court.  If the Assumed Liabilities as of the Closing Date, as reflected on the schedule prepared by

21

Avaya to determine whether the assumed liabilities exceeded $30 million.   The Trustee argues that the Final Schedule merely provides an estimate and not the total Liabilities that Avaya agreed to assume under the APA.   In support of his position, the Trustee notes that the cover letter states that the Final Schedule is "a schedule of the Company's estimate of the Assumed Liabilities."   In fact, the word "estimate" is used six times throughout the document.   (Id. at A 186-88.)

In response to the Trustee's argument, Avaya asserts that the use of the word "estimate" in the Final Schedule and cover letter is consistent with Avaya's interpretation of Schedule 1.03.   Because "accrued" liabilities must be recorded prior to the receipt of a final bill or invoice, they are of necessity estimates.   (Id. at A 280 ("that's the point of accruals . . . estimating what your liabilities are").)   Additionally, Avaya noted that the Debtors did, in fact, submit the estimated schedule to Avaya on April 5, 2001, and that the Final Schedule was submitted on April 20, 2001, and reflects the amount of assumed liabilities agreed upon by the parties after the Closing Date.   (Id. at A 183-88.)   Avaya notes that the April 5, 2001, schedule was marked "ESTIMATE" while the April 20, 2001, schedule

---

Company or as revised upon resolution of any comments
by Buyer, exceed $30,000,000, then the provisions of
Section 5.14 shall apply.

(Appendix at A 11.)

22

was plainly marked "FINAL."  (Id.)

The Court agrees with the Trustee that the Final Schedule does not represent a final and exclusive list of liabilities assumed by Avaya.  Rather, the Final Schedule provides only a broad categorical description of the types of liabilities to be assumed and an estimate of the amount owed in each of those categories; it does not include a specific listing of liabilities to be assumed, particularly with respect to the accrued liabilities.[9]  The Final Schedule bears no hallmarks of finality. It uses "estimate" six times, reflects dollar figures rounded to the nearest thousand and makes almost no reference to specific creditors.  Therefore, the Court concludes that the Final Schedule was not a conclusive list of the liabilities assumed by Avaya.[10]  The Court concludes instead that the liabilities assumed by Avaya are the actual liabilities that were reflected on the Debtor's books and records.

---

[9]  The trade payables ($7,080,000) were included as a line item and detailed in an attached Aged Payables Report dated that same date.  (Id. at A 187, 189-247, 301.)  The Final Schedule also included "Accrued Liabilities" as a line item ($5,513,000) and attached a one page list of the categories of accrued liabilities.  (Id. at A 186-88.)  The remainder of the assumed liabilities (in excess of $8 million) were in the deferred revenues category, which represented prepayment by customers for services which Avaya became obligated to provide after the Closing Date.

[10]  This is confirmed by the fact that the Avaya employees did not actually use the Final Schedule in paying the assumed liabilities.  (Appendix at A 296.)

23

### 3.   Bankruptcy Schedules

The Trustee argues that the Debtors' bankruptcy schedules reflect liabilities assumed by Avaya.  He notes that the Debtors' bankruptcy schedules were executed by Thompson on April 10, 2001, only one day prior to the Closing Date.  Thompson confirmed that the bankruptcy schedules reflect the Debtors' liabilities as they were shown in the Debtors' books and records.  (Opening Brief, Exhibit G at 146-47.)  Consequently, the Trustee asserts that the debts listed on the bankruptcy schedules are assumed liabilities under the APA.  The Trustee has compared the liabilities listed on the bankruptcy schedules with the evidence he obtained in discovery of Avaya's payment of claims and contends that at least $429,786.49 in trade claims and $302,134.97 in scheduled tax claims were never paid by Avaya.  (Reply Brief in Support of Chapter 11 Trustee's Motion for Partial Summary Judgment, Exhibit D at ¶¶ 9, 11-12; Supplement in Support of Chapter 11 Trustee's Motion for Partial Summary Judgment, Exhibit B at ¶¶ 12-13, 16.) Thus, the Trustee asserts that Avaya owes $731,921.46 in scheduled (and therefore assumed) liabilities.

