IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| | : | |
| QUINTUS CORPORATION, *et al.*,[1] | : | Case No. 01-00501 (MFW) |
| | : | Jointly Administered |
| Debtors. | : | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | : | |
| | : | |
| AVAYA, INC. | : | |
| | : | C.A. No. 06-769 (SLR) |
| Appellant/Defendant, | : | |
| | : | |
| v. | : | Adv. Proc. No. 04-53074 (MFW) |
| | : | |
| KURT F. GWYNNE, CHAPTER 11 | : | |
| TRUSTEE, | : | |
| | : | |
| Appellee/Plaintiff. | : | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | : | |

**APPENDIX TO ANSWERING BRIEF OF THE
CHAPTER 11 TRUSTEE IN OPPOSITION TO AVAYA'S
APPEAL FROM AN ORDER OF THE BANKRUPTCY COURT**

Dated:  May 9, 2007
       Wilmington, Delaware

Kimberly E.C. Lawson (No. 3966)
J. Cory Falgowski (No. 4546)
REED SMITH LLP
1201 Market Street, Suite 1500
Wilmington, DE  19801
Telephone:  (302) 778-7500
Facsimile:  (302) 778-7575

Attorneys for Kurt F. Gwynne,
Chapter 11 Trustee

---

[1]    The Debtors are the following entities:  Quintus Corporation, Mustang.com, Inc., and Acuity Corp.

# TABLE OF CONTENTS

Page

Letter Agreement Between Kurt F. Gwynne, the Chapter 11 Trustee, The
Official Committee of Equity Security Holders and Avaya, Inc. Dated
September 22, 2003 ..................................................................................................... 1-3

Letter from Elizabeth M. Zito to John G. Harris Re: Production
of Documents Bearing Production Numbers 01592-04373 ......................................... 4

Deposition Transcript of Eric M. Sherbet Dated January 30, 2004 (relevant excerpts) ............. 5-9

Deposition Transcript of Eric M. Sherbet Dated November 22, 2005 (relevant excerpts) .... 10-14

Deposition Transcript of Gregory Maloney Dated December 8, 2005 (relevant excerpts) .... 15-24

Deposition Transcript of Mark Thompson Dated January 26, 2006 (relevant excerpts) ........ 25-41

Deposition Transcript of Rosie Nguyen Dated January 27, 2006 (relevant excerpts) ............ 42-48

WILLIB-53643.1-KELAWSON

# ReedSmith

Kurt F. Gwynne
Direct Phone: 302.778.7550
Email: kgwynne@reedsmith.com

1201 Market Street
Suite 1500
Wilmington, DE 19801-1163
302.778.7500
Fax 302.778.7575

September 22, 2003

Via Facsimile 302-658-7567
Kevin Gross, Esquire
Rosenthal, Monhait, Gross & Goddes, P.A.
Mellon Bank Center, Suite 1401
P.O. Box 1070
Wilmington, DE 19899

Via Facsimile 312-853-7036
Shalom L. Kohn, Esquire
Sidley Austin Brown & Wood LLP
Bank One Plaza
10 South Dearborn Street
Chicago, IL 60603

Re:    In re: Quintus Corporation, et. al., Debtors; Case No. 01-0501

Dear Kevin & Shalom:

The following sets forth the terms on which I, as the Chapter 11 Trustee for the estate of the above referenced Debtors ("Trustee") and The Official Committee of Equity Security Holders ("Equity Committee" and collectively with the Trustee, the "Movants") will agree to continue the hearing on the Motion of Chapter 11 Trustee and The Official Committee of Equity Security Holders for an Order, Pursuant to Federal Rule Bankruptcy Procedure 2004 and Delaware Bankruptcy Local Rule 2004-1(i) Authorizing Examination of Avaya, Inc. and (ii) Compelling Production of Documents (the "Rule 2004 Motion"):

1.    Production of Documents[1]. Avaya, Inc. ("Avaya") agrees to produce the following documents to the Trustee and the Equity Committee not later than October 24, 2003.

---

[1] For purposes of this letter agreement, "documents" shall mean refer to all written, recorded or graphic matter however produced or reproduced, including without limitation, copies of front and back of checks, operating statements, correspondence, memoranda, tapes, stenographic or handwritten notes, publications, books, pamphlets, certificates, receipts, presentations, billing summaries, invoices, reports, electronic data processing films, minutes or statistical compilations, and every copy of such a document where such copy contains any commentary or notation whatsoever which does not appear on the original, including but not limited to, all canceled checks, all ledgers, all statements of accounts payable, and all statements of accounts receivable.

LONDON ♦ NEW YORK ♦ LOS ANGELES ♦ SAN FRANCISCO ♦ WASHINGTON, D.C. ♦ PHILADELPHIA ♦ PITTSBURGH ♦ OAKLAND ♦ PRINCETON
FALLS CHURCH ♦ WILMINGTON ♦ NEWARK ♦ MIDLANDS, U.K. ♦ CENTURY CITY ♦ RICHMOND ♦ HARRISBURG ♦ LEESBURG ♦ WESTLAKE VILLAGE

r e e d s m i t h . c o m

WILLIB-003/273.01-KFGWYNNE
September 22, 2003 2:25 PM

**ReedSmith**

Kevin Gross, Esquire
Shalom L. Kohn, Esquire
September 22, 2003
Page 2

a.    Documents relating to the negotiations of what items were to be included within the "Assumed Liabilities" as defined in the Asset Purchase Agreement pursuant to Section 363 of the Bankruptcy Code (the "Agreement") entered into between Avaya, Inc. and the Debtors on February 22, 2001 and referenced in Sections 1.03 and 1.04(6) and Schedule 1.03;

b.    Documents indicating which obligations of Quintus were paid by Avaya as "Assumed Liabilities" as defined in the Agreement. For purposes of this production, the Movants and Avaya agree that Avaya will (i) produce a list of the Debtors' liabilities paid by Avaya (including the name of payee and the amount) and (ii) execute an affidavit (or declaration pursuant to 28 U.S.C. § 1746) in form and content reasonably satisfactory to the Movants regarding the Debtors' liabilities paid by Avaya. Avaya acknowledges that the Trustee and the Committee will rely upon the affidavit (or declaration) in connection with claims objections. In the event that any party in interest disputes, orally or in writing, whether Avaya has paid all or any portion of any liability listed on the affidavit (or declaration), Avaya will provide the Trustee and the Committee with a copy of the canceled check (front and back) and monthly account statement evidencing the payment of such obligation. If Avaya paid any such liability other than by check, Avaya will provide the Movants with evidence of such payment, including account statements or electric funds transfer receipts if available in Avaya's records or the records (including any microfiche) of the institution that made such transfer. To the extent that Avaya has not paid an obligation that it lists in the affidavit (or declaration) as being paid, Avaya shall promptly pay such obligation;

c.    Documents indicating which taxes incurred by Quintus have been paid by Avaya under the Agreement. The Movants and Avaya agree to handle this production in same manner as the documents to be produced under paragraph "1.b." above;

d.    All Documents indicating which particular obligations (including claimant and amount) comprise the amount set forth in the "estimate of the Assumed Liabilities as of the closing date" required by Section 1.03 of the Agreement. Without limiting this document request, the Movants agree that, at this time, Avaya need not produce copies of any underlying invoices in response to this request; provided, however, that if either of the Movants later believes that it needs such documents, the Movant(s) may request such invoices from Avaya or seek a hearing on the Rule 2004 Motion.

e.    All supporting Documents breaking down all categories of liabilities listed in the company financial statements and/or company disclosure documents and December 31, 2000 Balance Sheet as defined in the Agreement. Without limiting this document request, the Movants agree that, at this time, Avaya need not produce copies of any underlying invoices in response to this request; provided, however, that if either of the Movants later believes that it needs such documents, the Movant(s) may request such invoices from Avaya or seek a hearing on the Rule 2004 Motion.

f.    Documents indicating why Avaya has not paid any obligation of Quintus as an "Assumed Liability" under the Agreement; and

**ReedSmith**

Kevin Gross, Esquire
Shalom L. Kohn, Esquire
September 22, 2003
Page 3

g.    All correspondence between Avaya and any entities filing claims against Quintus or
listed in the Debtors' Schedules. The Movants and Avaya agree that this request shall
only refer to correspondence that relates to the Debtors or claims against the Debtors.

2.    Avaya shall produce for examination in Wilmington, Delaware one or more designated corporate
representative(s) to testify under oath regarding the areas of inquiry identified in the Rule 2004
Motion on a mutually agreeable date, but not later than the first week of November 2003 (or such
other time as the Movants and Avaya may agree in writing), subject to the following conditions.
Avaya, the Trustee and the Equity Committee agree that such examination shall be considered a
deposition taken pursuant to the Federal Rules of Civil Procedure, as incorporated by the
Bankruptcy Rules, and specifically, such representative(s) shall be deemed a representative(s) of
Avaya pursuant to the terms of Federal Rule of Civil Procedure 30(b)(6). Further, such
deposition may be used in any future proceedings in accordance with Federal Rule of Civil
Procedure 32 and Federal Rules of Evidence including without limitation, Fed.R.Evid. 801.

3.    Subject to Avaya's agreement to the foregoing terms, the Equity Committee and the Trustee
agree to continue the hearing on the Rule 2004 Motion, provided that the Trustee and the Equity
Committee reserve their right to seek a hearing on the Rule 2004 Motion if the Trustee or the
Committee believes that Avaya has not complied with the terms of this agreement or either of the
Movants believes that it needs to conduct a further examination of Avaya. All of Avaya's
objections to the Rule 2004 Motion are preserved and nothing in this letter or its execution shall
be deemed to affect such objections or any other objections which Avaya may assert.

4.    This letter agreement may be executed by facsimile and in any number of counterparts, each of
which when so executed shall be deemed an original, but all such counterparts shall constitute but
one and the same letter agreement.

If the foregoing accurately reflects the terms to which Avaya agrees, please so indicate by signing in the
space provided below on behalf of your client.

Sincerely,

Kurt F. Gwynne
REED SMITH LLP
Chapter 11 Trustee

AGREED:

_____
Kevin Gross, Esquire
Counsel for Avaya, Inc.



SIDLEY AUSTIN LLP
787 SEVENTH AVENUE
NEW YORK, NY  10019
212 839 5300
212 839 5599 FAX

ezito@sidley.com
(212) 839-5820

BEIJING     GENEVA      SAN FRANCISCO
BRUSSELS    HONG KONG   SHANGHAI
CHICAGO     LONDON      SINGAPORE
DALLAS      LOS ANGELES TOKYO
            NEW YORK    WASHINGTON, DC

FOUNDED 1866

February 8, 2006

**By Federal Express**

John G. Harris, Esq.
Reed Smith LLP
1201 Market Street
Suite 1500
Wilmington, DE 19801-1163

> Re:   In re Quintus Corporation, et al.[Bankr. Nos. 01-00501-503] (Quintus, et al. v. Avaya, Inc. [Adversary No. 04-53074 (MFW)])

Dear Jack:

Enclosed please find copies of documents bearing production numbers 01592-04373.

Very truly yours,

Elizabeth M. Zito

Enclosures

Sidley Austin LLP is a limited liability partnership practicing in affiliation with other Sidley Austin partnerships

NY1 5831874v.1

ORIGINAL

1

1   UNITED STATES BANKRUPTCY COURT

2   FOR THE DISTRICT OF DELAWARE

3   ------------------------------------------ x

4   IN RE:

5        QUINTUS CORPORATION, ET AL.,

                                    01-00501 (MFW)

6                                   01-00502 (MFW)

                                    01-00503 (MFW)

7

                              DEBTOR

8

9   ------------------------------------------ x

10

11

12        DEPOSITION OF AVAYA INC. by ERIC SHERBET,

13   taken by the Debtor, pursuant to Order, held at

14   the offices of REED SMITH, LLP., 599 Lexington

15   Avenue, New York, New York, on January 30, 2004,

16   at 10:00 a.m., before a Notary Public of the

17   State of New York.

18

19

20

21   ************************************************

             BARRISTER REPORTING SERVICE, INC.

22                    120 Broadway

                 New York, N.Y. 10271

23                   212-732-8066

24

25

16

1                         Sherbet

2    spent on the transaction prior to its

3    closing?

4    A.      I don't know that I can estimate.

5    Q.      Was it more than 1,000?

6    A.      Well, the transaction was signed in

7    February and closed in April.  My best

8    recollection probably took a fairly

9    significant amount of time of my time in

10    that interim period.

11    Q.      Half of your time?

12    A.      To the best of my recollection, that

13    sounds like a fair estimate.

14    Q.      How much time did Justin Choi spend

15    on the transaction in that same time period?

16    A.      To the best of my recollection, it

17    would be less than that.

18    Q.      Much less?

19                MR. ARDEN:  Objection to form.

20    A.      I don't specifically recall how much

21    time he spent, but I would guess it would be

22    a fair amount less.

23    Q.      Like maybe a quarter of his time

24    spent on the transaction?

25                MR. ARDEN:  He's already

42

```
 1                          Sherbet
 2   Q.      After the closing, Quintus'
 3   accounting records and its accounting system
 4   all became property of Avaya, right?
 5   A.      Yes.
 6   Q.      So, Quintus didn't have any more
 7   financial records post closing, correct?
 8                   MR. ARDEN:  If you know.
 9   A.      I don't know.  Presumably -- it would
10   require speculation, but presumably Quintus
11   received cash at the closing and had to
12   account for them, have accounting records.
13   Q.      So, Quintus' financial records for
14   you, for purposes of being recorded in the
15   ordinary course of business, consistent with
16   past practice includes things like --
17                   MR. ARDEN:  Prior to the
18              closing date?
19   Q.      Includes things like general ledger,
20   correct?
21   A.      Yes.
22   Q.      So, if Quintus were to prepare a
23   general ledger and to list obligations on
24   it, that would satisfy this language in your
25   opinion, correct?
```

1                          Sherbet

2    ledger account number, but I'm not sure.

3    Q.      And this was prepared by Mark

4    Thompson?

5    A.      That's my understanding.

6    Q.      Please turn to Bates stamp page 28.

7    A.      Yes.

8    Q.      Do you recognize that?

9    A.      Yes.

10   Q.      What is it?

11   A.      That is a copy of the Claims Register

12   your firm submitted to me with my markings

13   on it.

14   Q.      What are your markings?

15   A.      The pencil marks.

16   Q.      The little P in certain places, is

17   that supposed to indicate that Avaya paid

18   that obligation?

19   A.      Yes.

20   Q.      How did you remember that an

21   obligation was paid so that you could put

22   the P down here on the chart?

23   A.      I believe the items on the first

24   page.  I believe substantially all the P's

25   are reflected in that Disbursements

83

                        Sherbet

1
2    Register, although I think the Silicon
3    Valley Bank payments were made separately by
4    a wire transfer is my recollection.
5    Q.     Who paid Middlesex Bank, Avaya or
6    Quintus?
7    A.     I believe it was us, but I -- I
8    believe it was us.
9    Q.     Was that an assumed liability?
10    A.     I don't recall.
11    Q.     Can you please turn to Bates stamp
12    page 30?
13    A.     Yes.
14    Q.     Do you recognize that?
15    A.     Yes.
16    Q.     What is it?
17    A.     It's a portion of the Claims Register
18    that reflects that -- I assume represents
19    claims made with respective taxes.
20    Q.     If you look at pages 30 and 31, only
21    four of those tax obligations had been paid,
22    correct?
23    A.     Correct.
24    Q.     Why didn't Avaya pay the rest?
25    A.     Well, I don't know which of these are

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

:    CHAPTER 11    COPY

IN RE:                          :
                                :    Bankr. No. 01-00501(MFW)
QUINTUS CORPORATION, et al,     :    through No. 01-00503 (MFW)
                                :
   Debtors                      :    Jointly Administered
_____ :

QUINTUS CORPORATION,            :
MUSTANG.COM, INC., and          :    Adversary No. 04-53074 (MFW)
ACUITY CORPORATION,             :
                                :
   Plaintiffs,                  :    DEPOSITION OF:
                                :
        vs.                     :    ERIC M. SHERBET
                                :
AVAYA, INC.,                    :
                                :
   Defendant.                   :
_____ :

            TRANSCRIPT of the stenographic notes of the

proceedings in the above-entitled matter, as taken by and

before JANICE D. BURNESS, a Certified Shorthand Reporter,

Registered Professional Reporter and Notary Public of the

State of New Jersey, held at the office of REED SMITH, LLP,

Princeton Forrestal Village, 136 Main Street, Suite 250,

Princeton, New Jersey, on Tuesday, November 22, 2005,

commencing at 10:05 in the forenoon.