Avaya disagrees, asserting that the bankruptcy schedules are irrelevant.  It asserts that they are not the books and records kept by the Debtors in the ordinary course of business and that Schedule 1.03 did not provide for the assumption of all liabilities listed on the bankruptcy schedules.

24

The Court rejects Avaya's arguments.  The Debtors' bankruptcy schedules reflect liabilities that were on the Debtors' books and records as of the date of the filing of the schedules.  (Opening Brief, Exhibit G at 146-47.)  Because Avaya assumed all liabilities accrued or recorded on the Debtors' books and records, it is responsible for the claims listed on the Debtors' schedules.  Avaya has presented no evidence to refute the Trustee's proof that $752,696.76 in scheduled (and therefore assumed) liabilities have not been paid by it.[11]  Based on the evidence presented by the parties, judgment in the Trustee's favor in this amount is warranted.

### 4.    Proofs of Claim

The Trustee argues that Avaya assumed the liabilities that are reflected on the claims register in this case.  He contends that a debt is "recorded" on the Debtors' books and records when a proof of claim is filed and the obligation is listed in the claims register, because the claims register was the Debtors' only remaining means of recording an obligation once their books and records were transferred to Avaya on the Closing Date.

Avaya disagrees and reiterates its argument that the assumed liabilities were only those which were actually reflected by accrual or recording on the Debtors' books and records and that

---

11  In fact, Avaya has conceded that it owes a portion of these claims.  Specifically, Avaya admits $202,165.46 in trade payables and $321,383.83 in tax liabilities remain unpaid obligations which it assumed under the APA.

25

the claims register is not part of the Debtors' books and
records.  It further argues that the book entry must have been
made before the Closing Date according to the language of
Schedule 1.03.  The Trustee responds that the language "prior to
the Closing" contained in Schedule 1.03 modifies only the phrase
immediately preceding it: "to the extent not satisfied."  The
Trustee argues, therefore, that any debt recorded or accrued on
the Debtors' books and records in the ordinary course of business
at any time, even after the Closing Date, was assumed by Avaya.

    The Court agrees with the Trustee's interpretation of the
contract.  There is nothing to suggest that "prior to the Closing
Date" modifies the entire sentence rather than simply the clause
immediately before it.  Thus, Schedule 1.03 eliminated
liabilities from assumption if they were paid before the Closing
Date.  Avaya's argument that the assumed liabilities only
included those which were recorded before the Closing Date is
contradicted by the activities of the Debtors' employees hired by
Avaya who continued to process invoices they received in the
ordinary course of business post-Closing.  The Court, however,
disagrees with the Trustee's contention that the filing of a
proof of claim was a "recording" in the Debtors' books and
records done "in the ordinary course of business consistent with
past practice" as required by Schedule 1.03.

26

The Trustee asserts nonetheless that Avaya has admitted its
liability for filed proofs of claim. He relies on an email sent
by Janet Poriadjian, an Avaya employee responsible for setting
the account policy for and defining the scope of assumed
liabilities under Schedule 1.03, which he quotes as stating:

> . . . please keep in mind that we purchased "certain
> assets and liabilities" and not the Quintus
> Corporation.  We have no obligation to pay the vendors
> that may think that they have an economical right to be
> paid by Avaya, because they may not, <u>unless the vendor
> filed a claim through the original bankruptcy courts
> and/or we've agreed to assume their particular
> liability</u>.  All vendors that are not on our originally
> assumed list of liabilities shall pursue their 'right'
> to get paid by filing a claim to the bankruptcy courts
> . . . wherever Quintus filed for bankruptcy.

(Opening Brief, Exhibit I (emphasis added).)

Avaya contends that the Trustee grossly distorts Ms.
Poriadjian's email.  Reproduced more fully, the email states:

> Also, for Mark's benefit, please keep in mind that we
> purchased "certain assets and liabilities" and not the
> Quintus Corporation.  We have no obligation to pay the
> vendors that may think they have an economical right to
> be paid by Avaya, because they may not, unless the
> vendor filed a claim through the original bankruptcy
> courts and/or we've agreed to assume their particular
> liability.
> All vendors that are not on our originally assumed list
> of liabilities, should pursue their 'right' to get paid
> by filing a claim to the bankruptcy courts in Dublin
> (or wherever Quintus filed for bankruptcy).
> If there is a vendor that comes to us with a claim . .
> . we should look to the original liability balance that
> we assumed (i.e. the $22M liability list).  <u>If they are
> not on that list, legally we owe them nothing.</u>

(<u>Id.</u> (emphasis added).)