DOERNER & GOLDBERG, INC                              973-740-1100
5 Becker Farm Road * Roseland, NJ  07068    2 Industrial Way West * Eatontown, NJ  07724

B-10

Page 24

1    knowledge, I assume likely includes the general ledger.

2           Some of the documents which are exhibits to my

3    prior deposition, my recollection, without seeing them, is

4    that they make references to general ledger accounts, etc.  So

5    I would assume that they do.

6           Q.    So Mr. Thompson, then, could not have relied on

7    the accounts payable register alone in deciding whether to pay

8    or not to pay an obligation of Quintus.  Is that correct?

9                 MR. ARDEN:  Objection.  Ambiguous and vague.

10          A.    I can't speak to what Mr. Thompson did rely on.

11   My recollection, again without looking at the schedule, is

12   that the schedule has a line item for trade accounts payable,

13   a schedule of accrued liabilities, which includes accrued

14   vacation, accrued payroll, some other accruals, a "other" AP

15   line item, and some accrued taxes and a deferred revenue

16   account.

17          Q.    Mr. Sherbet -- my apologies.  Go ahead.

18          A.    If I could finish.

19                If the question is -- as I recall your question

20   is whether a vendor came forward, if a vendor came forward and

21   submitted payment or made a request for payment.  Based on

22   those categorizations -- again, without the absence of a

23   specific discussion with Mr. Thompson -- it would seem to me

24   the only places that someone could look would be in the

25   accounts payable register.

DOERNER & GOLDBERG, INC                              973-740-1100
5 Becker Farm Road * Roseland, NJ  07068     2 Industrial Way West * Eatontown, NJ  07724

B-11

Page 73

1    the parties arrived at the number seven or seven years, which

2    appears in Subsection A of Section 5.05?

3         A.    I don't.

4         Q.    In your experience, is -- does the seven years

5    a -- does that fall at the high end or the low end or medium

6    of the range typical of this provision?

7         A.    I would say at the high end.

8         Q.    And what documents would be covered by

9    Section 5.05, Subsection A?

10        A.    Well, it's fairly broad.  It's all business

11   records and files.  It's a fairly broad term.

12        Q.    And what would that include?

13        A.    It could include anything from personnel

14   records to financial records to other records.

15        Q.    Fair enough.

16              And Quintus transferred all or virtually all of

17   its books and the records to Avaya in connection with the

18   asset purchase.  Isn't that right?

19        A.    Yes.  There were some excluded assets and

20   liabilities and records related to that, but generally I would

21   say yes.

22        Q.    And so, would the -- among other documents,

23   would Quintus' general ledger have been transferred to Avaya

24   in connection with Section -- or pursuant to Section 5.05?

25              MR. ARDEN:  Objection to form.

DOERNER & GOLDBERG, INC                      973-740-1100
5 Becker Farm Road * Roseland, NJ  07068     2 Industrial Way West * Eatontown, NJ  07724

B-12

Page 117

1   accounting system as of the closing date.  Isn't that a

2   correct statement?

3        A.    Yes.

4        Q.    So then I take it from your testimony that

5   Avaya does not consider Quintus' bankruptcy schedules to

6   reflect Quintus' books and records.  Is that a fair statement?

7        A.    I would say that's a fair statement, yes.

8        Q.    Who prepared the accounts payable ledger?

9        A.    I would assume if not Mark Thompson, somebody

10  under his supervision.

11       Q.    And we have established here today, have we

12  not, that, in Avaya's view, the appropriate cut-off date for

13  the accounting system for purposes of the payment -- or

14  nonpayment of assumed liabilities was April 10th of 2001 or

15  about that date?

16       A.    Correct.  The date of closing.

17            MR. HARRIS:  Unfortunately, Jim, I only have

18  one of that stack of documents.  Correction.  I have two.

19            MR. ARDEN:  Thank you.

20            MR. HARRIS:  You're welcome.

21            MR. HARRIS:  I'll mark this stack of documents

22  as Exhibit V, and hope that that makes sense sequentially.

23            (Exhibit V is marked for identification.)

24  BY MR. HARRIS:

25       Q.    As always, you are more than welcome to take as

DOERNER & GOLDBERG, INC                        973-740-1100
5 Becker Farm Road * Roseland, NJ  07068    2 Industrial Way West * Eatontown, NJ  07724

B-13

Page 121

1  this, you know, lengthy language about accrued and recorded

2  after the -- after the balance sheet date would have been

3  unnecessary.

4       Q.    So is it Avaya's position that it is only

5  responsible for paying assumed liabilities that appear on the

6  company balance sheet?

7       A.    No.  Liabilities that were recorded on the

8  balance sheet, and then as may be -- may have been recorded or

9  accrued thereafter to the extent not satisfied prior to the

10 closing.

11      Q.    Right.  So there can be liabilities that appear

12 on Quintus' accounts payable ledger which are not reflected on

13 the company balance sheet, correct?

14      A.    Well, they may because -- they may because

15 there's been -- they may have been recorded on the ledger

16 after the balance sheet date.

17      Q.    On the general ledger?

18      A.    On the accounts payable ledger or in the

19 general ledger.

20      Q.    If you know, would the accounts payable ledger

21 -- the general ledger of Quintus would make up much more than

22 just the accounts payable ledger, right?

23      A.    Certainly.

24            MR. HARRIS:  I have nothing further.

25            Read and sign?

DOERNER & GOLDBERG, INC                          973-740-1100
5 Becker Farm Road * Roseland, NJ  07068    2 Industrial Way West * Eatontown, NJ  07724

B-14

Page 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

ORIGINAL

```
------------------------------------
In re:                          : CHAPTER 11
                                :Bankr. No. 01-00501
                                  (MFW)
                                :through No. 01-00503
QUINTUS CORPORATION, et al.,    :(MFW)
                                :
          Debtors.              :
------------------------------- X
QUNITUS CORPORATION, MUSTANG.COM,:
INC., and ACUITY CORPORATION,   :
                                :
          Plaintiffs,           :
                                :
          v.                    :
AVAYA, INC.,                    :
          Defendant.            :
-------------------------------X
```

T R A N S C R I P T of the stenographic

notes of LISA FORLANO, a Notary Public and Certified

Shorthand Reporter of the State of New Jersey,

Certificate No. XIO1143, taken at Reed Smith,

Forrestal Village, 136 Main Street, Suite 250,

Princeton, New Jersey, on Thursday, December

8, 2005, commencing at 9:45 a.m.

DOERNER & GOLDBERG, INC                          973-740-1100
5 Becker Farm Road * Roseland, NJ  07068   2 Industrial Way West * Eatontown, NJ  07724

Page 2

1    A p p e a r a n c e s:

2

3         REED SMITH, LLP
          BY:  JOHN G. HARRIS, ESQUIRE
4         1201 MARKET STREET
          SUITE 1500
5         WILMINGTON, DE  19801
          ATTORNEYS FOR CHAPTER 11 TRUSTEE

6

7         SIDLEY AUSTIN BROWN & WOOD, LLP
          BY:  ELIZABETH ZITO, ESQUIRE
8         787 SEVENTH AVENUE
          NEW YORK, NEW YORK  10019
9         ATTORNEYS FOR DEFENDANT AVAYA INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DOERNER & GOLDBERG, INC                          973-740-1100
5 Becker Farm Road * Roseland, NJ  07068    2 Industrial Way West * Eatontown, NJ  07724

B-16

Page 3

1                      I N D E X

2

3    WITNESS                                    PAGE

4    GREGORY MALONEY

5       By Mr. Harris                           4

6

7             E X H I B I T S

8    Exhibit A  Deft. Avaya Inc.'s Second Supplemental  5
     Response to Chapter 11 Trustee's First Set of
9    Interrogatories

10   Exhibit B  Quintus Integration (Project Redwood)   32
     Finance Status by Shobhna Asthana and Greg Maloney,
11   April 26, 2001, 01217 - 01232

12   Exhibit C  e-mail with attachment         34

13   Exhibit D  Asset Purchase Agreement between   59
     Quintus and Avaya (without exhibits)
14
15   Exhibit E  Document 248, 249, 250          70

16   Exhibit F  Document 251, 252, 253          71

17   Exhibit G  Accounts Payable Ledger dated 4/21/01   75

18   Exhibit H   Transcript of Eric H. Sherbet      80

19   Exhibit I   Amendment to Schedule of Assets and   82
     Liabilities, Schedule F of Quintus Corporation

20   Exhibit J   Transcript of Eric Sherbet dated 1/2004 89

21   Exhibit K   Two-page document, MT00968 and MT00964   94

22   Exhibit L   Project Management Control Document   99

23   Exhibit M   Document 01199                102

24   Exhibit N   Document 0100                 107

25   Exhibit O   e-mail with attachment        110

DOERNER & GOLDBERG, INC                    973-740-1100
5 Becker Farm Road * Roseland, NJ 07068    2 Industrial Way West * Eatontown, NJ 07724

B-17

Page 47

1    say that you answered yes, is that correct?

2    A      It's my understanding there was one.

3    Q      And I had also asked whether you knew whether

4    that document had a name or a heading and your answer

5    to that question, correct me if I'm wrong, was you

6    didn't know?

7    A      That's correct.

8    Q      Can you offer -- can you describe the

9    document -- let me back up.  You also testified, did

10   you not, that you believe that that master list of

11   assumed liabilities was one of the documents that you

12   reviewed in preparation for your deposition today, is

13   that correct?

14   A      The master document I am referring to is not

15   necessarily a document that would have been part of an

16   exhibit of the Asset Purchase Agreement.  The master

17   document I am referring to is what I would call a

18   control document of what the outstanding liabilities

19   were that were recorded in the books or accrued in the

20   books that we were using as a control document.

21   Q      And so -- again, I'm just trying to

22   understand, is it fair to say that in all likelihood,

23   that document was prepared by either Mark Thompson or

24   Rosie Nguyen at his direction?

25   A      Yes, that's definitely my recollection.

DOERNER & GOLDBERG, INC                          973-740-1100
5 Becker Farm Road * Roseland, NJ 07068    2 Industrial Way West * Eatontown, NJ 07724

B-18

Page 48

1    Q        And is it also accurate to say that that

2    document, the control document which you referred to,

3    would have been prepared post closing?

4    A        Correct.  That is correct.

5    Q        How voluminous is the document?

6    A        In terms of megs, it's several megs, but I

7    don't know how many pages it is.

8    Q        Is it less or more would you say than a half

9    an inch?

10   A        It's approximately five megs worth of data.  I

11   didn't print it out, so I don't know how thick it

12   would be.  It would not surprise me that it would be

13   more than ten pieces of paper, legal paper on a

14   landscape printer.

15   Q        Again, at the risk of repeating myself, on

16   behalf of the Chapter 11 Trustee of the Quintus

17   Bankruptcy Estates, you understand that I've requested

18   of Avaya that it produce that document to the Trustee

19   because I believe that that document has been called

20   for in the Trustee's discovery requests and that Avaya

21   is obligated to produce that document if it hasn't

22   already.

23            Do you understand my request?

24   A        Yes, I do.

25   Q        Will Avaya comply with that request?

DOERNER & GOLDBERG, INC                           973-740-1100
5 Becker Farm Road · Roseland, NJ  07068     2 Industrial Way West · Eatontown, NJ  07724

B-19

Page 51

1    off before it was updated with payments or portions of

2    payments?

3    A        I don't know that exact date.

4    Q        Could it have been the closing date?

5    A        Yes.  It would have been my expectation at the

6    time, that that list represented the outstanding

7    liabilities at the operationalization level based upon

8    the APA and the agreements of the two firms.  That was

9    the intent of that list, so we knew what to pay and

10   what not to pay.  It was constructed by Mark Thompson,

11   Rosie Nguyen and confirmed by us so we paid against

12   it.

13   Q        It makes sense to me.  Do you recall,

14   Mr. Maloney, whether that list, the master list that

15   we've been referring to, listed by account debtor or

16   specific vendors the liabilities that were owed?

17   A        Yes, it did.  It named what we would call the

18   payee.

19   Q        And does it also name or identify rather with

20   specificity the amounts owed in dollars and cents?

21   A        I believe it did.  I think it did.

22   Q        And so it wouldn't have just simply referred

23   to dollar figures in thousands?  It would have

24   included cents owed?

25   A        Correct.  The document would have been a

DOERNER & GOLDBERG, INC                                    973-740-1100
5 Becker Farm Road • Roseland, NJ  07068    2 Industrial Way West • Eatontown, NJ  07724

B-20

Page 66

1    A      Correct.

2    Q      So contemporaneously, then, with the closing

3    of the Quintus/Avaya transaction all or virtually all

4    of Quintus's books and records were transferred under

5    the agreement to Avaya, is that right?

6    A      Correct.

7    Q      And I think you testified earlier, did you

8    not, that Avaya then assumed control of the books and

9    records of Quintus post closing, right?

10   A      Correct.

11   Q      So where would Avaya have recorded -- where

12   would Quintus have recorded the -- an assumed

13   liability in its books and records post closing if

14   Avaya controlled those books and records post closing?

15   A      They would have to set up a set of records.

16   Q      And how would they have done that?

17   A      You can set up Quicken.  You can buy any kind

18   of application package that said that.  Normal course

19   of an acquisition, if you take over the systems and if

20   something is applicable to the part you didn't buy,

21   you have to give that information over to the seller,

22   whether that seller -- depending upon who it is.  And

23   they have to record it in something, whether it's

24   Quicken, Excel spreadsheets or old fashioned manual

25   documents.

DOERNER & GOLDBERG, INC                                        973-740-1100
5 Becker Farm Road • Roseland, NJ  07068        2 Industrial Way West • Eatontown, NJ  07724

B-21

Page 75

1    Q       Is this the master -- is Exhibit F the master

2    list that you referred to earlier?

3    A       No.

4    Q       I'm sorry, let me put a finer point on my

5    question.  Mr. Maloney, the master list of assumed

6    liabilities that you referred to earlier in your

7    deposition?  This is not that document, is it?

8    A       It is not and I believe if we go back and look

9    at the testimony, I'm talking about a master list of

10   accounts payable.  Accounts payable would exclude

11   payroll liability, 401(k) liability.  So I'm very

12   particular that the master list that I'm alluding to

13   has to do with something that would be run through

14   accounts payable.

15   Q       Thank you for that clarification.

16           I'm handing you now what I'm marking Exhibit

17   G.  This document was produced by Avaya in connection

18   with this litigation.  This is what I'll refer to as

19   the accounts payable ledger.  It has -- it's dated on

20   the first page as of 4/20/2001.

21           (Accounts Payable Ledger dated 4/20/01 was

22   marked Exhibit G for identification.)