27

The Court agrees with Avaya that the Poriadjian email is not
an admission by Avaya that it owes the claims evidenced by proofs
of claim.   Therefore, the Court concludes that the claims listed
on the claims register, to the extent they were not otherwise
recorded in the Debtors' bankruptcy schedules or books and
records, were not assumed by Avaya.

     5.   Books and Records

This, of course, leads back to the question of what was
reflected on the Debtors' books and records as liabilities
assumed by Avaya.   The former employees of the Debtors who were
hired by Avaya to handle the payment of the assumed liabilities
testified that the Debtors' books and records consisted of a
general ledger, accounts payable ledger and other sub-ledgers,
including tax sub-ledgers.   In addition, they testified that when
the Debtors received invoices, whose amount the Debtors disputed,
the Debtors would reflect that reduction on the face of the
invoice and only the amount the Debtors believed was due would be
recorded in the accounts payable ledger.   They also testified
that the Debtors' books and records (both hard copies and
electronic versions) were transferred to Avaya on the Closing
Date.   Thereafter, those documents were regularly archived by
Avaya.

After commencement of this action, the Trustee sought the
Debtors' books and records that were relevant to his Complaint.

28

When Avaya failed to produce them, the Trustee filed a motion to compel their production which was granted, in part, by Order dated October 14, 2005. Avaya still did not provide all the relevant documents; namely, Avaya has not provided copies of the Debtors' entire general ledger from the Closing Date, the applicable tax sub-ledgers, and the vendor files.

After discovery was completed, however, Avaya did produce some of the Debtors' books and records, arguing that they support its assertion that it paid all the obligations it assumed. (See Amended Sur-reply Brief of Defendant Avaya, Inc., in Opposition to the Motion for Sanctions for Spoliation of Evidence of the Chapter 11 Trustee, Exhibits 2-4, 10.) The fact that Avaya did produce a portion of the Debtors' general ledger and tax sub-ledgers after the conclusion of discovery does not help its cause. A party cannot selectively preserve "relevant" documents and only present those that it finds favorable to its case, at a time when it finds it convenient. See, e.g., Shamis, 34 F. Supp. 2d at 890 (concluding that the plaintiff's assertion that he kept and produced all the relevant documents while allowing the destruction of 3,000 boxes of documents was unavailing because "a determination of what is and is not relevant varies substantially based on the parties' different theories of the case.").

Rule 37 of the Federal Rules of Civil Procedure expressly provides the Court the power to sanction a party for failure to

29

comply with a discovery order.  Fed. R. Civ. P. 37.  Sanctions
available under that Rule include striking pleadings, making
inferences, granting attorneys' fees, and other appropriate
actions.  Id.

In addition, the Court's inherent power to oversee
litigation before it, gives the Court the authority to sanction
Avaya for its failure to produce documents relevant to this case.
See, e.g., Silvestri, 271 F.3d at 590 ("The right to impose
sanctions for spoliation arises from a court's inherent power to
control the judicial process and litigation . . . ."); Shepherd,
62 F.3d at 1479 ("As old as the judiciary itself, the inherent
power enables courts to protect their institutional integrity and
to guard against abuses of the judicial process with contempt
citations, fines, awards of attorneys' fees, and such other
orders and sanctions as they find necessary, including even
dismissals and default judgments.").

Appropriate sanctions include (1) an inference that the
evidence would have been unfavorable to the party that destroyed
it, (2) the preclusion of any evidence to contradict the missing
evidence, and (3) the entry of judgment in favor of the other
party.  Schmid, 13 F.3d at 79 (citations omitted); Howell, 168
F.R.D. at 505.

As noted above in Part III.A.2, the Court has concluded that
Avaya intentionally destroyed evidence after it should reasonably

30

have anticipated litigation about its failure to pay all assumed liabilities.  In this case, Avaya did timely produce the accounts payable ledger which was attached to the Final Schedule and which it asserts reflects all the trade payables it assumed.  The accrued liabilities, including the tax claims, are more problematic.  Only a one page summary of accrued liabilities was attached to the Final Schedule.  (Appendix at A 188.)  Avaya did not produce all the Debtors' books and records relevant to those claims, namely the general ledger, tax sub-ledgers or the vendor files, which would permit the Trustee or the Court to determine what accrued claims were reflected on the Debtors' books and records at the Closing Date and remain unpaid.