23   BY MR. HARRIS:

24   Q       Mr. Maloney, is this the master list of

25   assumed liabilities that you were referring to

DOERNER & GOLDBERG, INC                      973-740-1100
5 Becker Farm Road · Roseland, NJ  07068    2 Industrial Way West · Eatontown, NJ  07724

B-22

1  Q      And we've established here today, have by not,

2  that accounts payables is synonymous with assumed

3  liabilities, is that right?

4                  MS. ZITO:  Objection.

5                  THE WITNESS:  Accounts payables is a

6  subset of assumed liabilities.

7  BY MR. HARRIS:

8  Q      So is this reference 500K payables to sort

9  out, does that mean that $500,000 worth of assumed

10  liabilities needed to be sorted out?

11  A      At this moment in time, yes.

12  Q      And that moment in time was August 3, 2001,

13  right?

14  A.     Correct.

15                  MS. ZITO:  I would just note for the

16  record that the attachment is dated August 2, 2001.

17                  MR. HARRIS:  Thank you for that

18  clarification, counsel.

19                  THE WITNESS:  Right.

20  BY MR. HARRIS:

21  Q      Based on this document, then, it's accurate to

22  say that in August, 2001, at least as far as Avaya was

23  concerned, $500,000 of assumed liability still needed

24  to be sorted out?

25                  MS. ZITO:  Objection to form.

Page 132

1    BY MR. HARRIS:

2    Q        Is that right?

3    A        This is saying that there's $500,000 of

4    accounts payable that needs to be paid by Avaya.

5    Q        And so the reference then to "sort out" you

6    understand to mean to be paid?

7    A        Yes.

8                 (Six-page document MT00332 through

9            MT00337 marked Exhibit T for

10           identification.)

11   BY MR. HARRIS:

12   Q        Exhibit T is next.  Regrettably, counsel, I

13   only have one copy.

14           For the record, Exhibit T is a six-page

15   document bearing bate stamp number MT00332 through in

16   sequential order 00337.  It's a document which was

17   produced by Avaya to the Trustee in connection with

18   this litigation.

19           Mr. Maloney, once you familiarize yourself

20   with the document, let me know, please.

21   A        Okay.

22   Q        Do you recognize this document?

23   A        Yes.

24   Q        And how is it that you recognize it?

25   A        I produced this document.  This is an e-mail

DOERNER & GOLDBERG, INC                        973-740-1100
5 Becker Farm Road * Roseland, NJ  07068    2 Industrial Way West * Eatontown, NJ  07724

B-24

Page 1

1              IN THE UNITED STATES BANKRUPTCY COURT

2                  FOR THE DISTRICT OF DELAWARE

3    - - - - - - - - - - - - - - - - - -

4    IN RE:                         ) Chapter 11

5    QUINTUS CORPORATION, et al.,    ) Bankr. No.

6              Debtors.              ) 01-00501

7    - - - - - - - - - - - - - - -) through

8    QUINTUS CORPORATION, MUSTANG.COM,) 01-00503

9    INC., and ACUITY CORPORATION,   ) (MFW)

10             Plaintiffs,           )

11   V.                             ) Adversary

12   AVAYA, INC.,                   ) No. 04-53074

13             Defendant.            ) (MFW)

14   - - - - - - - - - - - - - - - -

15

16

17              DEPOSITION OF MARK THOMPSON

18             THURSDAY, JANUARY 26, 2006

19

20

21

22

23

24

25

Page 10

1  describe it?
2      Business intelligence software is
3  probably the best way to do it.
4      Q.  Now, for some period you were
5  employed by Quintus Corporation?
6      A.  Correct.
7      Q.  When were you first employed by
8  Quintus?
9      A.  My resume is long, so let me -- let
10  me think of the years here.  Boy.  1990 --
11  unfortunately, I'm guessing.  I'm going to
12  say '98 through 2001.  It could be '97.  I'd
13  really have to go back and take a look at my
14  records.
15      I've -- I've had about a dozen
16  positions here in Silicon Valley.
17      Q.  And when you joined in 1998 or
18  thereabouts, what was your position?
19      A.  It was controller.
20      Q.  And at some point you became
21  vice-president of finance?
22      A.  Correct.  About a year later I
23  believe.
24      Q.  What were your responsibilities as
25  vice-president of finance?

Page 11

1      A.  Basically, it was the financial
2  operations of the corporation.  So, it
3  covered everything from SEC reporting to
4  financial planning to just general financial
5  information.  I also was responsible for the
6  risk management area, the insurance area,
7  some legal as well as facilities eventually.
8      Q.  When you became vice-president of
9  finance, did you continue with the
10  responsibilities you had as controller?
11      A.  Yes.
12      Q.  And those included maintaining the
13  books and records of the company?
14      A.  Correct.
15      Q.  And technically, was the title
16  vice-president, finance or vice-president of
17  finance?
18      A.  I believe it was vice-president,
19  finance.  I couldn't swear on that, but I'm
20  pretty sure that's what it was.
21      Q.  To whom did you report?
22      A.  Sue Salveson (phonetic), our CFO.
23      Q.  And who reported to you?
24      A.  I had -- at the beginning or just
25  over the -- over the life of the 3 or 4 years

Page 12

1  I was there?
2      Q.  Toward the end.
3      A.  Toward the end.
4      Q.  Let's say 2000, 2001 period.
5      A.  Reporting to me were four -- four
6  direct reports.  I had an accounting manager,
7  Rosie Nguyen, last name is spelled
8  N-g-u-y-e-n.  Bob Beebe, last name is spelled
9  B-e-e-b-e.  Sloan Wood was our director of
10  facilities.  And then, there was an FP&A
11  director Terry Wilson.
12      Q.  Do you recall -- withdrawn.
13      Do you recall that in or about April
14  2001 Avaya acquired certain assets of
15  Quintus; correct?
16      A.  Yeah.  Yes.
17      Q.  At that point, Ms. Nguyen was still
18  reporting to you; right?
19      A.  Correct.
20      Q.  Were Mr. Bee or --
21      A.  Mr. Beebe and Mr. Wood were also.
22  Mr. Wilson had left the company by then.
23      Q.  Did Mr. Wood or Mr. Beebe have
24  responsibilities with respect to the Asset
25  Purchase Agreement?

Page 13

1      A.  Yes, Mr. Beebe did.  Mr. Wood did
2  not.
3      Q.  And what were Mr. Beebe's
4  responsibilities?
5      A.  He was the director of revenue.  And
6  so, his principal responsibilities were
7  revenue recognition, accounts receivable and
8  collections, sales and use tax reporting.
9      I think those were principally
10  his -- he might have had another one or two
11  of them I'm missing, but those were principal
12  accounting duties.
13      He also handled deferred revenue and
14  such.  So, it was all in the revenue area.
15      Q.  After the asset acquisition, at some
16  point you became an employee of Avaya;
17  correct?
18      A.  Correct.
19      Q.  Did you have a title at that point?
20      A.  No, we were -- my whole team were
21  just transitionary employees of Avaya with
22  dates of when we were going to basically be
23  leaving that temporary period.
24      Q.  And so, Mr. Beebe and Ms. Nguyen
25  were both employees in transition as well?

Page 14

1    A.   Correct.
2    Q.   You described Mr. Beebe's
3 responsibilities.  What were the
4 responsibilities of Ms. Nguyen?
5    A.   She was responsible for closing our
6 internal books, for maintenance of our
7 general ledger.  Accounts payable reported up
8 to her.  Payroll reported up to her.  Fixed
9 assets reported up to her.  And she was also
10 our internal sys admin I'll call it for our
11 financial system that we had.
12    Q.   When you say "sys admin," are those
13 two abbreviations for --
14    A.   Systems administrator.
15    Q.   Yeah.  Thank you.
16         And she left Avaya at some point
17 before you did; correct?
18    A.   Correct.  My team -- basically, my
19 staff left 3 months after the acquisition.
20 Mr. Beebe left 4 months after the
21 acquisition.  Ms. Nguyen left 5 months after
22 the acquisition.  And I left 6 months after
23 the acquisition.
24         Actually, Mr. Wood and I both left 6
25 months after the acquisition.

TSG Reporting - Worldwide    212-702-9580

Page 15

1    Q.   And the closing date of the asset
2 acquisition was April 11th; correct?
3    A.   I believe so, yeah.  I know it was
4 approximately that date.
5    Q.   You recall it was in April of 2001?
6    A.   I know it was April.  I know there's
7 a date of the 10th in my head.  I know
8 there's the date of, like, the 20th in my
9 head.  It's been awhile.
10     (Defendant's Exhibit No. 1
11      was marked for identification)
12 BY MR. ARDEN:
13    Q.   Mr. Thompson, I'm showing you a
14 document that's been marked as Thompson
15 Exhibit 1.  And for the record, it bears the
16 stamp MT 1579 through MT 1635.  Do you see
17 your name as one of the recipients of this
18 document --
19    A.   Yes.
20    Q.   -- on the first page?
21    A.   Yes.
22    Q.   Do you have a recollection of
23 receiving a draft of the Asset Purchase
24 Agreement at some point in or around February
25 20, 2001?

TSG Reporting - Worldwide    212-702-9580

Page 16

1    A.   Yes.
2    Q.   Do you recall how many drafts you
3 saw?
4    A.   I do not.
5    Q.   The legend at the top of the second
6 page indicates it was prepared by DPW.  Do
7 you see that?
8    A.   Yes.
9    Q.   And you recognize it as Davis, Polk,
10 and Wardwell?
11    A.   Now that you mention it, yes.
12    Q.   And in connection with the
13 negotiation as a purchase agreement, Davis,
14 Polk represented Quintus; right?
15    A.   I believe so.
16         I -- I was not involved in
17 negotiations certainly of that acquisition.
18 But I'm familiar with what you just
19 mentioned.
20    Q.   All right.  Did you review any of
21 the drafts before the Asset Purchase
22 Agreement was executed?
23    A.   I don't remember in particular.  It
24 would make sense, but I don't remember
25 specifically.

TSG Reporting - Worldwide    212-702-9580

Page 17

1     (Defendant's Exhibit No. 2
2      was marked for identification)
3 BY MR. ARDEN:
4    Q.   I'm showing you a document that's
5 been marked as Thompson Exhibit 2.  This
6 document bears the stamp 470 through 530.
7 And pages 527 and 528 bear signatures under
8 Avaya and Quintus as well as Mustang and
9 Acuity.
10         Do you recognize this document?
11    A.   Yes.
12    Q.   And what is it?
13    A.   It's the actual executed purchase
14 agreement.
15    Q.   If you could, please turn to page
16 529.
17    A.   Yes.
18    Q.   Do you recognize that page?
19    A.   I'm familiar with it.
20    Q.   And what is it?
21    A.   It details the assumed liabilities
22 description of what Avaya was purchasing from
23 Quintus.
24    Q.   It's fair to say, isn't it, that if
25 a liability falls outside Schedule 1.03 it's

TSG Reporting - Worldwide    212-702-9580

Page 18

1 not a liability that Avaya assumed under the
2 Asset Purchase Agreement; right?
3     MS. LAWSON:  Objection to form.
4     Just so we --
5     THE WITNESS:  Do I still answer?
6     MS. LAWSON: -- if we object -- we'll be
7 objecting to certain things. It's really for
8 preservation of the record --
9     THE WITNESS:  Okay.
10     MS. LAWSON: -- purposes.
11     THE WITNESS:  Okay.
12     MS. LAWSON:  I think the only issue would
13 be if for any reason one of us objects on the
14 basis of privilege, I would ask that you hold
15 off on answering until we resolve the
16 issue --
17     THE WITNESS:  Okay.
18     MS. LAWSON: -- because you may be
19 disclosing confidential information.  But if
20 we object to form or foundation or any other
21 things --
22     THE WITNESS:  Okay.
23     MS. LAWSON: -- you can just go ahead and
24 answer.
25     THE WITNESS:  Okay.
      TSG Reporting - Worldwide    212-702-9580

Page 19

1     MS. LAWSON:  Unless you don't understand
2 the question, and then....
3     THE WITNESS:.  I'll ask you to repeat that
4 question please.
5 BY MR. ARDEN:
6     Q.  Your understanding is that Schedule
7 1.03 defines which liabilities Avaya assumed
8 under the Asset Purchase Agreement; correct?
9     A.  My interpretation of it is that they
10 were purchasing assumed liabilities up to a
11 dollar amount.  This does not say which --
12 which liabilities they were.
13     So, my interpretation would be at a
14 high level this basically is just depicting
15 that they were to buy up to $30 million of
16 assumed liabilities but did not give the
17 detail.
18     Q.  But it does define in terms of
19 description of what those liabilities would
20 be; right?
21     A.  Correct.
22     Q.  And could you read the first
23 sentence of Schedule 1.03?  Could you read it
24 into the record.
25     A.  Starting with:  "All liabilities
      TSG Reporting - Worldwide    212-702-9580

Page 20

1 listed"?
2     Q.  Yes.
3     A.  "All liabilities listed on the
4 Company Balance Sheet (exclusive of the
5 liability listed thereon that is an Excluded
6 Liability pursuant to Section 1.04) and all
7 liabilities accrued or recorded after the
8 Balance Sheet Date in the ordinary course of
9 business consistent with past practice to the
10 extent not satisfied prior to the Closing
11 Date, provided that the aggregate amount of
12 liabilities assumed pursuant to this
13 paragraph shall not exceed $30,000,000, and
14 provided further that in no event shall Buyer
15 assume liabilities for any advisors to any
16 Seller in connection with the Chapter 11 Case
17 or any Existing Claims in excess of an
18 aggregate of $1,000,000."
19     Continue?
20     Q.  You might as well complete the
21 paragraph.  Yes, please.
22     A.  "In addition, Buyer shall assume
23 each of the liabilities and obligations set
24 forth in clauses a through c below, and such
25 liabilities shall count against the
      TSG Reporting - Worldwide    212-702-9580

Page 21

1 $30,000,000 limitation in the foregoing
2 sentence to the extent such liabilities are
3 or should be accrued or recorded on the
4 Company balance sheet based on GAAP applied
5 on a consistent basis and have not been
6 satisfied at the Closing."
7     Q.  And so, therefore, Mr. Thompson,
8 clauses a through c include liabilities that
9 might be assumed given certain conditions to
10 the extent such liabilities are or should be
11 accrued or recorded; right?
12     A.  Correct.
13     Q.  And so, that includes the "should
14 be"?
15     A.  Yeah.  The -- the key is "should be"
16 and in the ordinary course of business.
17 Definitely.
18     Q.  Now, the first sentence refers to
19 liabilities listed on the Company Balance
20 Sheet which is all capitalized or has initial
21 caps and is a defined term?
22     A.  Correct.
23     Q.  Which refers back to the 12/31/2000
24 balance sheet according to page 519; right?
25     A.  Correct.
      TSG Reporting - Worldwide    212-702-9580

Page 38

1  of our -- out of our system -- financial
2  system which then go right to an Excel
3  spreadsheet.
4   . . ....So, I would do that.
5      Q.  And so, these are the documents
6  you're referring to. on 432, 433, and 434?
7   ... A... Correct.
8   ...Q.. And you wrote to Kelly Wall that you
9  were attaching a recap of the liabilities
10  that were assumed by Avaya; right?
11  ...A.  Correct.
12  ...Q.. And on the last page, you have two
13  columns, one showing what had been originally
14  assumed and a second column that shows the
15  effect of paying down certain items among the
16  assumed liabilities; right?
17    A.  That is correct.
18    Q.  So, as of April 30, 2001, the total
19  liabilities assumed by Avaya stood at
20  17,807,764; right?
21    A.  That's correct.
22    Q.  You noted that the accounts payable
23  had been reduced by about 1.3 million; right?
24    A.  Correct.
25    Q.  And the accrued liabilities had also

TSG Reporting - Worldwide   212-702-9580

Page 39

1  been reduced; right?
2    A.  Correct.
3    Q.  And that had been reduced by about
4  2.8 million; right?
5    A.  Correct.
6    Q.  And if we look at the line of trade
7  accounts payable as of 4/30/2001, the total
8  amount of outstanding trade accounts payable
9  that had been assumed was 5,810,569; right?
10    A.  Correct.
11    Q.  And that number was automatically
12  generated in your accounting system?
13    A.  That's correct. Upon the
14  acquisition, our accounting system was kept
15  active until we transitioned those activities
16  over to Avaya. So, we kept our payroll
17  service open, and we recorded all the payroll
18  up through the end of May, and accounts
19  payable as I remember was up through the end
20  of June.
21        And at that point in time, we no
22  longer paid any bills, and it was all then
23  processed by Avaya directly.
24    MR. ARDEN:  Let's mark this document as
25  Thompson Exhibit 6.