Avaya asserts that those documents are not essential to the Trustee's claim because the Final Schedule shows what the Debtors' books and records contained at that time.  However, without the Debtors' books and records, this thesis cannot be tested.  <u>Shamis</u>, 34 F. Supp. 2d at 890.  Avaya further asserts that the vendor files are irrelevant because the invoices would only reveal a number higher than the Debtors actually recorded in their books and records.  Avaya asserts that it assumed only the amount of the claim reflected in the Debtors' books and records and not the amount that the vendor asserts is due.

The Court disagrees.  Avaya assumed certain liabilities, both accrued and recorded in the Debtors' books and records.

31

Nguyen testified that the Debtors made notations on the face of
the vendors' invoices.  (Reply Brief in Support of Chapter 11
Trustee's Motion for Summary Judgment, Exhibit G.)  Therefore,
the Court concludes that those invoices were part of the Debtors'
books and records.  Furthermore, to the extent that the amount
actually due to a creditor whose claim was accrued or recorded on
the Debtors' books and records exceeds the amount the Debtors
listed on their general ledger, the Court concludes that Avaya
owes the correct amount.  The Final Schedule made this clear; it
repeatedly referred to the amounts listed as estimates, although
Avaya's liability was ultimately capped at $30 million.

        Therefore, the Court concludes that all the Debtors' books
and records, including the vendor files, general ledger and sub-
ledgers, are relevant to the Trustee's claims and should have
been preserved and produced in discovery.  The destroyed evidence
is not simply relevant to this case but goes to the heart of the
Trustee's suit: what claims were assumed by Avaya that remain
unpaid.  Further, Avaya did not merely alter the evidence, it
destroyed it.  Consequently, the Court concludes that the most
severe sanction of judgment against Avaya is warranted.  See,
e.g., Computer Assocs., 133 F.R.D. at 170 ("Destroying the best
evidence relating to the core issue in the case inflicts the
ultimate prejudice upon the opposing party.  I find and conclude
that no alternate sanction short of a default judgment would

                              32

adequately punish [the defendant] and deter future like-minded litigants."); Thompson, 593 F. Supp. at 1456 (holding that default judgment was appropriate where "destruction of documents and records . . . deprived [opposing party] of the opportunity to present critical evidence on its key claims to the jury.").

Even if the Court did not find that the most severe sanction was warranted by Avaya's conduct, the result would be the same. If the Court applied the spoliation inference and inferred that the destroyed (or withheld) documents would be unfavorable to Avaya's position, it must conclude that the Debtors' books and records would include the claims of those creditors who have filed proofs of claim. Similarly, if the Court were to preclude Avaya from presenting any evidence that the Debtors' books and records did not include those claims or included them in lesser amounts, the Court would have to conclude that the Debtors' books and records were consistent with the creditors' records as reflected in their proofs of claim. Thus, entry of judgment in favor of the Trustee is nothing more than what would result from the other available sanctions.[12]

---

12  Avaya asserts that the Trustee has only a breach of contract claim for its failure to preserve the Debtors' books and records.  Even if that were so, the damages suffered by the Trustee for that breach would include the amount he could not prove that Avaya owes because of the destruction of the records by Avaya.  Therefore, the result would still be the same: judgment in favor of the Trustee.

33

As a result, the Court concludes that judgment should be entered in favor of the Trustee for all claims listed in the Debtors' bankruptcy schedules and on the claims register which the Trustee contends is $1,888,410.52.[13]

D.  Attorneys' Fees

The Trustee also seeks attorneys' fees as a sanction for Avaya's failure to produce the Debtors' books and records.  Such a sanction is available under Rule 37.  Fed. R. Civ. P. 37. Because the Court is granting a more severe sanction, judgment in the Trustee's favor, the Court will not award attorneys' fees as an additional sanction.