TSG Reporting - Worldwide   212-702-9580

Page 40

1        (Defendant's Exhibit No. 6
2         was marked for identification)
3  BY MR. ARDEN:
4    Q.  Mr. Thompson, I'm showing you a
5  document that bears the stamp 00332 through
6  00337 and includes the letters MT at the
7  beginning.
8    A.  Uh-huh.  Yes.
9    Q.  And that includes an e-mail that you
10  prepared on July 25, 2001; right?
11    A.  Correct.
12    Q.  And it also includes a 2-page
13  attachment that you included with that
14  e-mail; right?
15    A.  Correct.
16    Q.  And you note that what you have
17  attached is the final schedule of the assumed
18  liabilities that Avaya took over from
19  Quintus, approximately 22.5 million; right?
20    A.  Correct.
21    Q.  And that is the number that appears
22  on the far left column of 00336?
23    A.  Correct.
24    Q.  Now, those numbers appear in
25  thousands; right?

TSG Reporting - Worldwide   212-702-9580

Page 41

1    A.  Correct.
2    Q.  The columns to the right include the
3  last dollar amount; right?
4    A.  Say again?
5    Q.  They include -- they go to a single
6  dollar amount?
7    A.  Yes.
8    Q.  And this shows that as of June 30,
9  2001 the trade accounts payable had been paid
10  down to only $1,199; right?
11    A.  That's correct.
12    Q.  So, there's $1 less than $1200 left
13  in trade accounts payable; right?
14    A.  That's correct.
15    Q.  And that number also was tied to the
16  accounting system of -- of Quintus; right?
17    A.  Correct.
18    Q.  Do you know what the $1,199 referred
19  to, what were those --
20    A.  I don't remember off the top of my
21  head, no.
22    Q.  Do you believe that at the time you
23  left Avaya all accounts payable had been
24  paid?
25    A.  All the accounts...? My -- my

TSG Reporting - Worldwide   212-702-9580

Page 50

1    A.  I'd be guessing at this point.  As a
2  controller of the company, I didn't use the
3  system day in and day out like some of the
4  people who reported to me.  And so, I
5  couldn't answer that.
6    Q.  Uh-huh.
7    A.  I can say the cash accounts, those
8  accounts would tie directly to the general
9  ledger.  And so, they would definitely be
10  supported by whatever activity occurred in
11  the general ledger for that particular
12  account.  But I believe the control numbers
13  are -- automatically come out of the system
14  probably when you make a check, they probably
15  assign a disbursement number.
16    (Defendant's Exhibit No. 9
17    was marked for identification)
18  BY MR. ARDEN:
19    Q.  Mr. Thompson, I'm showing you a
20  document that's been marked as Thompson
21  Exhibit 9.  It bears the stamp MT 0961 to
22  0967.
23    A.  Yes.
24    Q.  Could you give a quick read to that
25  document?
TSG Reporting - Worldwide    212-702-9580

Page 51

1    A.  The whole document or just the top
2  piece?
3    Q.  Could you read the -- the first 3
4  pages.  And then, I will refer you to a
5  shorter --
6    A.  Okay.
7    Q.  -- string.
8    A.  Okay.
9    Q.  Do you recognize these e-mails that
10  are Thompson Exhibit 9?
11    A.  I don't remember them off the top of
12  my head, but I -- they look familiar reading
13  through them.
14    Q.  And you recall a person stating
15  that -- that if vendors came with claims that
16  weren't accrued or recorded those were not
17  assumed liabilities of Quintus -- assumed
18  liabilities of Avaya?
19    A.  Of Avaya.  That's correct.
20    Q.  And you didn't disagree with that;
21  correct?
22    A.  No, not at all.
23    I was looking for a definition in
24  fact I believe if you take a look at the
25  e-mails.
TSG Reporting - Worldwide    212-702-9580

Page 52

1    Q.  Pardon me?
2    A.  I was looking for a definition of
3  what we should pay or not pay.
4    The challenge we had upon the
5  acquisition was that they kept the Quintus
6  organization books still open.  And so, the
7  challenge we had was making sure we separated
8  what was Avaya from Quintus on an ongoing
9  basis until it was all taken over by Avaya.
10    So, part of our challenge was to
11  obviously pay the assumed liabilities down
12  according to the report that was taken over
13  by Avaya, but then we also were receiving
14  invoices for work that was being rendered
15  after the acquisition.  And those we also had
16  to pay and were instructed to pay within the
17  confines of my team until we stopped paying
18  all bills.
19    Q.  Right.  Well, we saw earlier a
20  column for June 30, 2001 that showed only
21  $1,199 in trade accounts payable; correct?
22    A.  Correct.
23    Q.  And that was an accurate number;
24  correct?
25    A.  Correct.
TSG Reporting - Worldwide    212-702-9580

Page 53

1    What I should do to clarify just to
2  make sure we're both clear on it, if I
3  received a bill let's say in May for services
4  that had been rendered in May and the bill
5  came to us, we were instructed to pay that
6  immediately.
7    Q.  Right.
8    A.  So, we paid it down.  So, bottom
9  line is the accounts payable records that you
10  saw are true.  That's exactly what we had in
11  our books.  But we did end up paying some
12  services that were not the assumed
13  liabilities but they were truly Avaya
14  liabilities -- expenses, but we were
15  instructed to keep on paying those until we
16  stopped.
17    Q.  Because those were services --
18  withdrawn.
19    Those were liabilities that were
20  post-closing?
21    A.  Post-close.  Right.  Correct.
22    Q.  Okay.
23    A.  And that's where some of these
24  questions came up.  Because you have -- you
25  know, you have a challenge to the extent of
TSG Reporting - Worldwide    212-702-9580

Page 70

1   to Shobhna. Informally, you know, I probably
2   only talked to her three or four times and
3   met her maybe once or twice. And so, I
4   really was talking to instead most of the M&A
5   people at Avaya.
6       I mean, Avaya, the way they set up
7   their acquisitions -- Jim might know. I
8   mean, you have a balance sheet, and there's
9   probably -- everybody is responsible for one
10  little account kind of a deal on the balance
11  sheet.
12      And so, you know, part of our
13  biggest challenge was trying to figure out
14  who we needed to talk to on the Avaya side
15  since when you're a small company you wear
16  multiple hats. On the Avaya side, you were
17  more I guess focused in one little particular
18  area.
19      So, we went into interfacing with
20  different people on the other team at Avaya.
21  But my people reporting to me would work
22  directly with their Avaya counterparts on
23  trying to transition over anything that was
24  going on.
25      Q. Okay. So, I'm just going to try to
    TSG Reporting - Worldwide   212-702-9580

Page 71

1   understand this from maybe a practical point
2   of view.
3       A. Uh-huh.
4       Q. You earlier testified that Mr. Beebe
5   was responsible at Quintus for the sales and
6   use tax reporting?
7       A. Correct.
8       Q. So, when your team was transferred
9   over to Avaya after the acquisition --
10      A. Yes.
11      Q. -- he would -- instead of you all
12  handling all that, he would report to a
13  specific person?
14      A. He would interact with various
15  people at Avaya to transition his knowledge
16  base over from the Quintus side over to the
17  Avaya side. Yes.
18      Both Mr. Beebe and his staff
19  members, I do remember this because I was
20  involved in the meetings, they would be
21  meeting with their counterparts in accounts
22  receivable, in deferred revenue, in
23  collections for sure with transitioning over
24  those areas. And so, they would work
25  directly with the Avaya team members.
    TSG Reporting - Worldwide   212-702-9580

Page 72

1       Q. Okay. So, the person let's say
2   Rosie would talk to about trade payables
3   would be different than the person that Mr.
4   Beebe would talk to about sales and use tax?
5       A. To a great extent, yes.
6       Q. Okay.
7       A. They might have had some synergies,
8   a few people that may interact with both.
9   But most of the time, it was with different
10  people.
11      Q. Okay.
12      A. I think Rosie was specifically
13  reporting with Kelly Wall probably the most
14  that I was aware of because Kelly was out
15  here in the Milpitas office.
16      Q. Okay.
17      (Plaintiff's Exhibit No. 12
18      was marked for identification)
19  BY MS. LAWSON:
20      Q. You've been handed what's been
21  marked Thompson Exhibit 12. And if you could
22  just take a minute to review that document.
23  It's a Quintus Integration (Project Redwood)
24  Finance Status by Shobhna Asthana and Greg
25  Maloney dated April 26th, 2001.
    TSG Reporting - Worldwide   212-702-9580

Page 73

1       A. Do you have any questions?
2       Q. Are you familiar with this document?
3       A. No.
4       Q. Okay.
5       MR. ARDEN: And I again object not only
6   to using a document that the witness is
7   unfamiliar with but also using a draft of a
8   document that you have.
9   BY MS. LAWSON: Okay.
10      Q. You had testified earlier that the
11  accounting systems -- you refer to it as like
12  the finance system of Quintus was maintained
13  separate from that of Avaya; is that correct?
14      A. Correct.
15      Q. Okay. You on your end as well, and
16  that's what you refer as the Quintus system,
17  you had different accounts set up -- one for
18  Quintus, one for Mustang, and one for Avaya.
19  I believe you testified that.
20      A. That's correct.
21      Q. At any point, were those three
22  systems integrated into one on the Quintus
23  records?
24      A. I'm not sure if I understand that
25  question. Was it integrated into --
    TSG Reporting - Worldwide   212-702-9580

Page 78

1  invoicing process. It would then go into the
2  general ledger at that point. And we would
3  then report to the particular taxing agency
4  depending upon when it was due.
5      So, sometimes they're monthly.
6  Sometimes they're quarterly. Sometimes
7  they're annually. So, it all depends upon
8  which jurisdiction we were in would be the
9  time to report.
10  Q. Okay. When you say you recorded in
11  your general ledger system, was there a sub
12  ledger for sales and use tax?
13  A. I don't believe so. I think it just
14  probably went into an account number for
15  sales and use tax probably by state is how we
16  normally would do it.
17  Q. Okay.
18  A. And so, it would be set up that way.
19  Whoever was responsible in Mr. Beebe's team
20  would then have to go into the general
21  ledger, pull the activity for whatever period
22  it was, accumulate everything for the
23  reporting and the payment of the taxes.
24  Q. Okay. And that -- would that have
25  been recorded in the -- ever recorded in the
      TSG Reporting - Worldwide    212-702-9580

Page 79

1  accounts payable -- trade accounts payable
2  ledger or any accounts payable ledger?
3      A. Not in accounts payable. Only to
4  the extent that we actually paid the amount
5  to the state.
6      So, you know, when we actually, you
7  know, filed the return to the state, we owed
8  money, we would then go ahead and issue a
9  check to the state. And so, yes, that would
10  then be processed through accounts payable
11  since the check was issued out of the system.
12  But as far as the actual recording of
13  activity and how much we had booked into the
14  sales and use tax accounts, those all -- it
15  all came out of the accounts receivable
16  system.
17  Q. Okay. Did you ever receive invoices
18  from taxing authorities for sales and use
19  tax?
20  A. I don't recall receiving invoices.
21  Normally what they do is they give you blank
22  returns for the subsequent period to report.
23  And so, you fill those out, and then you send
24  them in on whatever time schedule you're
25  supposed to.
      TSG Reporting - Worldwide    212-702-9580

Page 80

1  Q. Okay. For property taxes, I'm going
2  to ask similar questions. Are the property
3  taxes recorded in the accounting system?
4  A. Property taxes are recorded in the
5  accounting system as an accrual.
6  Q. As an accrual?
7  A. As an accrual. So, basically --
8  property taxes. We would -- we would -- I
9  think -- my time frames again. Usually I --
10  February of every year, so you got a report
11  of what assets you have that you own. And
12  then, the tax year here in California I think
13  is July through June of every year.
14      So, you'd get the bill. It would
15  then be paid through the accounts payable
16  system. And we would take it into our system
17  in the general ledger as far as the actual
18  invoice. And then, the accounting treatment
19  is to spread it over the 12 months kind of a
20  deal. But that's kind of the process. And
21  reporting would be like in February and cover
22  the July period.
23  Q. So, for property taxes you've
24  received invoices from taxing authorities?
25  A. Yes.
      TSG Reporting - Worldwide    212-702-9580

Page 81

1  Q. And did you say they were recorded
2  in the accounts payable ledger?
3  A. When an invoice comes up, everything
4  always goes through the accounts payable in
5  order for it to get paid. So, once it got
6  paid, it would then be coded into a different
7  account once it got paid.
8      So, it would go out of the accounts
9  payable system and it would get paid and it
10  would go into an account for the payment.
11  So....
12  Q. Okay. And payroll taxes, you said
13  they were managed through another company?
14  A. Yeah, correct.
15  Q. Do you know what company that was?
16  A. ADP. I'm trying to remember,
17  because there have been a few companies
18  that -- it was ADP probably because they're
19  kind of the most prevalent here in the area.
20  And I think it was ADP for Quintus would have
21  processed all of our tax, payroll tax for
22  whatever measure, whether it be federal,
23  state, whatever states we were in, they would
24  have been managing that process.
25  Q. And would any entries for those
      TSG Reporting - Worldwide    212-702-9580

Page 102

1 run reports for hard copies when we did
2 reconciliations definitely.
3    Q.  Okay.
4    A.  But, you know, I guess my short
5 answer is frankly all of this is all
6 supportable if I could get my hands on the
7 financial system that we were using back then
8 because it would say everything that we have
9 here.  It would support everything.
10    Q.  I agree.  Okay.
11       On Exhibit 6 in the June 30th column
12 on the page that's Bates marked MT 00336?
13    A.  Yes.
14    Q.  Okay.  In the accrued liability, if
15 you look at the detail for that in the next
16 page, the MT 00337.  I know it's really a
17 small page.  So, to the best that you can
18 read it, I'd appreciate it.
19       There's a section, it's probably one
20 of the largest sections.  It says: "Taxes,
21 Sales Tax," almost at the very bottom?
22    A.  Yes.
23    Q.  And there's a listing of numbers.
24 At the top, it says:  "GL Account."  And
25 then, over there's a series of totals, amount

TSG Reporting - Worldwide    212-702-9580

Page 103

1 as of 6/30/2001.  And then, there's a final
2 column.
3       Is that a total for that category?
4    A.  Yes.
5    Q.  Okay.  And I don't know if you can
6 read that, but can you tell me what —
7    A.  138,826.90.
8    Q.  So, does that mean that as of June
9 30th, 2001 there was 138 plus thousand
10 dollars due in sales taxes that had been
11 recorded?
12    A.  That's correct.  And there's the VAT
13 by the way.
14    Q.  And there's the VAT.
15    A.  Yeah.  There we go.  So, there was a
16 valid VAT that we handled, international.
17    MR. ARDEN:  But then, that would be 0.
18    THE WITNESS:  Yeah.  Looks like 0 at the
19 end.  And these account numbers that you see
20 should correspond to states is the way I
21 remember it.
22       So, basically, you know, you'd see
23 each of these account numbers were set up in
24 order to know that we had sales tax in each
25 individual state that we were filing in.