IV.  CONCLUSION

For the foregoing reasons, the Court will grant, in part, Avaya's Motion for Summary Judgment and dismiss the Trustee's Unjust Enrichment count of the Compliant.  The Court will also grant, in part, the Trustee's Motions for Partial Summary

---

13  One of the claims is a $228,564 rejection damages claim assumed by Avaya as the result of a letter agreement executed on April 11, 2001.  (See Supplement at Exhibit A.)  While Avaya admits it owes that claim, it asserts that it is not the proper subject of the Trustee's summary judgment motion which is based only on Schedule 1.03 of the APA.  The Court rejects this argument as elevating form over substance.  The letter agreement was executed on the Closing Date and appears to clarify obligations of Avaya under the APA; the Trustee's Complaint seeks to recover sums due by Avaya under the APA.  The Court will not require the Trustee to incur the additional expense of prosecuting another complaint to collect an obligation that Avaya admits it owes.

34

Judgment and for Sanctions.

An appropriate Order is attached.


Dated: October 27, 2006                BY THE COURT:

                                       *Mary F. Walrath*
                                       Mary F. Walrath
                                       United States Bankruptcy Judge

# EXHIBIT B

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| QUINTUS CORPORATION, et al., | ) | Case No. 01-00501 through |
| | ) | Case No. 01-00503(MFW) |
| Debtors. | ) | |
| _____ | ) | Jointly Administered |
| | ) | |
| QUINTUS CORPORATION, | ) | |
| MUSTANG.COM, INC., and | ) | |
| ACUITY CORPORATION, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adversary No. 04-53074 |
| | ) | |
| AVAYA, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

### ORDER

AND NOW, this **27th** day of **OCTOBER, 2006**, upon consideration of the cross motions for summary judgment filed by the parties, and for the reasons set forth in the accompanying Opinion, it is hereby

ORDERED that the motion of the Defendants is **GRANTED IN PART**; and it is further

ORDERED that Count II of the Plaintiffs' complaint is **DISMISSED**; and it is further

ORDERED that the motion of the Plaintiffs is **GRANTED IN PART**; and it is further

D.I. 121
10-30-06

**ORDERED** that judgment is entered in favor of the Plaintiffs against the Defendant in the amount of $1,888,410.52.

BY THE COURT:

Mary F. Walrath
United States Bankruptcy Judge

cc:  Kimberly E.C. Lawson, Esquire [1]

---

  [1] Counsel shall serve a copy of this Order and the accompanying Opinion on all interested parties and file a Certificate of Service with the Court.

## CERTIFICATE OF SERVICE

I, Jeffrey S. Goddess, hereby certify that on April 9, 2007, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF which will send notification of such filing to

all registered participants. I further certify that I caused a copy of the foregoing document to be

served upon the following persons in the manner indicated:

**First Class Mail**
(Official Committee of Unsecured Creditors)
Christopher A. Ward, Esquire
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, DE 19899-5130

**First Class Mail**
Richard Schepacarter, Esquire
Office of the U.S. Trustee
844 King Street, Room 2311
Wilmington, DE 19801

**First Class Mail**
(Official Committee of Equity Security
 Holders)
J. Mark Chevallier, Esquire
McGuire, Craddock & Strother, P.C.
Lincoln Plaza, Suite 3550
500 North Akard
Dallas, TX 75201

**First Class Mail**
Michael S. Etkin, Esquire
Ira M. Levee, Esquire
Lowenstein Sandler PC
65 Livington Avenue
Roseland, NJ 07068

**First Class Mail**
(Official Committee of Equity Security
 Holders)
Thomas E. Biron, Esquire
Blank Rome LLP
One Logan Square
Philadelphia, PA 19103

**First Class Mail**
(Official Committee of Equity Security
 Holders)
Bonnie Glantz Fatell, Esquire
Blank Rome LLP
1201 Market Street #800
Wilmington, DE 19801-4226

**Hand Delivery**
Kimberly E.C. Lawson, Esquire
Reed Smith LLP
1201 Market Street #1500
Wilmington, DE 19801-1163

*/s/ Jeffrey S. Goddess*
Jeffrey S. Goddess (Del. Bar No. 630)
Jessica Zeldin (Del. Bar No. 3558)
jgoddess@rmgglaw.com
jzeldin@rmgglaw.com
(302) 656-4433