TSG Reporting - Worldwide    212-702-9580

Page 104

1 That's how — it would help the accounting
2 person who's doing the filing to know that
3 here's a total amount that's been collected
4 for, let's say, the State of Massachusetts,
5 and then they would go to the general ledger
6 and say, "Yep, that's the number," and go
7 write a check.
8 BY MS. LAWSON:
9    Q.  So, if the State of Massachusetts
10 contacted you and said you haven't paid your
11 sales tax for this year, you could look up
12 by —
13    A.  By account number —
14    Q.  By Massachusetts —
15    A.  By account number.
16    Q.  — or by account number —
17    A.  To know exactly what —
18    Q.  — and determine how much liability
19 was due?
20    A.  That is totally correct.
21    Q.  Okay.
22    A.  And the largest on here probably is
23 California.
24    Q.  And if you turn to Exhibit 7, this
25 document is as of 4/20/2001; is that correct?

TSG Reporting - Worldwide    212-702-9580

Page 105

1    A.  That's what it says.
2    Q.  Okay.  Would this reflect any
3 historical information about previous
4 accounts payable vouchers?
5    A.  This is as — it's a window — it's
6 a snapshot in time being 4/20/01 what we were
7 liable to pay at that date.
8    Q.  Okay.
9    A.  Not historic- — historically what
10 happens when a payment occurs it's taken off
11 this particular report because it's no longer
12 a payable.
13    Q.  And does it disappear from the
14 ledger system completely, or is it stored
15 somewhere else in the ledger?
16    A.  Well, it's stored historically in
17 the system.  So, you can always go back and
18 run the report at a set point in time, but
19 you'd have to have access to the system to go
20 back and run the reports.
21    Q.  So, if I wanted to look up all
22 historical information, say, on the very
23 first vendor, 1-800-FLOWERS, you could go
24 back to the actual system, put in that vendor
25 name or number, and research all previous

TSG Reporting - Worldwide    212-702-9580

**Page 106**

1 invoices that were entered into the system,
2 and it would show whether or not they were
3 paid?
4   A.  Correct.
5   Q.  Does it also show the method of
6 payment -- i.e., the check number, wire
7 transfer?
8   A.  It should, yes.
9   Q.  Okay.  And that's accessible not
10 only for the aged payables but for any other
11 obligation within the ledger?  Sales taxes
12 that were paid, long term debt, short term
13 debt, payments, lease payments?
14   A.  Right.  If we made a payment to a
15 vendor, the vendor is given a vendor number.
16 And historically, you could go back in time
17 from day one and find out exactly what
18 information you wanted to about that vendor.
19   Q.  I'm just going to keep going through
20 these exhibits.
21        First, can I have you turn to
22 Exhibit 9?
23   A.  I got it.
24   Q.  And this document I think and a lot
25 of documents refer to -- and that previous
        TSG Reporting - Worldwide   212-702-9580

**Page 107**

1 exhibit refers to the trade AP as of 4/20.
2       Do you know if there was ever a hard
3 copy ledger produced that was cut off as of
4 4/10?
5   A.  I don't remember off the top of my
6 head.
7   Q.  Okay.  You also testified earlier
8 that DSI was given access to the records that
9 were available at your location?
10   A.  Yes.
11   Q.  Were they actually given possession
12 of those records to take and do what they
13 wanted with?
14   A.  I'm trying to remember which records
15 they received versus which records
16 historically were sent out to Avaya.  And I
17 don't remember off the top of my head.
18       I do remember we sent out a bunch of
19 records for accounts payable and for payroll.
20 I just don't remember --
21   Q.  You sent out to DSI or to Avaya?
22   A.  To Avaya.  We sent out I think to
23 Avaya for payroll purposes because most of
24 the employees were still being kept on.  With
25 the new Avaya entity, they were acquired.
        TSG Reporting - Worldwide   212-702-9580

**Page 108**

1 So, all the payroll records I believe all
2 definitely went back to Avaya.
3      .   The accounts payable records, I
4 remember Rosie worked with somebody back east
5 and as far as sending out all the accounts
6 payable records that we had I thought to a
7 point in time.  But I could be wrong.  I
8 don't know.  You'd have to talk to Rosie on
9 that one.
10   .  .  I do remember though that all the
11 records -- we had a bunch of records that
12 were still there onsite in the office that
13 basically we just boxed up and told DSI, "No
14 one wants them so we're leaving them here.
15 Whether or not someone from Avaya comes and
16 gets them or the DSI Quintus people need
17 them, they were there."
18   Q.  Was the Dublin office leased or --
19   A.  It was leased.
20   Q.  It was leased.
21   A.  It was leased.
22   Q.  Do you know if Avaya assumed that
23 lease?
24   A.  I assume so.  I mean, they would
25 have to since all the employees were kept on
        TSG Reporting - Worldwide   212-702-9580

**Page 109**

1 as Avaya employees.  They were still using
2 the facility.
3   Q.  And when you say that DSI was at
4 that facility, did they rent space?  Did they
5 own the building?  Or were they just there?
6   A.  They were just there.  I don't know
7 how the arrangement was or whether or not
8 they actually paid any rent kind of a deal. .
9 But, you know, frankly it was a large
10 building that we didn't fully occupy, so we
11 had space available.  And it was just a small
12 little office that they used that was within
13 the finance group.
14   Q.  And did they use that for the
15 operation of their entire business?
16   A.  It was just for whenever they came
17 over to do some work for Quintus.  And they
18 didn't appear all the time.  I mean, they
19 were there very sporadically.
20   Q.  Okay.  Okay.  Can you turn to
21 Exhibit 10 actually.  And I know it's not
22 Bates-stamped, but I wanted to look at page 4
23 of the aged payables.  And does this say the
24 details as of June 27th, 2001?
25   A.  Yes.
        TSG Reporting - Worldwide   212-702-9580

Page 134

1    Q.  What's been handed to you is Exhibit
2  16. It's an e-mail from John De Blase dated
3  August 30th, 2001, Bates-stamped MT 00955 to
4  MT 00960.
5    On the very first page -- first of
6  all, are you familiar with this document?
7    A.  I see my name on it again.. So, I'm
8  going to say obviously it was sent to me at
9  one time.
10    It's John Biase by the way.
11    Q.  Okay.
12    A.  It's B-i-a-s-e.
13    Q.  If you look at the e-mail prior to
14  his, that's an e-mail from you to Melissa
15  Lowery; is that correct?
16    A.  Down at the bottom?
17    Q.  Yes.
18    A.  Yes.
19    Q.  Okay.  If -- the last sentence in
20  that paragraph says:  "Do you know who I can
21  send the invoices to in order to get this
22  paid?"  And the reference is an invoice from
23  Pachulski, Stang, et al.
24    A.  Uh-huh.
25    Q.  Why wouldn't this invoice be entered
    TSG Reporting - Worldwide    212-702-9580

Page 135

1  on to the Quintus AP ledger?
2    A.  This is not one of the ones that was
3  accrued.
4    Q.  That's what --
5    A.  Yeah.  I don't know.  I mean, I
6  haven't seen the numbers and stuff.  All I
7  see is a number out there, so I'm not sure --
8  I mean, the name sounds familiar.  And I
9  thought I saw it.
10    Q.  If you want, you can read --
11    MR. ARDEN:  It's in the detail.
12  BY MS. LAWSON:
13    Q.  -- you can read the previous --
14    A.  Yeah.  I thought it would be one of
15  the --
16    MR. ARDEN:  In that it would be,
17  actually, if that's all right.
18    MS. LAWSON:  That's fine with me.
19    THE WITNESS:  Here it is.
20    MS. LAWSON:  And some parts of the
21  previous --
22    THE WITNESS:  Yeah.  I mean, I remember
23  seeing the name, so....
24    MR. ARDEN:  And let the record reflect
25  that the witness is referring to the detail
    TSG Reporting - Worldwide    212-702-9580

Page 136

1  of the accrued liabilities in the final
2  schedule of assumed liabilities.
3    THE WITNESS:  So, basically this is one
4  of the invoices that we did not physically
5  have at the time of the closing but we were
6  told accrued X amount of dollars because work
7  was being done by these attorneys.  So, we
8  would have accrued for it.
9    So, now the bill has come in I
10  think, and that's what this is referring to.
11  BY MS. LAWSON:
12    Q.  Do you know whether that was ever
13  entered into the Quintus system, or was that
14  put into Avaya's system and paid out of
15  Avaya's system?
16    A.  I don't know what the answer was to
17  this e-mail down here, if that's the
18  question.  It's asking somebody that --
19  actually -- actually, I do know based upon
20  the date.  It was not paid by Quintus at all.
21  I mean, it had to have been paid by Avaya.
22    The reason why I say that is the
23  date is dated August 30th, 2001.  So, from --
24  from my organization standpoint, we stopped
25  paying bills as of the end of June.  So, who
    TSG Reporting - Worldwide    212-702-9580

Page 137

1  had to pay this was one of two parties:
2  Either DSI had to pay it, or Avaya had to pay
3  it.  And my interpretation based upon it was
4  in the assumed liabilities, so it should have
5  been paid by Avaya.  So, we would have sent
6  the invoice off to somebody to go pay it over
7  at Avaya directly.
8    Q.  Okay.  Because you're -- the Quintus
9  books closed and the Mustang and Acuity books
10  closed --
11    A.  All the books were closed on June
12  30th.  We could no longer do any checks as of
13  the end of June.
14    Q.  Okay.  And one of the other exhibits
15  was that 1199 balance, 1,199 as of June 30th.
16    A.  Yes.
17    Q.  Were those payables also transferred
18  over?  Would they have been transferred over
19  to Avaya's system?
20    A.  They would have been transferred
21  over to Avaya's system.
22    What happened I believe -- and,
23  again, this was something where Rosie was
24  involved.  It was a mapping over of the old
25  Platinum Quintus system into the Avaya SAP
    TSG Reporting - Worldwide    212-702-9580

system. So, I just remember her spending a lot of time with Kelly Wall and trying to map over all the stuff that still needed to go over into the system over into Avaya.

But Rosie can answer that question because that was I know very difficult and challenging. And frankly I didn't get involved in it.

**Q. Okay. So, prior to June 30th or actually prior to July 1 -- up to June 30th, liabilities that were in the Quintus system were paid with Quintus checks?**

A. Yes.

**Q. After that they were transferred -- anything that remained unpaid that was assumed would be transferred over to Avaya and paid with Avaya checks?**

A. Correct.

**Q. Out of different checking accounts?**

A. Correct.

**Q. Okay.**

A. Now, I'm trying to remember in my -- in my mind, I know there was the June 30th date, and I don't know if there were -- if anything was paid after June 30th. There

could have been something that we were asked to pay, but I don't think so.

But, you know, I do know that that was the approximate date when we closed our books officially and then everything going forward came out of Avaya's side.

**Q. Okay. Did you also close the corresponding bank accounts that were used for those ledgers?**

A. No. I think they were left open.

**Q. Okay. Forever, or do you know if they were ever closed?**

A. It was -- it was put in the hands of the treasury of Avaya. So, unless instructions came from Avaya to close them down, they then had to go and follow up with that process.

**Q. Okay.**

A. I just don't remember offhand. I don't remember closing them down personally.

**Q. I'll just give you this --**

A. Unless -- unless you have an e-mail that jogs my memory.

(Plaintiff's Exhibit No. 17 was marked for identification)

BY MS. LAWSON:

**Q. What you've been handed is Exhibit 17 which is an e-mail from Gregory Maloney dated July 31st, 2001. Are you familiar with this document?**

A. I mean, I don't remember this one specifically, but -- but --

**Q. Was it sent to you?**

A. It was sent to me.

**Q. Okay. If you turn to the second page which is MT 00357.**

A. Yes.

**Q. You'll see mid down the page there's a bullet point one and a two or numeral paragraphs 1 and 2.**

**Can you read paragraph 2.**

A. Starting with "if there are"?

**Q. Yeah.**

A. "If there are any outstanding checks as we approach Mark Thompson's off role date" of -- I don't know what that is. It should be -- it should be 10/10/01 -- "Mark Thompson will work with Treasury to close out the Quintus bank accounts and any outstanding checks will be treated as abandoned

property."

**Q. Okay. So, there was -- you don't know whether they actually did it, but there was an intent to close out the actual bank accounts; is that correct?**

A. That appears so.

**Q. Okay. And while we're on this topic here, and it's talking about any outstanding checks will be treated as abandoned property, do you know if at the time that you left or even as of the time of July 30th if there were any outstanding checks?**

A. I know when the acquisition occurred we had booked a certain amount of abandoned checks, outstanding checks that had never been cashed in the assumed liabilities section of the $22.5 million.

As far as after the acquisition occurred if there were any outstanding checks, I don't remember off the top of my head. I would not be surprised if there were not some that hadn't been cashed, but I don't remember off the top of my head without looking at a report.

**Q. Okay. You testified that there were**

**Page 146**

1 documents?
2    A.  I remember signing the documents,
3 yeah.  It's just daunting when you get
4 something this large.
5    Q.  And did you at the time that you
6 signed these realize that you were signing --
7 that these were accurate under penalty of
8 perjury of fine and imprisonment?
9    A.  Yeah.  I remember reading what that
10 said, but it's what was in our numbers so
11 that's fine.
12    Q.  Okay.  And do you remember who
13 actually prepared these schedules physically?
14    A.  I do not remember who prepared
15 these.  I don't think we -- I can't remember
16 if our -- I don't think our group would have
17 done something like this, so....
18    Q.  Do you know who would have provided
19 the information to create these documents?
20    MR. ARDEN:  Objection:  Calls for
21 speculation.
22 BY MS. LAWSON:
23    Q.  Did you provide the information to
24 create these schedules?
25    A.  Personally, no.  It would be someone
    TSG Reporting - Worldwide   212-702-9580

**Page 147**

1 on my team would help with the sub schedules
2 to prepare this.
3    Q.  All right.  Can you turn in Tab 1 --
4    Well, let me ask you this question:
5 Would the information that's contained in
6 here be based on -- do you know whether it
7 would be based on Quintus' books and records?
8    MR. ARDEN:  Objection:  Foundation.
9    THE WITNESS:  Yes, it would.
10 BY MS. LAWSON:
11    Q.  You mean you can't answer that.
12    A.  Oh, it means I can answer that.  It
13 should be.
14    Q.  Okay.  Can you -- it's hard to tell
15 you exactly where to turn, but if you flip
16 through and try to find Schedule E, it's
17 probably a little bit more than halfway
18 through the pack of 1?
19    A.  Schedule A.
20    Q.  Schedule E?
21    A.  Oh, E.  Is that machinery and
22 equipment?  That's B still.  F.  D.
23 Creditors Holding Unsecured Priority Claims.
24    Q.  Correct.
25    A.  Okay.
    TSG Reporting - Worldwide   212-702-9580

**Page 148**

1    Q.  And if you look, it says page 1 of
2 2, but it's basically Schedule E.
3    Can you look at that and the next
4 page and see -- tell me what types of
5 liabilities they look like, they appear to
6 be?
7    A.  These are -- appear to be sales and
8 use tax liabilities.  I think all of them
9 look that way.
10    Q.  And how do you know that?
11    A.  I know that because that's all that
12 we would have on our books would be sales and
13 use tax liabilities.  We wouldn't accrue for
14 anything else or have on our books anything
15 else.
16    Q.  Okay.  And if these were in your
17 books and records in your general ledger
18 somewhere, where would they be located?
19    A.  They're specifically spelled out.  I
20 think we've looked at those in another
21 schedule if I remember right.  They had all
22 those accounts.
23    I mentioned they were states pretty
24 much.  And so, they're distinctly in our
25 general ledger under separate GL account
    TSG Reporting - Worldwide   212-702-9580

**Page 149**

1 numbers.
2    Q.  Okay.  I believe the exhibit you
3 were referring to earlier -- I'm trying to
4 find that schedule.  It was probably a
5 different date than these.  I'll try and find
6 it.
7    A.  This document here is as of April
8 10th.
9    MR. ARDEN:  Part of it, yes.
10    THE WITNESS:  Part of it.
11    MR. ARDEN:  Exhibit 4?
12    MS. LAWSON:  No, I don't think that's it.
13    MR. ARDEN:  Oh.
14    MS. LAWSON:  I think it's Exhibit 10.
15    MR. ARDEN:  The July exhibit.
16    MS. LAWSON:  No, it's not 10.
17    Here it is.  I think it's Exhibit 5
18 maybe.
19    No, that's not it either.
20    Here we go.  Exhibit 6.
21    THE WITNESS:  Yes.  Last page.
22 BY MS. LAWSON:
23    Q.  On page MT 00337.
24    A.  Correct.  Some of them tie though.
25    Q.  Okay.
    TSG Reporting - Worldwide   212-702-9580

Page 150

1  A.  The 3226 you can see ties to North
2  Carolina Department of Revenue for 54,645.30.
3  Q.  Okay.  So, when you say 3226, you're
4  referring to the GL account number?
5  A.  Yeah.  Correct.
6  Q.  Okay.  And I believe the one below
7  that, the 9,867.52 or GL 3227, refers to the
8  Colorado?
9  A.  Correct.  So, ones that would not
10  appear I would have to assume were paid, do
11  not appear.
12  Q.  Okay.  You identified the North
13  Carolina one.
14  A.  Yes.
15  Q.  So, that -- based on this Exhibit 6,
16  you would say that that liability was
17  specifically listed in your general ledger as
18  a liability?
19  A.  Correct.
20  Q.  That was assumed by Avaya?
21  A.  Correct.
22  Q.  Okay.  Can you look for -- I'm going
23  to ask you to look for specific ones.  I'm
24  not going to ask you to look for all of them.
25  I just have certain ones.
    TSG Reporting - Worldwide    212-702-9580

Page 151

1  A.  Okay.
2  Q.  The next one from Ohio for
3  22,791.30.
4  A.  Yes, I see it.
5  Q.  Okay.  So, that's in there, and that
6  would have been an assumed --
7  A.  Liability.
8  Q.  -- liability?
9  A.  Correct.
10  Q.  There's one like three more down, it
11  says Colorado Department, the 9,867.52.  I
12  believe you already found that one?
13  A.  Yeah.  You just mentioned that one.
14  Q.  So, that would have been an assumed
15  liability?
16  A.  That is correct.
17  Q.  Can you go down to the Oklahoma Tax
18  Commission which is, like, three more below
19  that --
20  A.  Uh-huh.
21  Q.  -- for 3823.31.  Do you see that one
22  anywhere in there?
23  A.  Yes.
24  Q.  So, that would have been an assumed
25  tax liability?
    TSG Reporting - Worldwide    212-702-9580

Page 152

1  A.  That's correct.
2  Q.  Can you find the next one, the Texas
3  one for 3749.27?
4  A.  Yes.
5  Q.  So, that would have been an assumed
6  tax liability?
7  A.  Correct.
8  Q.  Can you find the next one, State of
9  New Jersey, 3384.20 -- actually, you can
10  ignore that.
11    Go ahead, yes, you do need to find
12  it.
13  A.  Which state is this again?
14  Q.  State of New Jersey?
15  A.  State of New Jersey.
16    And this is -- when you say look in
17  the last column, basically as of June 30th.
18  Q.  I was looking more towards April
19  20th because it's closer in time.
20  A.  Okay.
21  Q.  The schedules are dated April 10th,
22  so....
23  A.  I don't see anything.
24  Q.  Okay.  So, you don't see that one?
25  A.  No.
    TSG Reporting - Worldwide    212-702-9580

Page 153

1  Q.  If we knew the vendor number, the GL
2  account number for that, we could look it up?
3  A.  Sure.  Certainly.
4  Q.  Okay.
5  MR. ARDEN:  But there's nothing other
6  than the ones listed here; right?
7  THE WITNESS:  In front of me, yeah.
8  MR. ARDEN:  But there would be nothing in
9  the general ledger other than what's listed
10  here in terms of what --
11  THE WITNESS:  In the general ledger, it
12  actually should have a description of what
13  account and what state and --
14  BY MS. LAWSON:
15  Q.  Do you know how that amount, the
16  3384.20, would have ended up in the schedule
17  that was filed with the Court if it wasn't in
18  the general ledger?
19  A.  No.  I would assume -- I mean, it
20  would have to be in the general ledger at
21  that point in time.
22  Q.  Okay.  Is there a possibility it
23  could have been paid between --
24  A.  The 10th and the 20th.
25  Q.  -- the 10th and the 20th?
    TSG Reporting - Worldwide    212-702-9580

Page 154

1    A. Definitely.
2    Q. Okay. And if it was paid, it would
3  still be in the general ledger showing the
4  payment?
5    A. Yes. You would be able to go back
6  and retrace that.
7    Q. Okay. Can you look for the next one
8  with the Washington Department of Revenue,
9  the 1,231.07?
10    A. I don't see it.
11    Q. And do you have any reason to know
12  why it would be on this schedule filed with
13  the Court but not in the general ledger?
14    MR. ARDEN: Objection: Foundation.
15    THE WITNESS: Just the assumption that it
16  was paid between those dates.
17  BY MS. LAWSON:
18    Q. Okay. If it's listed on the
19  schedule, should it have been somewhere in
20  the ledger?
21    A. Yeah.
22    MR. ARDEN: Objection: Foundation. No
23  foundation.
24  BY MS. LAWSON:
25    Q. Okay. And can you flip to the next
    TSG Reporting - Worldwide   212-702-9580

Page 155

1  page, the last one, the Wisconsin Department
2  of Revenue and see if that's in there.
3    A. I don't see it.
4    Q. Okay. I'm going to ask you to turn
5  now to — actually, hold on a second. Tab 2
6  but keep Exhibit 6 with you. Exhibit 6 and
7  this — this schedule of assumed liabilities
8  that's on here, this is incorporating
9  Quintus, Mustang, and Acuity liabilities; is
10  that correct?
11    A. That's correct.
12    Q. Okay. So, if you turn to Tab 2,
13  again you're going to have to find Schedule E
14  because they're not sequentially numbered.
15  But it's pretty far back. If you can look
16  for Schedule E.
17    A. Okay.
18    Q. Did you find it?
19    A. Yes.
20    Q. Okay. And we're on page 1 of 2. It
21  says: "Schedule E - Creditors Holding
22  Unsecured Priority Claims."
23    If you look at this page, what does
24  that page — what types of claims does that
25  primarily consist of?
    TSG Reporting - Worldwide   212-702-9580

Page 156

1    A. It appears to be sales and use tax
2  again.
3    Q. Okay. I know your eyes are probably
4  killing you, but the very first one. The
5  Board of Equalization for 2475.09. Do you
6  see that in the Exhibit 10 — or Exhibit 6.
7  I'm sorry.
8    A. I don't see it.
9    Q. Okay.
10    A. The numbers are all running together
11  right now, so....
12    Q. I know. It's very small. I
13  apologize.
14    A. No. That's okay. I don't see it.
15    Q. Do you see the next one for State of
16  Ohio, 2450.11?
17    A. No.
18    Q. Okay. Do you see the Missouri
19  Department of Revenue, two down, 2046.99?
20    A. Yes.
21    Q. So, that would have been an assumed
22  liability?
23    A. Yes.
24    Q. Okay. Do you see the next one,
25  Indiana Department of Revenue, 1664?
    TSG Reporting - Worldwide   212-702-9580

Page 157

1    A. No.
2    Q. Do you see the Nebraska Department
3  of Revenue, 1057.23, anywhere?
4    A. No.
5    Q. Do you see the next one, Minnesota
6  for 734.50?
7    A. No.
8    Q. Okay. Do you see the Florida
9  Department of Revenue for 349.04?
10    A. No.
11    Q. Okay. For that one, I'm going to
12  ask you to look at the aged payables ledger
13  of 4/20.
14    A. Okay.
15    Q. Is that Document No. 7 or Exhibit
16  No. 7?
17    A. 7.
18    Q. Can you — now, this would be a
19  Mustang liability, so that would be in the
20  Mustang aged payables ledger; correct?
21    A. Correct.
22    Q. Can you look for the Florida one in
23  there?
24    A. I don't see it. I guess I'm not
25  looking in the right place.
    TSG Reporting - Worldwide   212-702-9580

Page 158

1    Q.  Actually, it's — that's a different
2  one.  Okay.  So, that one is not in there.
3  Okay.  Okay.
4       In the Exhibit 6, do you see the
5  Alabama Department of Revenue for 259.60?
6    A.  Yes.
7    Q.  And that would have been an assumed
8  tax liability; correct?
9    MR. ARDEN:  Do you see it in the --
10  BY MS. LAWSON:
11    Q.  Do you find it --
12    A.  Oh, you're saying if I find it here.
13    Q.  Yes, yes.
14    A.  Found it over here.
15    Yeah, it is.  Here it is.
16    Q.  Okay.  And that would have been an
17  assumed liability; correct?
18    A.  Yes.
19    Q.  Can you find the Utah Department of
20  Revenue for 156.25?
21    A.  Don't see it.
22    Q.  Okay.  And the next one, the Iowa
23  Department of Revenue for 108?
24    A.  Yes, I see it.
25    Q.  And that would have been an assumed

TSG Reporting - Worldwide   212-702-9580

Page 159

1  tax liability; correct?
2    A.  Correct.
3    Q.  And then, the next one Illinois
4  Department of Revenue for 92.68?
5    A.  Don't see it.
6    Q.  And if these are in the bankruptcy
7  schedules and they are also in Quintus',
8  Mustang's, or Acuity's assumed liability
9  schedules, should they have been paid by
10  Avaya?
11    MR. ARDEN:  Objection to form in your
12  introduction of the irrelevant bankruptcy
13  schedule.
14  BY MS. LAWSON:
15    Q.  The tax liabilities in the Quintus
16  ledgers --
17    A.  Quintus ledgers.
18    Q.  -- as assumed tax liabilities --
19    A.  As of 4/20/01?
20    Q.  -- should they have been paid by
21  Avaya?
22    A.  Yes.
23    Q.  Can you flip to Tab 3 in the binder.
24    A.  Before I lose my train of thought on
25  that.

TSG Reporting - Worldwide   212-702-9580

Page 160

1    Q.  Yeah.
2    A.  I will say yes, they are assumed
3  liabilities of Avaya.  Whether or not they
4  should be paid or not I guess is a question
5  that I would have but I couldn't answer right
6  now.
7    Q.  Okay.
8    A.  Because some of those could have
9  been assumed liabilities that maybe we had
10  not registered in the states but we had
11  collected tax for.  And so, I'm just not sure
12  of the accounting and how they would be
13  treated and such.  But they were assumed
14  liabilities of Avaya.
15    Avaya ended up taking ownership of
16  those liabilities.  And the question is
17  whether or not those were states that the
18  company was -- was filing up to the time of
19  the acquisition or if we had collected taxes
20  and had not paid those states, and so they
21  just were sitting there.
22    And so, we had not registered --
23  let's say for a state, we might have
24  collected the tax from a customer, had put it
25  in the account and not registered in the

TSG Reporting - Worldwide   212-702-9580

Page 161

1  state yet.  And so, they would be sitting
2  there basically forever until we filed and
3  registered in that state.
4    And Avaya when they purchased the
5  company and acquired the company, in essence
6  they took that legacy unfortunately with them
7  of -- of those particular sequences.
8    Q.  Okay.  Can you turn to Tab 3 in the
9  binder and find Schedule E for Acuity.
10    A.  Schedule E?
11    Q.  Yes.
12    A.  Okay.  Short schedule.
13    Q.  Yes.  And just for the record, this
14  is Schedule E - Creditors Holding Unsecured
15  Priority Claims for Acuity.  And looking at
16  that, what types of liabilities do these
17  appear to be?
18    A.  They appear to be, again, sales and
19  use tax related.
20    Q.  Okay.  And this is a short list, but
21  I actually need you to look for every single
22  one.
23    A.  Okay.
24    Q.  So, the first one is Utah Department
25  of Revenue for 19,664.68.  Is that in this

TSG Reporting - Worldwide   212-702-9580

Page 162

1   schedule in Exhibit 6?
2       A.  I don't see it.
3       Q.  Okay.  The next one, State of Ohio,
4   8400.63?
5       A.  Yes.
6       Q.  So, that would have been an assumed
7   liability?
8       A.  Yes.
9       Q.  The next one, Board of Equalization,
10  4100.89?
11      A.  I don't see it.
12      Q.  Idaho State Tax Commission for
13  3797.25?
14      A.  Yes.
15      Q.  So, that would have been an assumed
16  liability?
17      A.  Yes.
18      Q.  Texas Comptroller of Public Accounts
19  for 3477.01?
20      A.  I don't see it.
21      Q.  Okay.  I'm going to actually ask you
22  to pull out Exhibit 7, and I'm going to ask
23  you to turn actually to Exhibit 1A.
24      A.  Exhibit 1A where?
25      Q.  Tab 1A.

TSG Reporting - Worldwide   212-702-9580

Page 163

1       A.  Oh, Tab 1A.
2       MR. ARDEN:  Tab 1A within Thompson 18.
3       MS. LAWSON:  Correct.
4       THE WITNESS:  Okay.
5   BY MS. LAWSON:
6       Q.  And if you can turn to page 2 of 25.
7       A.  Yes.
8       Q.  If you looked at the third from the
9   bottom, there's claim Karr & Associates,
10  Inc.?
11      A.  Yes.
12      Q.  For 50,533.34?
13      A.  Yes.
14      Q.  Can you look in the Quintus aged
15  payables on Exhibit 7 and find that
16  liability?
17      A.  Yes.
18      Q.  And is the exact amount in there?
19      A.  Correct.
20      Q.  So, that would have been an assumed
21  liability?
22      A.  Correct.
23      Q.  Okay.  Can you turn to page 3 of 25
24  in the binder which is Exhibit 18, third one
25  down from the top, GTSI Corporation for

TSG Reporting - Worldwide   212-702-9580

Page 164

1   44,000.  Is that in the aged payables ledger
2   in Exhibit 7?
3       A.  No.  Oh, wait a second.  Yes, it is.
4   Sorry.  Threw you off.
5       Q.  So, that would have been an assumed
6   liability?
7       A.  Yes.  Yes.
8       Q.  Okay.  Page 4 of 25, the third claim
9   from the top, Epicor for 24,500.  Is that in
10  Exhibit 7?
11      MR. ARDEN:  Which page?  I'm sorry.
12      MS. LAWSON:  Page 4 of 25 in Exhibit 18.
13      THE WITNESS:  Yes.
14  BY MS. LAWSON:
15      Q.  The amount 24,500?
16      A.  500.
17      Q.  So, that would have been an assumed
18  liability?
19      A.  Correct.
20      Q.  The very next one, Front Line
21  Solutions in the amount of 22,000, is that in
22  Exhibit 7?
23      A.  Yes.
24      Q.  So, that would have been an assumed
25  liability?

TSG Reporting - Worldwide   212-702-9580

Page 165

1       A.  Correct.
2       Q.  If you can turn to page 5 of 25 on
3   Exhibit 18, American Express, RPC.  It's the
4   fourth one down.  15,780.75.  Is that in the
5   Exhibit 7, aged payables?
6       A.  I don't see it.
7       Q.  You testified earlier that these
8   schedules were based on the debtors' books
9   and records; is that correct?
10      MR. ARDEN:  No.  He didn't testify to
11  that.  That's what he assumed.  He had no
12  involvement in it.
13      In fact, you're now showing a May
14  document that he had nothing to do with.
15      MS. LAWSON:  Okay.  If you have an
16  objection, just state the objection.
17  Speaking objections are not necessary.  Just
18  so we're clear.
19      MR. ARDEN:  I object.
20      MS. LAWSON:  You've done it once before,
21  and that will be the last time.
22      THE WITNESS:  So, the question --
23      MR. ARDEN:  I'd ask that you not
24  mischaracterize the testimony of the witness
25  and ask questions.

TSG Reporting - Worldwide   212-702-9580

Rosie Nguyen - 1/27/06

SHEET 1 PAGE 1
IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

IN RE:

QUINTUS CORPORATION, et al.,

    Debtors.                     BANKR. NO.
                                   01-00501 (MFW)
_____        through NO.
                                   01-00503 (MFW)

QUINTUS CORPORATION, MUSTANG.COM,
INC., and ACUITY CORPORATION,

           v.

AVAYA, INC.,

    Defendants.                   /


DEPOSITION OF ROSIE NGUYEN
January 27, 2006


PATRICIA CALLAHAN & ASSOCIATES, INC.
Certified Shorthand Reporters
Oakland, California  (510) 835-3993
San Francisco, California (415) 788-3993
Castro Valley, California (510) 885-2371
Facsimile (510) 247-9775
WeReport@aol.com

Reported by:
WENDY C. BROWN
C.S.R. NO. 5697

---

PAGE 3                                               3

1                    EXHIBITS
2
3                                    PAGE
4
5   PLAINTIFF'S EXHIBIT 1,              18
6   A PHOTOCOPY OF A ONE-PAGE COVER LETTER
7   SIGNED BY MARK P. THOMPSON, ATTACHING
8   A TWO-PAGE SCHEDULE OF ASSUMED LIABILITIES
9
10  PLAINTIFF'S EXHIBIT 2,              20
11  A PHOTOCOPY OF A MULTIPAGE DOCUMENT
12  ENTITLED "ASSET PURCHASE AGREEMENT"
13
14  PLAINTIFF'S EXHIBIT 3,              32
15  A PHOTOCOPY OF A MULTIPAGE GROUP OF
16  DOCUMENTS ENTITLED "AGED PAYABLES BY:
17  BRANCH CODE/VENDOR CODE"
18
19  PLAINTIFF'S EXHIBIT 4,              34
20  A PHOTOCOPY OF A ONE-PAGE PROOF OF
21  CLAIM NUMBER 37 FILED BY SOFTWORLD,
22  INC., WITH FIVE ATTACHED INVOICES
23
24
25

---

PAGE 2                                            2

1                    INDEX
2
3                                    PAGE
4
5   EXAMINATION BY MS. LAWSON            8
6   EXAMINATION BY MR. ARDEN            50
7   FURTHER EXAMINATION BY MS. LAWSON       56
8   FURTHER EXAMINATION BY MR. ARDEN        59
9
10               --oOo--
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

PAGE 4                                            4

1                    EXHIBITS
2
3                                    PAGE
4
5   PLAINTIFF'S EXHIBIT 5,              41
6   A PHOTOCOPY OF A ONE-PAGE EMAIL DATED
7   SEPTEMBER 14, 2001, FROM ROSIE NGUYEN
8   TO SALLIE JOHNSON, ET AL., AND A
9   MULTIPAGE LIST OF ABANDONED PROPERTY
10  FOR AP
11
12  PLAINTIFF'S EXHIBIT 6,              42
13  A PHOTOCOPY OF A ONE-PAGE PROOF OF
14  CLAIM #0022 BY LIGHTHOUSE CONSULTING,
15  WITH FOUR PAGES OF INVOICES AND A
16  ONE-PAGE LETTER DATED AUGUST 8, 2001,
17  FROM STEVEN F. MONES TO DONLIN,
18  RECANO & COMPANY, INC.
19
20  PLAINTIFF'S EXHIBIT 7,              46
21  A PHOTOCOPY OF A CHECK REGISTER,
22  BATES NOS. 000374 THROUGH 000427
23
24
25

---

Patricia Callahan & Associates, Inc.          (510) 885-2371 / (415) 788-3993

Rosie Nguyen - 1/27/06

SHEET 4   PAGE 13

13

1 what you do -- if you had not been purchased by Avaya,
2 you wouldn't have to do all that. And what gets booked
3 over to Avaya was, um, given guidance by the accounting
4 team from the Avaya side. Okay.
5 Q.    And who did you report to at Avaya?
6 A.    Um, I reported to Shobhna -- and I have no idea
7 what her last name is; she was the CFO at the time --
8 but I interfaced with Kelly Wall.
9 Q.   Okay.
10 A.   Okay.
11 Q.   And did you still report to anyone on what I'll
12 call the Quintus side?
13 A.    So -- from -- from an actual reporting
14 structure, no.
15 Q.   Okay.
16 A.   But we all -- you know, we're the same team, so
17 we all rolled up to Mark Thompson, who was the --
18 Q.   Okay.
19 A.   -- controller then.
20 Q.   Okay. And were you involved at all in the
21 payment of assumed liabilities on the Avaya side, once
22 you transitioned over?
23 A.    Yes.
24 Q.    Okay. And for that, that's when you reported to
25 Shobhna and you worked with Kelly Wall; is that correct?

PAGE 14

14

1 A.    Correct.
2 Q.    Did Quintus maintain separate ledgers for
3 Quintus, Mustang and Acuity?
4 A.    Yes.
5 Q.    And does that mean that there would be separate,
6 say, accounts payable ledgers, separate asset ledgers,
7 separate liability ledgers, or were there only certain
8 ledgers that were separate?
9 A.    So there were separate ledgers for each of the
10 entities, and when we moved the transaction over to
11 Avaya, it would be at a consolidated level.
12 Q.   Okay.
13 A.   Okay. So on the Quintus side, on the system,
14 there are three different databases, okay: there's a
15 Quintus, there's an Acuity, there's a Mustang. But when
16 you consolidate the financials, it's at a Quintus level
17 consolidation, okay.
18 Q.    Okay. Were the ledgers ever combined on the --
19 we refer to the Quintus side and Avaya side -- on the
20 Quintus side, or was it only when they were transferred
21 over to the Avaya side?
22 A.    The things that we could definitely decipher as
23 being separate were separated.
24 Q.   Okay.
25 A.    So I won't say that there could never be a

PAGE 15

15

1 possibility of something being paid on the Quintus side
2 for Mustang and Acuity, but the things that were
3 definitely Mustang and Acuity and we know, they're paid
4 on a separate ledger.
5 Q.    Okay. Did part of your responsibilities at
6 Quintus involve dealing with property taxes?
7 A.    Yes.
8 Q.    Was that real and personal, or one or the other?
9 A.    It's both, yes.
10 Q.    Okay. Do you know if property taxes are an
11 accrued tax, or if you get invoiced for those at a
12 specific time?
13    MR. ARDEN:    Objection to form.
14    THE WITNESS:    I'm sorry.
15    MR. ARDEN:    Objection -- I was just
16 objecting to the form of the question, which means that
17 at a later date, the court can look at whether it's a
18 fair question.
19    THE WITNESS:    Okay.
20    MR. ARDEN:    But if you are able to
21 respond, it's -- it is not an instruction for you not to
22 answer.
23    THE WITNESS:    Okay.
24    Generally, you get invoiced, so we -- I don't
25 believe we ever accrued for property taxes.

PAGE 16

16

1    MS. LAWSON:    Q. Okay. Where in the
2 general ledger are property taxes recorded?
3 A.    It would hit a property tax account. It would
4 hit a tax account.
5 Q.    Okay. So you would put an entry in a property
6 tax account when you were invoiced by the taxing
7 authority; is that correct?
8 A.    Correct.
9 Q.    When it was paid, how did it -- where did it go
10 when it got paid; does it get paid out of that account,
11 or did it get transferred to, like, accounts payable?
12 A.    So the normal payment is there's an accounts
13 payable liability account; there's an expense account.
14 So when you have an invoice, you would voucher that
15 against the expense account, which is tax, right. Let's
16 say it's $100. Okay. And that hits an accounts payable
17 liability account on -- so you have debits and credits,
18 right. So you voucher the debit onto the expense side;
19 the credit will hit accounts payable liability, because
20 you now have an invoice that you're liable for. And
21 when payment is paid, the liability is offset as a
22 debit, and cash is hit, so that you know that cash went
23 out the door to make that payment.
24 Q.   Okay.
25 A.   Okay.

Rosie Nguyen - 1/27/06

SHEET 5   PAGE 17

17

1  Q.     And then after the property tax — you call it a
2  voucher. After that's paid, that entry is paid, where
3  would you be able to locate information about that
4  voucher?
5  A.     So, it's — number one, it's in the financial
6  system. Number two, we keep a paper record of it in the
7  vendor file, the AP files, with the check and the
8  payment and the account that it was coded to. That's
9  all — there's a folder for every year that that's done.
10  Q.     Okay. And when you say "we," who are you
11  referring to?
12  A.     My team.
13  Q.     Okay.
14  A.     The AP clerk who made the transaction, put the
15  transaction into the system.
16  Q.     And are you talking about "we" in the sense of
17  when you were at Quintus?
18  A.     Yes.
19  Q.     Just want to be clear —
20  A.     Yeah.
21  Q.     — this isn't something you talk about doing
22  now.
23  A.     Yeah.
24  Q.     It's something you did at Quintus?
25  A.     Yeah.

PAGE 18

18

1  Q.     We're also going to have exhibits marked and let
2  you look at them and --
3  A.     Okay.
4  Q.     — and ask you some questions about them, as
5  well.
6     (PLAINTIFFS' EXHIBIT NO. 1
7     WAS MARKED FOR IDENTIFICATION.)
8     MS. LAWSON:  Q.  What you've been handed
9  is going to be Nguyen — do you say "Nuwin" or "Win"?
10  A.     Nguyen.
11  Q.     Okay. Nguyen No. 1.
12  A.     Okay.
13  Q.     And if you can just take a moment to look at
14  that document.
15     (Pause.)
16  A.     Okay.
17  Q.     Are you familiar at all with this document?
18  A.     So, this looks like our balance sheet that Mark
19  put together per the asset purchase.
20  Q.     Okay. And you've seen this before?
21  A.     Yes.
22  Q.     Okay. Can you turn to the second page of the
23  document. At the bottom it will have a stamp, page
24  number 252.
25  A.     Okay.

PAGE 19

19

1  Q.     And I don't know if you can read it, it's kind
2  of hard to read, but can you read the date over the
3  column with all the numbers?
4  A.     4 — no.
5     MR. ARDEN:     I think we could say it's
6  4/20, I think we —
7     MS. LAWSON:     You're okay with it?
8  Q.     It's 4/20. I know it's hard to read because
9  it's been highlighted.
10     MR. ARDEN:     It's a little easier to read
11  on the detail page, actually, but not much.
12     THE WITNESS:     Okay.
13     MS. LAWSON:     Q.  Okay. Can you read what
14  the total liabilities are at the bottom of that page?
15  A.     So, total liabilities are $22,549.
16  Q.     Okay. And is it fair to say, based on what you
17  think this document is, that that was the number of
18  liability — amount of liabilities that Avaya assumed?
19  A.     Yes.
20  Q.     Okay. Now, when you look at the first category,
21  and it says "Other Accounts Payable" —
22  A.     Um-hum.
23  Q.     — since you handled accounts payable, what type
24  of liabilities would have fallen in that category?
25  A.     Um, I don't recall. Let me see if I can look it

PAGE 20

20

1  up.
2  Q.     Actually, you can't look it up. You need to
3  just do it from your recollection.
4  A.     I can't recall.
5  Q.     Okay. If you look at the next one, where it
6  says "Trade AP" —
7  A.     Um-hum.
8  Q.     — what would be in that category?
9  A.     So trade AP are the standard invoices that come
10  in that we pay out. So as I stated before, whenever you
11  voucher, it hits a liability account. That is
12  considered trade AP.
13  Q.     Okay.
14     Okay. You can actually put that document away.
15  A.     Okay.
16     (PLAINTIFFS' EXHIBIT NO. 2
17     WAS MARKED FOR IDENTIFICATION.)
18     MS. LAWSON:  Q.  You've been handed
19  Exhibit 2, which is entitled "Asset Purchase Agreement
20  Pursuant to Section 363 of the Bankruptcy Code, Dated as
21  of February 22, 2001, Among Quintus Corporation, Certain
22  Wholly-Owned Subsidiaries of Quintus Corporation and
23  Avaya, Inc."
24     Are you familiar with this document?
25  A.     Yes, I've seen it before.

Rosie Nguyen - 1/27/06

SHEET 7  PAGE 25
25

1 your duties, accounts payable, property taxes, do you
2 know if they were all paid?
3 A.    I don't know that it was all paid. I know that
4 as of the end of June, we were directed to clear all
5 trade AP and post that date, because that was the date
6 that they had, um, let go the rest of the finance staff,
7 the accounting staff. So there was to be no more
8 transactions, um, to be paid on the Quintus' accounting
9 system.
10     Post that, all the invoices that came were
11 forwarded to Avaya to be paid. So to say that I know
12 that it all got paid, I don't know.
13 Q.    Okay.
14 A.    Okay.
15 Q.    So if April 11th was the closing, you had a
16 cutoff date for the books and records as to what would
17 be assumed and what would not be assumed; is that
18 correct?
19 A.    So, yes and no. So as of April, the assumed
20 liability is $30,000,000, up to $30,000,000. So we have
21 directions to, you know, keep on paying invoices as they
22 come, once it's deciphered that those were Avaya's
23 liabilities, right. So, for example, there were
24 invoices that pertained to the Quintus bankruptcy that
25 came to Quintus, and we would separate those out and

PAGE 26
26

1 forward that to Quintus', um, estate management team to
2 take care of.
3     So when you say as of that date there was a
4 cutoff as to what was the assumed liability, there is
5 from the contract of $30,000,000, but did we have every
6 single invoice in there, and we stopped paying after
7 that date, no.
8 Q.    Okay. So as of April 11th, Avaya essentially
9 owned certain assets and liabilities of the company —
10 A.    Correct.
11 Q.    — of Quintus?
12     If invoices came in that applied — that were
13 incurred — for obligees that occurred after April
14 11th — Say on April 20th, they purchased a photocopier.
15 A.    Right.
16 Q.    Was that entered on the Quintus books, or was
17 that entered on the Avaya books?
18 A.    If it was a Quintus — and when I say "Quintus,"
19 I mean Quintus Chapter 11, the Quintus asset, then it
20 would be paid on the Quintus side. If it was for the
21 Avaya operations — because at that point, Avaya now
22 owns Quintus — then it would be paid on the Avaya books
23 through the Quintus accounting system.
24 Q.    Okay.
25 A.    Okay.

PAGE 27
27

1 Q.    And then at some point, you said you shut down
2 the Quintus books?
3 A.    End of June was the last AP run that was made,
4 and everything was transferred over to Avaya as of that
5 date, from a transactional basis.
6 Q.    And when you say "everything," you mean
7 historical information?
8 A.    Correct.
9 Q.    Current information and everything back how far?
10 Do you know how many years back the information was
11 transferred?
12 A.    Well, so it's from the beginning of time, right.
13 I mean, 'cause basically, when we run reports, it's
14 everything that is on the books from the beginning of
15 time. And if there are still things on the books, then
16 they have that information. I mean, basically, you
17 transferred the entire accounting history.
18 Q.    Okay. Was that done through — was an
19 electronic copy transferred, or was it paper copy, or
20 both?
21 A.    So, there is both. There are financials that
22 were transferred and, you know, they were printed out,
23 and there's a general ledger reconciliation binder that
24 Avaya had when we archived the material. There is an
25 e-mail that's sent, 'cause a lot of things were

PAGE 28
28

1 communicated through e-mails to the various employees in
2 Avaya. And then there is the accounting system that
3 essentially was owned by Avaya, and when I left, um, all
4 that was communicated to the Avaya team as to what's
5 where, you know. So it's in all forms.
6 Q.    Okay. So at the time when you left, that all
7 was still in existence and had all been transferred to
8 Avaya?
9 A.    Correct.
10 Q.    Okay. And were different parts of the — what
11 I'll just call generally books and records, accounts
12 payable, invoices, all that, were they sent to the exact
13 same location, the hard copies, or were they divided up
14 and sent to different locations?
15 A.    No, they — all the archived material went to
16 one location.
17 Q.    Okay.
18 A.    Um, I do recall that payroll was to be sent to a
19 different location.
20 Q.    Okay.
21 A.    And that was in Florida. And that was the only
22 piece that was —
23 Q.    Okay.
24 A.    — that was sent to a different location.
25 Q.    And after you left Avaya, did you ever have a

Rosie Nguyen - 1/27/06

SHEET 8  PAGE 29

29

1 conversation with an Avaya employee about the books and
2 records and the archival of those records?
3 A.    Yes.
4 Q.    Was the conversation about the hard copy or the
5 electronic copy?
6 A.    The electronic piece. The accounting system, in
7 fact.
8 Q.    And what was that conversation?
9 A.    Um, so, I still had relationships with various
10 people, Quintus people who are now Avaya employees, and
11 I was told that the accounting server was reformatted,
12 because they needed the server.
13 Q.    And do you know what reformatting is or what it
14 would do to the accounting system?
15 A.    Basically, it wipes out the entire accounting
16 system and all the data on there. And, you know, once
17 you format a drive, it basically wipes it clean, as if
18 it's a brand new server.
19 Q.    Okay. And the exhibit that's in front of you,
20 Exhibit 2, can you turn to page 30 of the asset purchase
21 agreement, which, at the bottom, is 000503.
22 A.    (Witness complies.)
23 Q.    And if you look down the page, there's Section
24 5.05, "Books and Records." Can you read paragraph (a)
25 for me, please?

PAGE 30

30

1 A.    "Books and Records." (a) Buyer agrees to make
2 copies of all business records and files being
3 transferred to Buyer pursuant to this Agreement and to
4 retain such copies for seven years after the Closing."
5 Q.    Based on your knowledge of the date of the
6 acquisition, has that seven-year period expired yet?
7 A.    No.
8 Q.    And when was this conversation with the Avaya
9 employee regarding the reformatting of the hard drive?
10    MR. ARDEN:      I have an objection to the
11 form, and relevance. Has nothing to do with the books
12 and records that were transferred. She's, I think,
13 talking about books and records that were altered after
14 -- that were continued and used after the closing.
15    MS. LAWSON:      Your objection is noted.
16 Q.    Go ahead and answer the question.
17 A.    Okay. So I don't recall exactly when, but I
18 would say within six months.
19 Q.    Okay. Do you happen to recall the name of the
20 Avaya employee?
21 A.    No.
22 Q.    Okay.
23 A.    I recall who, um, agreed to it.
24 Q.    Okay. Who was that?
25 A.    Okay. And his name was Sidarham. That's his

PAGE 31

31

1 last name.
2 Q.    Okay.
3 A.    His first name was -- it starts with an "M".
4 It's too hard to pronounce, so we never pronounced it.
5 Q.    Okay.
6 A.    Okay. But that was the VP at the time who
7 agreed to it. Okay.
8 Q.    Okay.
9    All right. After the acquisition, were invoices
10 still coming to the location where you were working?
11 A.    Yes.
12 Q.    And so being in charge of accounts payable,
13 let's say, anything that would have been in the accounts
14 payable system, let's say property tax charge, would
15 that invoice have come to you?
16 A.    Yes.
17 Q.    And you would have been the one to record it in
18 the system, if it was appropriate?
19 A.    Yes.
20 Q.    In order to know whether to record that in the
21 Quintus system, did you have to check with anyone?
22 A.    It depends on the type of invoice. For example,
23 some of the legal invoices that came through, some of
24 the legal fees, there were gray areas as to who would
25 really own these liabilities. And when we had the gray

PAGE 32

32

1 area, we would actually escalate it up to, um, Avaya's
2 accounting team to get guidance on who should own that.
3 And it would come back down as to whether or not we
4 would pay it.
5 Q.    Okay. Do you recall if there were any other
6 types of invoices that occurred, or whether it was
7 primarily legal fees?
8 A.    Um, I don't recall.
9 Q.    Okay.
10 A.    The legal fee was just one example that I
11 remember.
12 Q.    Okay. Do you remember how that was resolved;
13 was that recorded on the Quintus books, or was that
14 handled through the Avaya books?
15    MR. ARDEN:      Objection to form.
16    THE WITNESS:      I don't recall.
17    MS. LAWSON:      Q. And when you say
18 you would check with the Avaya -- I don't know whether
19 you referred to it as accounting team or finance team --
20 would that be Shobhna or was there someone --
21 A.    Kelly, Shobhna, and sometimes Greg Maloney.
22    (PLAINTIFFS' EXHIBIT NO. 3
23    WAS MARKED FOR IDENTIFICATION.)
24    MS. LAWSON:      Q. What you've been handed
25 has been marked Exhibit 3. At the top it says "Aged

Patricia Callahan & Associates, Inc.          (510) 885-2371 / (415) 788-3993

Rosie Nguyen - 1/27/06

41

1 payment had been taken out of your checking account?
2 A.    Right.
3 Q.    Then they would record it?
4 A.    Right.
5 Q.    Okay.
6        But there was nothing entered into the ledger
7 until that --
8 A.    Right.
9 Q.    -- entry? Okay.
10       At the time that the -- you referred to the
11 closing of the Quintus books was about June 2001, I
12 believe you said; is that correct?
13 A.    Yes.
14 Q.    Are you aware of whether any checks that you had
15 issued were uncashed or returned or had not cleared the
16 bank, essentially?
17 A.    So, we provided a list of outstanding checks
18 upon the closing, and that was forwarded to Avaya.
19 Q.    Okay.
20       (PLAINTIFFS' EXHIBIT NO. 5
21       WAS MARKED FOR IDENTIFICATION.)
22       MS. LAWSON:    Q.  You've been handed
23 Exhibit 5, which is an e-mail from you dated
24 September 14th, 2001.  Are you familiar with this
25 document?

PAGE 42

42

1 A.    Yes.
2 Q.    If you can turn to the first page, which is of
3 the -- what appears to be the attachments, at the
4 bottom, it says MT01637.
5 A.    Okay.
6 Q.    You just testified that you sent a list to Avaya
7 of outstanding checks.  Does this appear to be a list of
8 outstanding checks?
9 A.    Yes.
10 Q.    Okay.  Can you turn to the very next page,
11 MT01638.  Does that also appear to be a list of
12 outstanding checks?
13 A.    Yes.
14 Q.    And can you turn to the next page, MT01639.
15 Does that appear to be a list of outstanding checks?
16 A.    Yes.
17 Q.    Do you know what the difference is between the
18 three lists?
19 A.    I -- I don't recall.
20 Q.    Okay.
21       (PLAINTIFFS' EXHIBIT NO. 6
22       WAS MARKED FOR IDENTIFICATION.)
23       MS. LAWSON:    Q.  Okay.  You've been
24 handed another exhibit, Exhibit No. 6, and it's Claim
25 No. 227 of Lighthouse Consulting, LLC.

PAGE 43

43

1        Are you familiar with this document?
2 A.    No.
3 Q.    Okay.  Can you pull out Exhibit 3 for me, which
4 is the age payable ledger?
5 A.    (Witness complies.)
6 Q.    And can you see if you can find Lighthouse
7 Consulting in the age payable ledger.
8        (Pause.)
9 A.    Yes.
10 Q.    And of the document number that you earlier said
11 was the invoice number, what is the invoice number of
12 the entry that's there?
13 A.    47, for the amount of 5,980.
14 Q.    Can you look at -- keep that page open,
15 actually, if you don't mind, and can you look at
16 Exhibit No. 6?
17 A.    Okay.
18 Q.    The second-to-last page that's attached as an
19 invoice --
20 A.    Okay.
21 Q.    -- can you read that -- what invoice number is
22 that?
23 A.    47.
24 Q.    And what's the amount of that invoice?
25 A.    The amount is 9,107.31.

PAGE 44

44

1 Q.    And you had testified earlier that hard copies
2 of invoices that were entered into the accounts payable
3 ledger would have been kept by Quintus, correct?
4 A.    Correct.
5 Q.    Could you recall off the top of your head why
6 there would be a discrepancy between the copy of the
7 invoice that we have here, and the invoice in the
8 ledger?
9 A.    I don't recall.
10 Q.    And the only way we could know -- the only way
11 you could check this amount in here would be to have a
12 hard copy of the invoice that was archived; is that
13 correct?
14 A.    Correct.  So when any adjustment that's made on
15 the voucher, it would be on the actual hard copy as to
16 why that adjustment was made.  So if you went back and
17 you looked up this invoice that was archived, you would
18 see if, you know, in fact, it was the same amount, and
19 we   may -- we would make notes as to why the voucher
20 amount would be different.
21 Q.    Would the adjustment be based on phone calls or
22 conversation with the vendor?
23 A.    Correct.
24 Q.    And what would be the reason for some of those
25 adjustments?

Patricia Callahan & Associates, Inc.          (510) 885-2371 / (415) 788-3993

Rosie Nguyen - 1/27/06

45

1 A.    Um, sometimes incorrect billings.
2 Q.    Okay.
3 A.    Um, for example, there's oftentimes where we
4 paid on a prior PO, and um, that wasn't decremented
5 correctly, so there would be an agreement from the
6 accounting – their accounting side, that, okay, on this
7 one, we would pay this much, because we've already paid
8 on a prior invoice.
9 Q.    And all of that would be noted on the hard copy
10 of the vouch – of the invoice?
11 A.    Yes.
12 Q.    Okay. And in the – in the general ledger, is
13 there a way to search the system by vendor name?
14 A.    No.
15 Q.    Okay. How would you search a specific vendor to
16 know what the history is on that vendor?
17 A.    You would search in the accounts payable ledger,
18 not the general ledger.
19 Q.    Um-hum.
20 A.    The general ledger is an aggregate of the
21 accounts payable, the fixed assets; all the various
22 ledgers roll into the general ledger, and the – so the
23 general ledger basically is your consolidated ledger of
24 all the various ledgers. But if you want to look at
25 details, you have to go to the various subledgers.

46

1 Q.    So if I wanted to do a search on the Board of
2 Equalization of the State of California –
3 A.    You have to go to the accounts payable ledger.
4 Q.    Okay.
5 A.    Okay. So there's the general ledger, and then
6 there's subledgers, right, and AP is the subledger.
7 Q.    Okay. And for payroll taxes, there would be a
8 payroll ledger you have to search?
9 A.    Correct. There would be a payroll system, yeah,
10 that you would –
11 Q.    And you could search within that system by name?
12 A.    Correct.
13 Q.    What about by invoice number?
14 A.    You can do that.
15 Q.    Okay. Does the system keep track of checks that
16 were written through the system –
17 A.    Yes.
18 Q.    – as to whether they cleared or not?
19 A.    Yes.
20 Q.    Could you search it by check number?
21 A.    Yes.
22 Q.    Okay.
23        (PLAINTIFFS' EXHIBIT NO. 7
24        WAS MARKED FOR IDENTIFICATION.)
25        MS. LAWSON:    Q. You've been handed

47

1 what's been marked as Exhibit 7, which was actually a
2 document – it's Bates stamped number 000374 through
3 000427. I'm going to refer to this document as what I
4 call disbursement register.
5 A.    Yes. It's a check register.
6 Q.    But do you recognize this document?
7 A.    Yes.
8 Q.    And what would you call this document?
9 A.    The check register.
10 Q.    Okay. And is this something that is printed out
11 of the general ledgers – the accounting system?
12 A.    This is printed out of the accounts payable
13 subledger.
14 Q.    Okay. And this would represent every payment
15 made out of that ledger for whatever time period this
16 applies to, this printing; is that correct?
17        MR. ARDEN:    Objection to the form.
18        THE WITNESS:    I don't see what the actual
19 date parameters are for this, so I can't tell you what
20 this report actually represents.
21        MS. LAWSON:    Q.  Okay. In the ledger, if
22 you wanted to print out all checks written between
23 January 1 and January 31, put in that date parameter and
24 say, "Print out all checks," you know, disbursements
25 made between those dates –

48

1 A.    (Nods head.)
2 Q.    – that's possible?
3 A.    Yes.
4 Q.    Can you also ask it to print out – to take that
5 date range, "I want to print out disbursements from
6 January 1 to January 31, but I want it to be
7 alphabetical per vendor"?
8 A.    Yes.
9 Q.    You can do that, as well?
10 A.    Um-hum.
11 Q.    And what would come out would look similar to
12 this?
13 A.    Correct.
14 Q.    And if you gave it that command, every single
15 disbursement would come out on this list?
16 A.    Correct.
17 Q.    Now, could you run a report based on all
18 payments, regardless of what ledger they were in, or
19 would you have to go into each individual, like the
20 accounts payable ledger, the tax, the payroll, to get a
21 list?
22 A.    So you can run all payments by entity out of the
23 accounts payable ledger. For example, as I previously
24 stated, the Mustang, Acuity and Quintus were on separate
25 books, which means they have their own accounts payable

Patricia Callahan & Associates, Inc.                    (510) 885-2371 / (415) 788-3993

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: | : | Chapter 11 |
|  | : |  |
| QUINTUS CORPORATION, *et al.*,[1] | : | Case No. 01-00501 (MFW) |
|  | : | Jointly Administered |
| Debtors. | : |  |
|  | : |  |
| AVAYA, INC. | : |  |
|  | : | C.A. No. 06-769 (SLR) |
| Appellant, | : |  |
|  | : |  |
| v. | : | Adv. Proc. No. 04-53074 (MFW) |
|  | : |  |
| KURT F. GWYNNE, CHAPTER 11 | : |  |
| TRUSTEE, | : |  |
|  | : |  |
| Appellee. | : |  |
|  | : |  |

## CERTIFICATE OF SERVICE

I, Kimberly E. C. Lawson, Esq., hereby certify that on this 9th day of May, 2007 I caused true and correct copies of the following:

1.    Answering Brief Of The Chapter 11 Trustee In Opposition To Avaya's Appeal From An Order Of The Bankruptcy Court; and

2.    Appendix To Answering Brief Of The Chapter 11 Trustee In Opposition To Avaya's Appeal From An Order Of The Bankruptcy Court

to be served upon the addressees on the attached service list in the manners indicated.

By: /s/ Kimberly E. C. Lawson
Kimberly E. C. Lawson (No. 3966)

---

[1]    The Debtors are the following entities:  Quintus Corporation, Mustang.com, Inc., and Acuity Corp.

- 1 -